1   Shawn A. McMillan, Esq. – SBN: 208529
    attyshawn@netscape.net
2   Stephen D. Daner, Esq. – SBN: 259689
    steve.mcmillanlaw@gmail.com
3   THE LAW OFFICES OF SHAWN A. MCMILLAN, APC
    4955 Via Lapiz
4   San Diego, California 92122
    Telephone: (858) 646-0069
5   Facsimile: (858) 746-5283

6   Attorneys for Plaintiffs Ruth Pope,
    Kristoffor Pope

7

8

9                   **UNITED STATES DISTRICT COURT**
                    **SOUTHERN DISTRICT OF CALIFORNIA**
10

11  RUTH POPE, an individual; RUTH        Case No.:  '21 CV 1102 JLS  BGS
    POPE, an individual; Kristoffor Pope,
12  an individual                         **COMPLAINT FOR DAMAGES**

13                Plaintiffs,             Claim 1:   42 U.S.C. §1983
                                                     (Unwarranted Seizure)
14         vs.
                                          Claim 2:   42 U.S.C. §1983
15  COUNTY OF SAN DIEGO, a public                    (Unwarranted Medical
    entity; Kaliha Johnson, an individual;           Exams/Procedures)
16  Robyn Charlton, an individual; Mary
    Robilotta, an individual; Diana        Claim 3:   42 U.S.C. §1983
17  Shreckengost, an individual; DOE                  (Judicial Deception,
    HHSA Workers 1- 10, known but                     Unnecessary/Excessive
18  unidentified individuals; and DOES 1              Duration of Continued
    through 20, inclusive.                            Detention)
19
                 Defendants.              Claim 4:   *Monell*-Related Claims
20
                                              – Count One:
21                                                (Unwarranted Seizure)

22                                            – Count Two
                                                  (Unwarranted Medical
23                                                Exam/Procedures)

24                                            – Count Three
                                                  (Judicial Deception)
25
                                          **JURY TRIAL DEMANDED**
26

27

28

────────────────────────────────────

**Jurisdiction and Venue**

1. This action is brought pursuant to 42 U.S.C. §1983 to seek redress for Defendants' actions taken under color of law which are alleged to have violated Plaintiffs' rights under the United States Constitution. Defendants' conduct deprived Plaintiffs of their fundamental constitutional rights secured under the United States Constitution's First, Fourth, and Fourteenth Amendments, and under federal law.

2. Jurisdiction is conferred by 28 U.S.C. §§1343(a)(3) and 1343(a)(4), which provides for original jurisdiction in this Court of all suits brought pursuant to 42 U.S.C. §1983. Jurisdiction is also conferred by 28 U.S.C. §1331 because the claims for relief derive from the United States Constitution and the laws of the United States.

3. The acts and omissions complained of herein occurred in the County of San Diego, and it is believed that all living Defendants currently reside in the County of San Diego. Venue is proper in the District Court for the Southern District of California.

4. Plaintiff makes the following allegations and claims upon personal belief, investigation of their counsel, and on information and belief.

**The Parties**

5. At all times relevant to this Complaint, Plaintiff Ruth Pope, was a resident of San Diego County, California. Ruth is J.P.1 (DOB: 06/01/2014), N.P. (DOB: 06/24/2017), and J.P.2's(DOB: 06/03/2019) mother.

6. At all times relevant to this Complaint, Plaintiff Kristoffor Pope, was a resident of San Diego County, California. Kristoffor is J.P.1 (DOB: 06/01/2014), N.P. (DOB: 06/24/2017), and J.P.2's(DOB: 06/03/2019) father.

7. Defendant County of San Diego ("County") is a public entity of which the San Diego County Health and Human Services Agency ("HHSA") is a subdivision. The County operates Polinski Children's Center ("Polinski").

COMPLAINT FOR DAMAGES

8.     At all times relevant to this Complaint, HHSA Worker Kaliha Johnson ("Johnson") was an individual residing in the County of San Diego, and an officer, agent, and/or employee of the County of San Diego and HHSA. At all relevant times alleged herein, she was acting under color of law in doing the things alleged herein.

9.     At all times relevant to this Complaint, HHSA Worker Robyn Charlton ("Charlton") was an individual residing in the County of San Diego, and an officer, agent, and/or employee of the County of San Diego and HHSA. At all relevant times alleged herein, she was acting under color of law in doing the things alleged herein.

10.    At all times relevant to this Complaint, HHSA Worker Mary Robilotta ("Robilotta") was an individual residing in the County of San Diego, and an officer, agent, and/or employee of the County of San Diego and HHSA. At all relevant times alleged herein, she was acting under color of law in doing the things alleged herein.

11.    *Left Intentionally Blank*

12.    At all times relevant to this Complaint, HHSA Worker Diana Shreckengost ("Shreckengost") was an individual residing in the County of San Diego, and an officer, agent, and/or employee of the County of San Diego and HHSA. At all relevant times alleged herein, she was acting under color of law in doing the things alleged herein.

13.    *Left Intentionally Blank*

14.    *Left Intentionally Blank*

15.    *Left Intentionally Blank*

16.    At all times relevant to this Complaint, DOE HHSA Workers 1- 10 were individuals residing in the County of San Diego, and officers, agents, and/or employees of the County of San Diego and HHSA. Plaintiff is ignorant of the true names and capacities of those DOE HHSA Worker Defendants sued herein as

DOE HHSA Workers 1- 10, and for that reason has sued such Defendants under such fictitious names. Plaintiffs will seek leave of Court to amend this Complaint to identify the DOE HHSA Worker Defendants when their identities have been ascertained. Each of the fictitiously named DOE HHSA Worker Defendants was in some manner liable and legally responsible for the harms sustained by Plaintiff in that their conduct caused the damages and injuries set forth herein.

17.   Hereinafter, when referred to collectively, the Defendants in paragraphs 7 through 16, inclusive, may occasionally be referred to as the HHSA DEFENDANTS.

18.   Plaintiffs are ignorant of the true names and capacities of those Defendants sued herein as Defendant DOES 1 through 20, and for that reason have sued such Defendants under such fictitious names. Plaintiffs will seek leave of Court to amend this Complaint to identify the DOE Defendants when their identities have been ascertained. Each of the fictitiously named DOE Defendants was in some manner liable and legally responsible for the harms sustained by Plaintiffs in that their conduct caused the damages and injuries set forth herein.

19.   Whenever this Complaint makes reference to any act of "Defendants," such allegations shall be deemed to mean all named Defendants, or their officers, agents, managers, representatives, employees, heirs, assignees, customers, tenants, who did or authorized such acts while actively engaged in the operation, management, direction or control of the affairs of Defendants (or any of them) and while acting within the course and scope of their duties, except as specifically alleged to the contrary.

20.   At all times relevant to this Complaint, Defendants, and each of them including all DOE Defendants, were the knowing agents and/or alter egos of one another. Defendants directed, ratified, and/or approved each other's conduct and that of each other's agents or employees. Defendants, and each of them including all DOE Defendants, agreed upon, approved or ratified each other's conduct, or otherwise conspired together to commit all of the acts and/or omissions alleged herein.

21. The HHSA Defendants, and each of them, were at all relevant times acting within the course and scope of their duties as employees of the County of San Diego.

22. The HHSA Defendants, and each of them, were at all relevant times acting in conformance with the regularly established customs and practices of the County of San Diego.

23. The HHSA Defendants, and each of them, were at all relevant times acting under color of law

## COMMON ALLEGATIONS

### – *Ruth and Kristoffor Get Married and Start Their Family*

24. Kristoffor Pope joined the United States Navy on March 8, 2011. He was stationed in Bangor, Washington with the Marine Corp Security Force Battalion. He and Ruth North met through mutual friends on Instagram in October 2012. By the beginning of November they were chatting regularly *via* text. By the end of the month they were communicating *via* Facetime for hours at a time. Their relationship flourished. They arranged to meet in Silverdale (Naval Base Bangor), Washington on December 26, 2012. Ruth stayed there with Kristoffor for two weeks. Their romance blossomed and by February 2013, unbeknownst to Ruth, Kristoffor was in contact with her closest friends and family seeking their blessings to pursue his proposal of marriage.

25. On Thursday, March 7, 2013, Ruth returned to Washington for a visit. Kristoffor picked her up at the airport and the two went for a walk on Alki Beach. Kristoffor proposed and Ruth accepted. Two days later they were married in Port Orchard Washington.

26. On June 1, 2014, J.P.1 was born at the Naval Hospital in Bremerton, Washington. In August 2015, the Pope family executed orders to Port Hueneme, California. Kristoffor and Ruth wanted a daughter dearly. In February 2016, Ruth learned that she was pregnant with a baby girl. But the baby suffered from holoprosencephaly and was stillborn on May 7, 2016. Although the loss was crushing, Ruth and

1    Kristoffor kept trying, and by November 2016, Ruth was pregnant with N.P.

2    27.    N.P. was born in Port Hueneme on June 24, 2017. About a year and a half later, in

3           September 2018, Ruth discovered she was pregnant with J.P.2. a short time later,

4           Kristoffor was sent to Lackland AFB, in San Antonio, for intense training until the

5           end of October. Upon his return the family executed orders to San Diego,

6           California. Kristoffor was assigned to the USS Boxer.

7           *– Ruth Tends to The Children While Kristoffor is on Deployment*

8    28.    On May 1, 2018, Kristoffor  deployed to the middle east for combat operations.

9           On June 3, 2018, with Kristoffor on deployment, J.P.2 was born at Best Start Birth

10          Center with the assistance of Ruth's doula, Venice Cotton. In advance of his birth,

11          Ruth prepared for the postpartum period. She made arrangements for her mother in

12          law, Corina Pope, to stay in San Diego and help out after the baby was born. She

13          also made arrangements with Ms. Cotton to stay in the home to care for J.P.2 for

14          eight days following his birth. Ruth had a close network of friends and extended

15          family in the Southern California area who she could rely on for help with the

16          children and emotional support while Kristoffor was on deployment.

17   29.    The weekend before J.P.2 was born, Ruth's sister in law, Courbine Pope, came

18          down from Ventura to help Ruth prepare the home for the new baby. That

19          Saturday, the two spent the day putting away Kristoffor's work-out equipment to

20          make a safe space for J.P.1 to play during the day. They essentially transformed

21          their two car garage into a safe play area for J.P.1. They made enough space so

22          that J.P.1 would have an area to ride his little bike and play with his various toys.[1]

23          *– Corina Pope Looks After J.P.1 and N.P. For The First Few Days After J.P.2's*

24          *Birth; Ms. Cotton Assists With The Baby at Night*

25   30.    J.P.2 was delivered, in the early morning hours of June 3, 2018. Ruth returned

26

27          _____

28          [1]The Pope's only owned one car at the time, so this arrangement worked out really
            well in terms of creating a fairly large and safe area where J.P.1 and N.P. could play in-
            doors.

COMPLAINT FOR DAMAGES

home that same morning. Ruth's sister in law, Courbine Pope, took care of the older boys that day while Ruth rested and took care of the baby. Ms. Cotton, came to stay in the home later in the evening. For the next five days, Ms. Cotton would arrive by 10:30 p.m. and stayed to assist throughout the night. She  normally departed around 6:00 a.m. Between June 3rd and June 12th, Courbine came down periodically to visit Ruth and assist with the older boys.

31.    Corina Pope and her grand-daughter, Treasure, arrived on June 4, 2018. During the day Corina would take J.P.1 and N.P. to stay at their cousin's house in Mira Mesa, while Treasure would stay with Ruth and help with the baby. The boys normally returned home in the evening. Treasure and Corina would feed and bathe the older boys and help get them ready for bed. Once J.P.1 and N.P. were settled in for the night, Ms. Cotton would help Ruth with the baby.

32.    On June 7, 2018, Corina and Treasure returned to their respective homes in Mississippi and Modesto, CA. Ruth's close friend, Suemy Miller, took the boys to stay over at her house for the rest of the weekend after Corina and Treasure left. She returned the boys the following Monday. Going forward, Ruth arranged for Ms. Cotton, the doula, to come earlier in the afternoon to assist in caring for J.P.1 and N.P. Ms. Cotton would then supervise the boys and assist with their end-of-day routine, i.e., she made sure the boys were fed, bathed, and put to bed for the evening. Before leaving, Ms. Cotton would typically check in with Ruth to see if anything further was needed. This was the daily life pattern at the Pope home until Tuesday, June 11, 2018.

33.    In anticipation of no longer having Ms. Cotton's help, Ruth made arrangements with a family friend to pick up J.P.1 and N.P. in the late morning on June 12th and take them to her house for a play day. That would allow Ruth extra time during the day to arrange meals for the evening and the next morning and to get chores done around the house.

/ / /

*– J.P.1 Teases His Little Brother Relentlessly; Ruth Separates the Boys*

34.  The morning of June 12, 2018, Ruth awoke to the shrill sound of N.P.'s screams. She headed toward N.P.'s room, which he shared with J.P.1, and found N.P. running down the hall. From the sound of his screams and cries, she thought he was injured. But, being only one year old, he was unable to communicate what was going on. Ruth checked his body for injuries and found nothing notable. She calmed him down, took him to the restroom to potty, and put him back to bed. Ruth returned to her room. About ten minutes later, she heard loud thumping noises coming from the boys' room. She went to their room and found J.P.1 wrapped in his blanket jumping up and down on the bed. She told him to stop and chastised him about waking and teasing his little brother. He paused for a moment, then continued jumping. Ruth disciplined him appropriately. [2]

35.  Although Ruth had planned to let J.P.1 and N.P. spend the day at her friend's house, after J.P.1's behavior she decided that the two should be separated and that J.P.1 would stay at home that day instead of going out to play.

36.  Ruth sent a text to her friend explaining what had happened that morning and how J.P.1 was continuing to tease his little brother by waking him up early every morning and was being generally disobedient. Ruth told her friend that J.P.1 would not be allowed to come to her house that day, but instead would stay home and play in the play area in the garage separate and apart from his little brother, N.P.

37.  Since the boys were up, Ruth went ahead and got them dressed, cleaned up, fed and ready for the day. June 12, 2019, was a nice, typical, June day in San Diego. It was between 63 and 70 degrees throughout the day – with a high of 70 degrees at around 3:00 p.m. There were scattered clouds and a light breeze of about 8-10

---

[2] A parent has a right to reasonably discipline his or her child and may administer reasonable corporal punishment. *Gonzalez v. Santa Clara Cty. Dep't of Soc. Servs.*, 223 Cal. App. 4th 72 (2014). See also, *In re D.M.*, 242 Cal. App. 4th 634, 640-41 (2015).

miles per hour all day. (A true and correct copy of the historical weather on June 12, 2019, is attached hereto as **Exhibit A** and incorporated herein by this reference as if set forth in full.)

38.    After breakfast, Ruth told J.P.1 that he was not allowed to play with N.P. and that he would not be allowed to go when Ruth's friend came to pick up N.P. J.P.1 was unhappy about it, but took it in stride. He went to his play area in the garage and played with his toys and his little bike for most of the morning. Every now and then he would come inside to use the restroom and get different toys. Ruth checked on him every fifteen to twenty minutes. She would periodically bring him snacks and water and talk to him about the events of the day and how he might improve his behaviors.

39.    At some point in the late morning or early afternoon Ruth heard the car door slam. She went downstairs to check on J.P.1 and found him playing with the car. She told him to stop and stayed with him for a few minutes to chit chat and watch him play. After a short time, Ruth went back upstairs to tend to the baby and other chores. Ruth was unaware at the time that J.P.1 had slammed his finger-tip in the car door.

*– La Mesa Police and HHSA Agents Come to The Pope Home to Investigate a Call*

40.    At around 3:00 p.m. J.P.1 heard a knock on the garage door. Frightened, he stopped playing with his toys and ran upstairs to tell Ruth. A short time later, Ruth heard a knock at the front door. When she answered, she found two La Mesa Police officers. They told her they had been informed that she "locked J.P.1" in the garage all day and requested entry into the home to check on J.P.1. The officers were accompanied by Defendants Johnson and Robilotta.

41.    Ruth allowed the police officers and Defendants Johnson and Robilotta to enter and inspect her home. They found the home to be tidy, in proper order, and safe for children. There was plenty of food in the refrigerator and the children appeared

to be clean, well fed, and generally well cared for. The play area in the garage was noted to be tidy and well organized with plenty of room for J.P.1 to move and play. His bike was there and various toys were scattered around – he'd obviously been playing there when they arrived.

42. Defendant Robilotta interviewed J.P.1. Defendant Johnson interviewed Ruth separately accompanied by Officer Rost.

43. When questioned Ruth explained what had happened earlier in the morning (see paragraphs 34 - 39, *supra*) and that as a result, J.P.1 was not allowed to play together with his little brother that day. When asked about whether or not she "locked" J.P.1 in the garage, she explained that he was not locked in the garage and that he was free to come and go as needed.[3] But, he was not allowed to play with N.P. She also explained that she had set a timer to remind her to check on him every twenty minutes and had done so throughout the day.

44. When questioned about whether or not she used corporal punishment as a means of disciplining J.P.1, she stated that she had paddled him in the past but not on that day or even recently. [4] She further explained that neither her nor her husband, who was currently on deployment, had used corporal punishment to discipline J.P.1 for quite some time, opting instead to use other methods like timeouts and loss of privileges.

45. Defendant Robilotta, accompanied by Officer Jensen, took J.P.1 outside to interview him in private. Officer Jensen was present for the entirety of J.P.1's interview. During his interview he was questioned about an apparent injury on his mouth and left arm. In response, J.P.1 told Robilotta that he had fallen at the

---

[3]This was verified by the fact that when J.P.1 heard the police knock on the garage door, J.P.1 run up stairs to get Ruth – as noted in the police report.

[4]As noted *supra*, a parent has a right to reasonably discipline his or her child and may administer reasonable corporal punishment. *Gonzalez v. Santa Clara Cty. Dep't of Soc. Servs.*, 223 Cal. App. 4th 72 (2014). See also, *In re D.M.*, 242 Cal. App. 4th 634, 640-41 (2015).

playground days prior. J.P.1 had no other obvious or apparent injuries.

*– Defendants Robilotta and Johnson Coerce Ruth Into Signing Their "Safety*
*Plan" and Sending J.P.1 to Stay Overnight With a Close Family Friend*

46.    In spite of the appearance of the home and the fact that the children appeared to be in good health and well cared for, Defendants Johnson and Robilotta openly discussed removing all of Ruth's children right then and there. They told Ruth that J.P.1 would have to leave for the night and presented her with a document they called a "safety plan." The obvious implication, at least to Ruth, was that if she did not agree, then her children would be seized and detained that afternoon. Ruth questioned them about their "safety plan" and what it meant. Instead of responding to her questions, Johnson in an arrogant and haughty manner ordered her to "just sign the plan."

47.    Ruth, having just overheard Johnson and Robilotta talking about taking all of her children if she did not cooperate, felt she had no choice but to sign their plan or face losing all of her children right then and there. [5]

48.    Facing what Ruth perceived to be Defendant Johnson and Robilotta's credible threat to seize her children that afternoon if she did not agree to their "plan," Ruth felt she had no real or rational choice other than to cooperate with Defendants' coercive demands. Hence, under extreme duress, she permitted J.P.1 to be placed overnight with her close friend, Almira Perry.

49.    Recognizing that N.P. and J.P.2 would not be in any danger whatsoever if left in Ruth's care, Johnson and Robilotta departed. Distraught, Ruth immediately called Ms. Cotton, and told her what had just happened.

---

[5]It bears note that at this point in time, there had been no determination by the police officers present that a crime against any of the children in the home had been or would be committed. Had either of the officers been of the opinion that Ruth posed an imminent threat of serious harm to any of her children, they would have taken immediate action. As far as the police were concerned, they were just there to perform a "welfare check." Finding the children appeared to be well supervised, well cared for, and not in any imminent danger, the police departed.

*– J.P.1 is Subjected to an Unwarranted, Non-Consensual, Highly Invasive*
*Forensic/Investigatory Medical Examination*

50. Later that same evening at around 7:00 p.m., Defendant Johnson called Ruth on the Telephone. Johnson explained that she had spoken with her supervisor, Robyn Charlton, and that the two decided J.P.1 would be subjected to what Johnson claimed was a "routine" medical examination at Balboa Naval Medical Center in the morning. [6] Johnson then ordered Ruth to bring N.P. and J.P.2 to the same facility in the morning for what Johnson termed "routine" medical examinations.[7] Johnson ordered Ruth to be there with the boys by no later than 12:00, noon. Ruth questioned Johnson saying "I don't like this. I know what you people do. You like to take little black boys from their families and I have three of them. I don't agree with this." Johnson responded saying, "you don't have a choice – be there on time," and hung up the phone.

51. Ruth again called Ms. Cotton, her doula, and told her what had happened. Ms. Cotton, came to Ruth's home to console and advise her. Ms. Cotton stayed with Ruth until approximately 9:30 p.m. She told Ruth she knew someone who might be able to give her some advice and would try to get the two in contact the next morning. Ruth was so distraught that she didn't sleep at all that night.

52. Early the next morning, June 13, 2019, Ms. Cotton texted Ruth the telephone number for Cjambreka Frett, a licensed foster care provider for the County of San Diego. Ruth called Ms. Frett and gave her a quick summary of what had happened the day before. She also told Ms. Frett that she had been ordered to bring her two

---

[6]As it turns out, Defendant Johnson had made arrangements for all of the boys to undergo a forensic/investigatory medical examination without first obtaining either a warrant or Ruth's consent.

[7]At no point in time did Johnson ever explain to Ruth that it was her undisclosed intention to subject all of the boys to highly intrusive forensic medical examinations designed to uncover evidence of child abuse. Instead, when questioned about the nature of the proposed examinations, Johnson responded by falsely stating they were merely "routine."

younger children in for a "routine" medical examination. Ms. Frett recommended that Ruth put together her own written safety plan, along with a list of names and phone numbers of Ruth's close friends and family who were in her support system so that it could be provided to Defendants Johnson and Robilotta when Ruth met them at the hospital. Ms. Frett also instructed Ruth to bring with her any records of therapy or other deployment support services which Ruth had already initiated and/or arranged for prior to June 12, 2019.

53. Once Ruth had done as Ms. Frett suggest, she gathered N.P. and J.P.2 and brought them to the hospital to meet Defendants Robilotta and Johnson as she had been ordered to do the night before. Having been instructed by Johnson to do so the previous evening, Ms. Perry brought J.P.1. separately. Ms. Perry arrived about the same time as Ruth and the younger boys.

54. When Ruth, Ms. Perry, and the boys walked into the facility, Johnson and Robilotta were there waiting. Ruth handed Johnson Ruth's safety plan and list of contact information for her support group along with her records of therapy and other deployment support services that had been arranged well before Kristoffor's deployment. Johnson and Robilotta snickered and took J.P.1 to sit in a different area of the waiting room. Ruth was directed to sit apart from J.P.1 with N.P. and J.P.2.

55. After waiting just a short period of time, Defendant Johnson came into the waiting room and instructed J.P.1 to come with her saying, "we're ready for him." Upon hearing this, Ruth got up to walk with them to the exam room. Johnson barked at Ruth, "Don't get up, you are not allowed." Believing she had no say in the matter, Ruth complied with Johnson's unlawful order.

56. Unbeknownst to Ruth, J.P.1 was subjected to a forensic/investigatory medical examination at approximately 1:00 p.m. at the specific request and instruction of Defendants Robilotta and Johnson. Only much later did Ruth learn that during J.P.1's non-consensual unwarranted forensic medical exam he was stripped naked,

laid on a table, and subjected to a close and detailed examination including a close examination and manipulation of his external genitalia. It bears note at this point that there had been no allegations of any kind to suggest J.P.1 had been sexually abused while in Ruth's care.

57.   Even though Johnson excluded Ruth from J.P.1's forensic medical exam, both Johnson and Robilotta attended the entirety of the child's  highly intrusive, invasive, and traumatic examination – they even took pictures.

58.   At no point in time did Johnson or Robilotta disclose to Ruth the nature or extent of J.P.1's intended forensic/investigatory medical examination or obtain her consent to it. Nor did either Johnson or Robilotta obtain a court order or warrant allowing for such an intrusive examination prior to conducting it. Moreover, at no point in time did either Johnson or Robilotta obtain a court order or warrant which would have permitted them to exclude Ruth from J.P.1's highly intrusive and traumatic investigatory examination of his naked body and sex organs. Absent such an order, Ruth had a constitutional right to attend and be present at all of J.P.1's medical events, including this one.

59.   The only explanation ever provided to Ruth regarding the nature of J.P.1's examination was provided by Johnson the night before when she said it was required, and that it was a matter of "routine." At no point in time did Ruth consent to allow her son to be examined in such an intrusive manner, nor did she consent to be excluded from the examination room.

   *– Defendant Johnson Interferes With Ruth's Access to J.P.1's Medical Records and Treatment*

60.   During his forensic/investigatory medical examination J.P.1 disclosed that the day prior, June 12, 2019, he had accidentally slammed his finger in the car door when playing in the garage. As a result of the disclosure, at approximately 2:00 p.m., J.P.1 was taken for an X-Ray exam. Ruth trailed behind in an effort to comfort her son. When they arrived at radiology, the X-Ray technician asked Ruth if she

would like a copy of the X-Ray once it was completed. Before Ruth could respond, Defendant Johnson rushed to intervene. Without any legal or rational basis to do so (particularly without first having obtained a warrant or other similar court order to withhold the child's medical records), Johnson instructed the X-Ray technician that Ruth was not permitted to see the X-Rays or know the results. Johnson then proceeded to loudly proclaim to all staff present that Ruth was not to be given any of J.P.1's medical records or information.

*– Without Ruth's Knowledge or Consent, and Without First Obtaining a Warrant, Defendant Johnson Orders a Full Body X-Ray of N.P. and J.P2*

61. When it came to the baby's (J.P.2) turn, the doctor completed a visual examination in Ruth's presence. Unbeknownst to Ruth at the time, Johnson and Robilotta had met in private with the doctor and, after consulting with Defendant Charlton to obtain her consent and agreement, decided to subject J.P.2 to a full-body skeletal X-Ray and more detailed forensic medical examination the following day once Johnson and Robilotta had seized the children and taken Ruth out of the picture.

62. Without Ruth's knowledge or consent and without first obtaining a court order or warrant to permit it, Defendants requested that a full skeletal survey be completed on J.P.2. This was accomplished the following day in spite of the fact that J.P.2 had no apparent injuries, and in spite of the fact that there were no allegations related to him in any way. At the time these Defendants made the decision to do these things, the baby appeared to be in good health, did not appear to be suffering from any form of injury or distress, and otherwise appeared to be a happy healthy baby.

63. There was no apparent exigent circumstance that would have obviated the requirement that Defendants first obtain either a warrant or consent before subjecting J.P.2 to either a non-consensual forensic medical examination or a full body X-Ray at that point in time.

64. Meanwhile, Ruth and the children continued to wait around at the hospital for

1    Johnson and Robilotta's further instructions.

2    *– **Defendants Johnson and Robilotta Seize All of Ruth's Children Without First***

3    ***Obtaining a Lawful Court Order***

4    65.   As evening approached, Johnson directed that Ruth and the children move into a

5    private conference room. The children were permitted to come and go and play in

6    the hall. But, Ruth stayed to care for the baby, J.P.2. Because the conference room

7    had windows, Ruth was able to see and loosely supervise J.P.1 and N.P.

8    66.   Approximately four hours later, a doctor came in and told Ruth that the X-Rays

9    revealed that N.P.1's finger tip was broken. This was the first time she learned of

10   J.P.1's injury. Regardless, the fracture as such a minor injury that it did not require

11   any sort of splint or cast.

12   67.   A short time later, Defendant Johnson came back into the conference room and

13   closed the blinds. Ruth had just begun to nurse J.P.2 when Johnson told her that

14   the decision had been made to "remove" all of the children from Ruth's custody.

15   Shocked, stunned, and amazed, Ruth looked out the door for J.P.1 and N.P. She

16   begged Johnson to at least let her hug them and reassure them. Johnson told her

17   not to bother, "we've already got them."

18   68.   Ruth was in shock – devastated. Johnson then directed her to "hurry up and get

19   done feeding the baby so we can take him too." Ruth finished nursing J.P.2 as best

20   she could and changed his diaper and clothes. She struggled to control her despair

21   to keep from upsetting the baby. Johnson stood over her huffing and puffing –

22   impatient to take the baby and leave. Reluctant to just hand over J.P.2, Ruth asked,

23   "Don't you have to have a warrant to take people's kids?" Johnson responded

24   saying, "I don't need to show you a warrant. After you give us the baby, I'll tell

25   you everything you need to know." Ruth put J.P.1 in the stroller. Ruth stood and

26   watched, speechless, as Robilotta pushed the stroller down the hall. Johnson gave

27   Ruth her business card and walked away. For Ruth, the days that followed were a

28   blur.

COMPLAINT FOR DAMAGES

*– Defendant Johnson Files Her Juvenile Dependency Petition; It Contains Knowingly False Material Allegations*

69.   On June 17, 2019 at 3:59 p.m. Kaliha Johnson filed her Juvenile Dependency Petition to initiate a juvenile dependency action to strip Ruth of custody of her children. There, Defendant Johnson falsely alleged under penalty of perjury that Ruth had broken J.P.1's finger, bruised his face and arm, and confined him to the garage all day. Johnson signed the document after the written phrase "I declare under penalty of perjury under the laws of the State of California that the foregoing and all attachments are true and correct."

70.   At the time she drafted and filed her sworn petition containing the above identified false statements, Defendant Johnson had already completed her interviews of J.P.1 and Ruth. Hence, Johnson knew that, at least according to J.P.1, he had slammed his finger in the car door by accident (see paragraphs 39 and 60, *supra*). Similarly, with respect to Johnson's allegations that J.P.1 had sustained bruises on his face due to some vaguely alleged conduct by Ruth, J.P.1 had already explained outside of Ruth's presence that he had scratched his face and bruised his arm at the playground days before. (See paragraph 45, *supra*.)

*– Defendant Johnson & Charlton Together Submit False and Incomplete Information to The Juvenile Court to Support The False Juvenile Dependency Petition*

71.   On June 17, 2019, Defendants Johnson and Charlton collaborated together to draft and file their Detention Report with the Juvenile Court. Although Charlton was not available to sign the report once it was completed, on information and belief, in spite of her full knowledge of the false and materially incomplete and misleading information it contained, Charlton authorized the Detention Report to be signed on her behalf and filed with the Juvenile Dependency Court. Within the body of their Detention Report, Johnson and Charlton created a false narrative replete with false statements, fabricated facts, and incomplete/misleading

statements. For example:

a.   In their Detention Report Johnson and Charlton state that when they asked J.P.1 how his finger got broken, he responded by stating, and they put this in quotes "My Mom [sic] was punching me and I was getting away from her and she punched my finger." This was not true at all. In fact J.P.1 specifically told Johnson and Robilotta that he had accidentally slammed his finger in the car door when playing on June 12, 2019. Charlton was not even present during the conversation referenced and would have had no personal knowledge of it. (See paragraphs 39 and 60, *supra*.)

b.   In their Detention Report Johnson and Charlton stated that Ruth had "confined" J.P.1 to the "hot" garage and "locked" him in there for 10+ hours. This was blatantly false. Specifically, it was not hot at all that day (see paragraph 37, attached **Exhibit A**). Secondarily, J.P.1 was not "confined" or "locked" in the garage. In fact he was free to go in and out as he pleased but was not allowed to play with or tease N.P., or to go out of the home for a play day. (See paragraphs 38 and 40, *supra*.) Lastly, he had not been playing in the garage that day for 10+ hours.

c.   In their Detention Report Johnson and Charlton stated during their June 12, 2019 interview with Ruth's friend, Almira Perry, Ms. Perry stated that she believed Ruth was abusive toward J.P.1 and that he should be detained from her care until "the father returns from deployment." These *alleged* statements were totally fabricated by Defendants. During the referenced interview Ms. Perry specifically stated that she thought Ruth was a good parent and that she believed the children were safe in Ruth's care. She never, ever, said that 'Ruth was abusive toward J.P.1 and that he should be detained from her care until "the father returns from deployment."

d.   In their Detention Report Johnson and Charlton stated that J.P.1 only had a bottle of water all day. This was a false statement and Defendants knew it

1
2
3
4
5
6
7
8
9

when they filed their report. During their interview with Ruth on the afternoon of June 12, she specifically provided them with the details of the day, including what J.P.1 had eaten that day. She told them that he had a balanced breakfast and lunch, and snacks throughout the day. She also told them that he had water and fruit juice available for him whenever he wanted. J.P.1 confirmed this during his private interview. Ruth also disclosed to Johnson and Robilotta that she has been a Certified nutrition therapist since 2016, and is very aware of what J.P.1's nutritional needs where and how to meet them.

10
11
12
13
14
15
16

e.   In their Detention Report Johnson and Charlton stated that J.P.1 "reported to PSW Robilotta" during his interview on June 12, 2019, that he did not "play when he was in the garage" but instead that he laid down all day on a cardboard box. Johnson's report of the substance of this conversation is false. J.P.1 never said these things. In fact, what he said was that he had been playing in the garage with his bike and toys. He confirmed this during his forensic interview as well.

17
18
19
20
21
22
23
24
25
26

f.   In their Detention Report Johnson and Charlton stated that "On 6/15/2019, Dr. Villarroel findings from Noah's forensic medical exam found abrasions on his abdomen." This is a technically true statement. However, these Defendants went on to state "The mother did not provide history to explain the injuries." This portion of the report is utterly false. In fact, when Johnson questioned Ruth about the scratches, Ruth explained that the light scratches on N.P.'s belly came about as a result of N.P., who was then in the process of being potty trained, yanking his pull-up diapers too quickly and as a result scraping his abdomen with the rough part of the pull-ups and his fingernails.

27
28

g.   In their Detention Report Johnson and Charlton stated that on June 13th, during J.P.1's medical exam at Balboa Ruth disclosed potentially abusive

1   behaviors to the doctor. The alleged conversation reported by Johnson was

2   totally fabricated – IT NEVER HAPPENED! Ruth was completely and

3   totally excluded from J.P.1's medical examination and she never spoke to

4   the doctor about J.P.1 at all. Moreover, Johnson had expressly prohibited

5   the medical staff from communicating with Ruth that day. (See paragraphs

6   54-57, *supra*.)

7   h.   In their Detention Report Johnson and Charlton stated that "while trying to

8   obtain a photograph of N.P.'s abdomen, he repeatedly stated 'ouchie." This

9   statement by Johnson and Charlton is a total fabrication. Its not true at all, in

10  any respect. When the doctor examined N.P. on June 13th, Ruth was present

11  for his. In fact, he sat in her lap. He did not utter a word during the exam.

12  Moreover, at this point in time N.H. was nearly non-verbal. (See paragraph

13  34, *supra*.)

14  i.   In their Detention Report Johnson and Charlton stated that Ruth " hit[] J.P.1

15  with a phone charger cords, electrical cords, and punch[ed] him to the point

16  of causing bruising to his head and ears." All of this was false. Ruth had

17  been honest when questioned and openly admitted that she had, in the past

18  spanked J.P.1, and on one occasion paddled him with a wooden spoon. [8]

19  j.   In their Detention Report Johnson and Charlton stated that "The explanation

20  provided by the mother as to how J.P.1 sustained [the scrapes on his face,

21  arm, and leg] on the playground are not consistent with the injuries." This

22  statement by Defendants, while being a mere statement of opinion, presents

---

[8]In *Gonzalez v. Santa Clara Cty. Dep't of Soc. Servs.*, 223 Cal. App. 4th 72 (2014), A report of child abuse alleged that plaintiff mother spanked her daughter with a wooden spoon and caused bruises. There, the court found that the use of a wooden spoon to administer a spanking does not necessarily exceed the bounds of reasonable parental discipline and more generally that it is not *ipso facto* unlawful for a parent to spank a child for disciplinary purposes with an object other than the hand. See also, *In re D.M.*, 242 Cal. App. 4th 634, 640-41 (2015); A parent's spanking of his or her children on the buttocks with his or her bare hand and with a sandal does not categorically constitute "serious physical harm" sufficient to invoke dependency jurisdiction.

totally false/fabricated "facts" as a basis for their opinion. Namely, no such conversation was ever had with Ruth. Ruth was never asked about how J.P.1 sustained the mentioned injuries. Rather, when J.P.1 was interviewed by Robilotta (along with Officer Jensen, who wore a recording device) he stated that he sustained the injury playing at the playground. Ruth never said anything about the bruises because she never asked. (See paragraph 45, *supra*.)

k.    In their Detention Report Johnson and Charlton state that Ruth was "the only adult in the home" leaving the children at a high level of risk. This was also false, and they knew it. (See paragraphs 28-32, and 52-54, *supra*.)

l.    In their Detention Report Johnson and Charlton state that Ruth did not have a support system in place to help care for the children, which put the children at risk. This was also false, and Defendants knew it at the time they drafted their report. (See paragraphs 28, 52, and 54, *supra*.)

m.    In their Detention Report Johnson and Charlton stated that "The mother reported that it was the father's idea to send J.P.1 to the garage for punishment." Nothing was further from the truth. Again, as with other statements in the Detention Report these Defendants twisted Ruth's statements in order to support the false narrative that she was an abusive mother. Ruth never "that it was the father's idea to send J.P.1 to the garage for punishment." In truth, Ruth told Johnson that Kristoffor was on deployment and very difficult to get a hold of. She went on to explain that Kristoffor had agreed that it would be fine if Ruth moved his work-out equipment out of the way in the garage while he was out to sea in order to make a safe place for the boys to play once the baby came.

n.    In their Detention Report Johnson and Charlton stated that both parents consistently used physical punishment on J.P.1. This was an intentionally misleading statement. During her interview on June 12, 2019, Ruth

disclosed that in the past she had spanked J.P.1 but that had been a long time ago. (See paragraph 44, *supra*.) Even though Johnson was aware that Ruth no longer used corporal punishment on a consistent basis, Johnson refrained from reporting this exculpatory information to the Juvenile Court in her Detention Report and in fact, actively suppressed the information substituting false information instead (See paragraph 71(I), *supra*.)

o.  In their Detention Report Johnson and Charlton state that a warrant had been obtained which would have allowed J.P.1, N.P., and J.P.2 to be lawfully removed from Ruth. The obvious implication being that another judge had already reviewed these facts and found the children to be in danger. However, on information and belief, this was not an accurate statement either. [9]

The above list is intended as exemplar only and is not to be considered as an exhaustive list of the false statements reported to the Juvenile Court by Defendants Johnson and Charlton in their Detention Report. [10]

_____

[9]In an effort to test the accuracy of this particular statement, Plaintiffs' counsel filed an 827 petition specifically seeking copies of "All warrants/court orders issued by the Court." Plaintiff's 827 Petition was granted on April 12, 2021. There, the Juvenile Court ordered that "The petitioner has demonstrated by a preponderance of the evidence that the records requested are necessary and have substantial relevance to the legitimate needs of the petitioner. After an in camera review, the court determines that all of the documents requested may be disclosed. The court releases the documents and orders the redaction of identifying information of other minors; names, addresses and telephone numbers of reporting parties; social security numbers, dates of birth and driver's licenses numbers." All responsive court documents were produced to Mr. McMillan on, or about, April 19, 2021. No warrant or other similar court order authorizing the seizure and/or detention of the Pope children on June 13, 2019 exists. Similarly, no warrant authorizing the forensic/investigatory medical examinations including the full-skeletal X-Ray of either J.P.2 or N.P. exists. Lastly, there is no warrant or similar court order allowing any of the Pope children to be vaccinated without the parent's foreknowledge and consent. As appears *infra*, J.P.1 was secretly vaccinated at Defendants Shreckengost and Straub's direction.

[10]On information and belief, J.P.1's interviews (particularly those where police were present) were recorded as indicated in the police reports. It is anticipated that upon receipt of those recordings through the discovery process more false statements and suppressions by these defendants will come to light. The same holds true of J.P.1's forensic interview.

72.   In spite of Johnson and Charlton's knowledge that the statements contained in their Detention Report created a false and fraudulent narrative of Ruth as an abusive and dangerous mother Johnson signed the report on her own, and as noted *supra*, Charlton authorized another worker to sign on her behalf and submit it to the Juvenile Court.

73.   At the time they did these things, Defendants Johnson and Charlton knew, or through the exercise of reasonable diligence should have known, that many of the important facts set out in their Detention Report were materially false and/or materially incomplete and misleading. Nonetheless, they  caused their fraudulent, incomplete, and misleading, Detention Report to be filed with the Juvenile Court.

74.   When they submitted their fraudulent, incomplete, and misleading, Detention Report to the Juvenile Court, due to their extensive training and experience, Johnson and Charlton knew with certainty that their Detention Report would be the primary evidentiary document the juvenile court would rely on in making its decision at the Detention Hearing (which is akin to an arraignment in the criminal context). When they submitted their Detention Report it was Johnson and Charlton's intention that the juvenile court accept their fraudulent report into evidence, accept the statements therein as true, accurate, and complete, and render its decision based on the "facts" contained in their fraudulent Detention Report.

***– Mislead by Johnson and Charlton's False Narrative of Abuse, Judge Bubis Detains The Pope Children; However He Gives Johnson and Charlton Discretion to Take Corrective Action – Which They Refrain From Doing***

75.   On June 18, 2019, the Detention Hearing was held at approximately 10:00 a.m. before Judge Gary M. Bubis. There, the judge read and considered the "facts" contained in Johnson and Charlton's fraudulent Detention Report, accepted the report into evidence, and relied upon it in deciding that the Pope children should continue to be detained from Ruth's care. At the same hearing, however, Judge Bubis also ordered that Defendant Johnson had "discretion" to allow the children

to return home to Ruth without further order of the court – thus putting the power to correct their actions directly in Defendant Johnson and Charlton's hands. Nonetheless, Defendants Johnson and Charlton continued to detain all of the children from Ruth's care and custody instead of sending them home.

*– The Children Are Placed First At Polinski Children's Center, Then in Foster Care*

76. On, or about, June 14, 2019, J.P.1 and N.P. were place at Polinski Children's Center. Based on information and belief, Defendant Shreckengost directed that J.P.2 be placed with foster parents "Charity and Sean," who lived more than an hour from Ruth's home. This made it particularly difficult for Ruth to deliver breast milk for J.P.2.

77. The next day Ruth was able to obtain Charity and Sean's contact information and to talk with Charity about the situation. She told Charity that J.P.2 was breast feeding at the time of his seizure and requested that she be permitted to provide Charity with pumped breast milk during the time he was placed in Charity's home. Charity was kind and sympathetic. She agreed to help Ruth continue providing J.P.2 breast milk. The two also discussed Ruth's desire to have J.P.2 circumcised and that he remain on a delayed vaccination schedule. Charity, holding similar views agreed to do what she could to conform to Ruth's wishes.

78. Due to restrictions imposed by DOE HHSA Workers (presumably Defendant Shreckengost) in contravention of Ruth's rights to manage the continued medical care of J.P.2, he was not able to timely be circumcised.

79. On, or about, June 27, 2019, N.P. was released from Polinksi Children's Center to Sean and Charity's custody. He remained there with J.P.2 until the Court ordered their release back to Ruth on or about July 18, 2019. But by this time, it was too late for J.P.2 to be circumcised. His doctor instructed Ruth that she would have to revisit the issue when he turned 5 years old. It bears note that at this point in time no court order had been issued to restrict Ruth's ability to make medical decisions

for her children, or otherwise restricting her ability to participate in and/or manage their healthcare.

80. On June 27, 2019, J.P.1was released from Polinski Children's Center back to Amira Perry where he remained until July 3rd when he was transferred to the care of Ruth's close family member, Terrilynette Minor. J.P.1 was permitted to stay with the Minor family for only a short time.

*– Ruth Meets Defendant Shreckengost For the First Time on July 2, 2019 at a Child and Family Team Meeting*

81. On July 2, 2019, there was a Child/Family Team meeting held. This was the first time Ruth met Melinda Straub's supervisor, Defendant Shreckengost, face-to-face. Several members of Ruth's support system attended the meeting  including CJ Frett, the Minor family, Ruth's cousin Gerald, her attorney (Judith Klein), and several others on conference call. The facilitator noted that she had never seen a CFT with so many support members present.

82. When the subject of the CFT meeting turned to the best path to getting the children back home, Diana Shreckengost rudely interrupted. Speaking in very punitive terms she said, "you'll get them home when I say you'll get them home. There is no way the little ones are coming back to you unless J.P.1 comes back with them." Ruth's attorney protested saying, "that's not your decision," or words to that effect. Ruth calmly and politely added, "I have the support I need in place." Shreckengost ignored Judy Klien's comments and responded directly to Ruth, "your kids aren't coming home anytime soon, even if you have all the support you need. I don't care." Everyone at the meeting including Melinda Straub, seemed disturbed by Diana Sheckengosts aggressive, condescending, and rude demeanor.

83. A few days later, on July 7th, J.P.1 was removed from the Minor family, without any reason being provided, and placed back at Polinski Children's Center where he stayed until July 11, 2019, when he was placed with foster parents Ruby and Donna – total strangers to the Pope family. On information and belief, this was

ordered to be done as a punitive measure by Defendant Shreckengost to punish Ruth and her attorney for challenging her at the CFT.

*– Melinda Straub and Defendant Diana Shreckengost File Their Jurisdiction/Disposition Report on July 8, 2019; The Report Repeats and Rephrases The Prior False Material Contained in The Detention Report*

84. Upon completion of the Detention Hearing on June 18th, Melinda Straub was assigned as the case carrying worker. Defendant Diana Shreckengost was her direct supervisor.

85. Part of Ms. Straub's job duties included the duty to continue to investigate and manage the case after the Detention Hearing. Pursuant to state regulations and San Diego County policies in place at the time, it was also Ms. Straub's obligation to conduct a thorough and complete re-investigation of the allegations contained in the Detention Report  – which included the obligation to re-interview the witnesses identified in the Detention Report to ensure the accuracy of what they were reported to have said, and to obtain a more thorough and complete understanding of the underlying issues that led the family to be before the Court in the first place.

86.  Upon completion of her investigation, Ms. Straub was supposed to honestly, accurately, and completely report her findings and information to the Juvenile Court, including all exculpatory information. Along those lines, to the extent her re-investigation uncovered any inaccuracies in the Detention Report, it was her duty to so inform the Court, and correct them. Then, based on the new and/or engrossed information uncovered, make recommendations to the Court regarding how best to deal with the child and/or the family.

87. On information and belief, notwithstanding her duties and obligations as noted above, Ms. Straub was specifically instructed by Defendant Shreckengost to forego any re-investigation of the "facts" reported in the earlier Detention Report, and instead merely to cut and past those "facts" into her Jurisdiction/Disposition

1   Report – which Ms. Straub did.

2   88.   Upon completion of her report, Defendant Shreckengost signed the

3         Jurisdiction/Disposition Report on July 8, 2019, and caused it to be filed with the

4         Juvenile Dependency Court the following day.

5   89.   At the time Defendant Shreckengost filed the Jurisdiction/Disposition Report she

6         knew, or through the exercise of reasonable diligence should have known, that

7         many of the important facts set out in the Detention Report were materially false

8         and/or materially incomplete and misleading. Nonetheless, Shreckengost filed her

9         report with the Juvenile Court.

10  90.   When she submitted the Jurisdiction/Disposition Report to the Juvenile Court, due

11        to he extensive training and experience, Shreckengost knew with certainty that her

12        Jurisdiction/Disposition Report would be accepted into evidence and relied on by

13        the Court in making its decisions at the Jurisdiction/Disposition hearing. When she

14        submitted her Jurisdiction/Disposition Report it was Shreckengost's intention that

15        the Juvenile Court accept the Jurisdiction/Disposition Report into evidence, accept

16        the statements therein as true, accurate, and complete, and render its decision

17        based on the "facts" contained in it, at least in part.

18        *– Ruth Responds to Shreckengost's Threats and Takes Steps to Get Her Boys*

19        *Ordered Returned*

20  91.    As soon as she learned what had happened, Cornia Pope started making

21        arrangement to come back to support Ruth during this difficult time. On July 15th,

22        she was able to return from Mississippi to stay with Ruth and help bring the boys

23        home.

24  92.   Meanwhile, J.P.1 had done very poorly while at Polinski, and was consistently

25        begging to come home – Defendant Shreckengost was aware of this, but simply

26        did not care. In addition, Ruth felt at this point that Shreckengost's conduct had

27        become retaliatory and punitive. In particular Defendant Shreckengost had taken

28        the position that Ruth would not get her children back unless and until

1   Shreckengost allowed it.

2   93.   In advance of Corina's return, Ruth's attorney requested a special hearing to
3   request that the Court order the return of Ruth's sons. The hearing was set for July
4   11, 2019. The hearing was held. There, the Court agreed that the boys should be
5   ordered home and set a further hearing for July 18, 2019.

6   94.   On July 18, 2019, Judge Bubis ordered that J.P.2 and N.P. be released back home
7   to Ruth. At the same hearing, through her attorney, Ruth requested that J.P.1 also
8   be permitted to return home. In response to the evidence and arguments of
9   counsel, Judge Bubis ordered that the HHSA Agency had discretion to return J.P.1
10   to Ruth also. He mused that they [HHSA] probably wouldn't exercise that
11   discretion, and went on to opine that it was safe for J.P1 to return to Ruth at that
12   time, especially in light of the fact that Corina Pope had returned to stay with the
13   family.

14   95.   Judge Bubis's words fell on deaf ears. By this time significant friction had
15   developed between Ruth and Defendant Shreckengost. Their relationship had
16   soured to the point that Shreckengost openly used her control over J.P.1 and his
17   placement as a punitive tool to work out her angst on Ruth.

18   *– On July 29, 2019, Ms. Ruby, J.P.1's Foster Parent, Secretly Took J.P.1 to The*
19   *Doctor, at Defendant Shreckengost's Direction, and Had Him Vaccinated*

20   96.   At the July 18th hearing Judge Bubis took special note of Ruth's initiative in
21   proactively seeking and completing services, therapy, and a parenting skills
22   classes through the Navy Fleet and Family Center. He spoke highly of Ruth when
23   he granted her request to return N.P. and J.P.2. With respect to J.P.1, however,
24   Judge Bubis was reluctant and noted that J.P.1 had some behavioral issues that
25   might need to be addressed. But, he was willing to consider returning J.P.1 at the
26   next hearing. The judge again reiterated that the "Agency" had discretion to return
27   J.P.1 home at any time without further order of the court.

28   97.   On July 30, 2019, Ruth and J.P.1 had a visitation at Incredible Families. While

painting with him Ruth noticed his left arm seemed to be in pain. She examined his arm. There was a band aid on his upper arm near his shoulder. Ruth asked him. "What happened baby?" J.P.1 responded, "Ms. Donna took me to the doctor yesterday and they gave me shots. I told them I didn't want to. But, they did it anyway and it still hurts." J.P.1 started crying and said, "and you weren't even there." Livid, Ruth stepped out of the room briefly to call her attorney to let her know what happened.

98.  That evening Ruth spoke with Cornia about what happened. Corina had a good relationship with Ruby and called her on the telephone to ask about J.P.1's visit to the doctor. She put the call on speakerphone. Ruby explained that she did not take him to the appointment, that it was Donna, her daughter. Ruby passed the phone to Donna. Donna then explained that they had to take him – they had no choice. Donna continued, "[Shreckengost] said to make the appointment. I knew mother attended all appointments, so I asked her about the scheduling. She told me not to worry about it and not to tell the mother." Donna ended the conversation saying, "I just did what CPS told me to do."

99.  The next day, August  1, 2019, J.P.1 was moved from the placement with Ruby and Donna and placed back with Terrilynette and Steve Minor. They picked him and his things up that morning. J.P.1 was very glad to at least be back with family.
 *– Krsitoffor Returns From Deployment, But Shrekengost Refuses to Return J.P.1*

100.  On November 17, 2019, Kristoffor returned from deployment. In spite of the fact that he had not been present during any of the events that led up to the children being removed and detained, on information and belief, Defendant Shreckengost directed that he be only allowed monitored visits with J.P.1. Shreckengost demanded that Kristoffor take classes and go to therapy stating that he "would not be allowed to be alone with J.P.1 unless he did as he was told." This was Shreckengost's directive in spite of the fact that months prior, Judge Bubis had

1   stated his opinion that the boys were in no danger in the home, and had granted

2   Shreckengost discretion to release them without further court orders.

3   *– Defendant Shreckengost and Ms. Straub Are Replaced by a New HHSA*

4   *Team; Kistoffor and Ruth Are Allowed Unsupervised Visits; J.P.1 Transitions*

5   *Home; The Case is Closed*

6   101.  Kristoffor was was not allowed to have unsupervised visits with J.P.1 until

7        November 25th, after Shreckengost had been replaced as the supervisor on the case

8        by Tonya Brown.

9   102.  By early December, both Kristoffor *and* Ruth were allowed unsupervised visits,

10       and by the beginning of January 2020, efforts were well under way to transition

11       J.P.1 back home with his family. J.P.1 was approved for overnight visits in early

12       February and the first such visit occurred on February 6th.

13  103.  Also, in early February, the process had been started to send J.P.1 home. On, or

14       about, March 14th, Ruth picked J.P.1 up from school and took him home for good.

15       The case was dismissed and jurisdiction was terminated on August 11, 2020.

16  104.  Plaintiffs are informed and believe and on such basis allege that notwithstanding

17       the misconduct of the individual Defendants named herein, none of these

18       Defendants has been disciplined in any way for the conduct alleged herein.

19       Moreover, Plaintiffs are informed and believe and on such basis allege, that the

20       County of San Diego has never disciplined a single one of its HHSA workers for

21       unlawfully seizing a child without first obtaining a warrant, directing that a child

22       be medically examined without parental consent or a warrant, and/or ordering that

23       a child be secretly vaccinated without first obtaining a warrant. Moreover,

24       Plaintiffs allege on information and belief that San Diego County has never

25       disciplined a single one of its HHSA workers for being dishonest in their court

26       reporting and other filings with the Juvenile Court, and that as a matter of custom

27       and practice, such behavior is deliberately left unaddressed by HHSA

28       management.

COMPLAINT FOR DAMAGES

# FIRST CLAIM FOR RELIEF – §1983

## *Unwarranted Seizure*

(By All Plaintiffs Against Defendants Kaliha Johnson, Robyn Charlton, Mary Robilotta, DOE HHSA Workers 1- 10, and DOES 1 through 20, inclusive.)

105.  Plaintiff incorporates the above allegations of fact and law as though fully set forth herein.

106.  At all times relevant herein, the right to familial association guaranteed under the First, Fourth, and Fourteenth Amendments to the United States Constitution was clearly established, such that any reasonable social services agent faced with the circumstances presented here would know that it is unlawful to seize a child from the care, custody, and control of his or her parent(s) or to question, threaten, examine, or search a child in the absence of exigent circumstances, without first obtaining the parent's knowing, intelligent, and *voluntary* consent unless a warrant or similar court order has been obtained.

107.  Defendants Kaliha Johnson, Robyn Charlton, Mary Robilotta, DOE HHSA Workers 1- 10, and DOES 1 through 20, and each of them, were acting under color of state law when they jointly acted, and/or agreed to violate Plaintiffs' constitutional rights by, but not limited to, seizing, removing, and/or detaining J.P.1, N.P., and J.P.2 from Ruth's care, custody, and/or control.

108.  At the time Defendants Kaliha Johnson, Robyn Charlton, Mary Robilotta, DOE HHSA Workers 1- 10, and DOES 1 through 20, and each of them seized the children, none of the defendants were in possession of specific articualble facts sufficient to support a reasonable suspicion that each of the children, independently, were in immediate danger of suffering severe bodily injury or death in the time it would have taken to obtain a warrant. Similarly, these Defendant, and each of them, failed to even consider whether there were lesser intrusive alternative means available to avert whatever specific injury might have befallen the children had they been left in their mother's care for the few hours it would

1    have taken to obtain a warrant authorizing their removal from Ruth's care and
2    custody.

3    109.    Prior to J.P.1, N.P., and J.P.2's unwarranted seizure, Defendants Kaliha Johnson,
4        Robyn Charlton, Mary Robilotta, DOE HHSA Workers 1- 10, and DOES 1
5        through 20, and each of them, discussed the proposed warrantless seizure. They all
6        agreed and/or approved of the decision to forgo obtaining judicial authorization
7        prior to seizing J.P.1, N.P., and J.P.2 from Ruth's care, custody, and/or control.

8    110.    Defendants Kaliha Johnson, Robyn Charlton, Mary Robilotta, DOE HHSA
9        Workers 1- 10, and DOES 1 through 20, and each of them together, were joint
10        and/or integral participants in J.P.1, N.P., and J.P.2's seizure from Ruth's care,
11        custody, and/or control.

12    111.    Prior to seizing J.P.1, N.P., and J.P.2 Defendants Kaliha Johnson, Robyn Charlton,
13        Mary Robilotta, DOE HHSA Workers 1- 10, and DOES 1 through 20, and each of
14        them, failed to conduct a reasonable investigation which included interviewing all
15        relevant witnesses.

16    112.    Prior to seizing J.P.1, N.P., and J.P.2, Defendants Kaliha Johnson, Robyn
17        Charlton, Mary Robilotta, DOE HHSA Workers 1- 10, and DOES 1 through 20,
18        and each of them, failed to even attempt to determine whether lesser intrusive
19        alternative means existed to ameliorate any percieved need to remove J.P.1, N.P.,
20        and J.P.2's from Ruth's care. Nor did any of the defendants obtain Ruth's
21        *voluntary* consent to the children's removal.

22    113.    As a direct and proximate consequence of Kaliha Johnson, Robyn Charlton, Mary
23        Robilotta, DOE HHSA Workers 1- 10, and DOES 1 through 20's conduct,
24        Plaintiffs have suffered, and will continue to suffer, damages, including but not
25        limited to, physical and/or mental anxiety and anguish according to proof at trial.

26    114.    In doing the things alleged, Defendants Kaliha Johnson, Robyn Charlton, Mary
27        Robilotta, DOE HHSA Workers 1- 10, and DOES 1 through 20, and each of them,
28        acted intentionally and/or with a conscious disregard for Plaintiffs' rights.

1   Consequently, Plaintiffs are entitled to recover punitive damages against these
2   individual defendants.

3   ### SECOND CLAIM FOR RELIEF

4   ### *Non-Consensual Unwarranted Forensic Medical Examinations,*
5   ### *Medical Procedures, and Vaccinations*

6   (By All Plaintiffs Against Defendants Kaliha Johnson, Robyn Charlton, Mary Robilotta,
7   Diana Shreckengost, DOE HHSA Workers 1- 10, and DOES 1 through 20, inclusive.)

8   115.  Plaintiff incorporates the above allegations of fact and law as though fully set
9        forth herein.

10  116.  At all relevant times, the constitutional right to remain free of non-consensual
11        intrusive forensic medical examinations and to make decisions regarding the
12        medical care of one's children was so "clearly established" that any reasonable
13        HHSA worker in Defendants' circumstances would know that it is a violation of
14        Plaintiffs' constitutional rights to subject the child to a forensic medical
15        examination without just cause, parental consent, or a court order/warrant
16        authorizing the examination. *See*, *Swartwood v. County of San Diego*, 2014 U.S.
17        Dist. LEXIS 182020, *58-59 (S.D. Cal. Sept. 30, 2014) "[T]he Constitution
18        assures parents, in the absence of parental consent, physical examinations of their
19        child may not be undertaken for investigative purposes at the behest of state
20        officials unless a judicial officer has determined, upon notice to the parents, and an
21        opportunity to be heard, that grounds for such an examination exist and that the
22        administration of the procedure is reasonable under all the circumstances."]; *see*
23        *also*, *Mann v. Cty. of San Diego*, 907 F.3d 1154, 1163 (9th Cir. 2018).

24  117.  Defendants Johnson, Charlton, and Robilotta violated said rights first when they
25        directed that such an unwarranted forensic/investigational medical examination be
26        performed without first obtaining a warrant or knowing and voluntary parental
27        consent; then again when they excluded Ruth from J.P.1's exam on June 14, 2019
28        without any just or legal cause. Finally, Defendant Johnson further violated Ruth's

---

constitutional rights when she instructed medical staff to refrain from providing Ruth with any information relative to J.P.1's diagnosis, treatment, and/or care on June 14, 2019.

118. In addition to the foregoing, parents also have a guaranteed constitutional right arising from the liberty interest in family association to be with their children while they are receiving medical attention or undergoing medical procedures. *Wallis ex rel. Wallis v. Spencer*, 202 F.3d 1126, 1141-1142 (9th Cir. 1999). This right includes the right of parents to make important medical decisions for their children. *Id.* at 1141.

119. Defendant Shreckengost, without a lawfully obtained court order, and without first informing Ruth and obtaining her consent directed that J.P.1 be administered one or more vaccinations. In doing so, she even went so far as to direct that Ruth not be informed of the event and that it be kept a secret from her. At the time Sheckengost did this, she was fully aware that pursuant to the extant Juvenile Court order Ruth maintained full authority over medical decision making for J.P.1. This was a blatant violation of Ruth's parental rights. See, *Mann v. Cty. of San Diego*, supra, 907 F.3d at 1164, "[Defendant's] failure to provide parental notice or to obtain consent violated [Ruth and Kristoffor's] Fourteenth Amendment rights..."

120. No reasonable HHSA agent in Defendant Shreckengost's position could have believed that the above mentioned conduct was lawful or even abstractly justifiable. In fact it was not.

121. These Defendants, and each of them, had an affirmative duty and obligation to recognize, acknowledge, and respect Plaintiffs' constitutional rights and to conduct themselves in a manner that confirms, provides for the preservation of, and does not violate those rights. These rights include, without limitation, the right to privacy, family integrity and the right to remain free of non-consensual unwarranted forensic medical examinations, the right to be present at such

examinations absent an affirmative showing of good cause for exclusion, the right to control and participate in medical decisions relative to their children – all arising under the First, Fourth, and Fourteenth Amendments to the United States Constitution.

122.   Defendants Kaliha Johnson, Robyn Charlton, Mary Robilotta, Diana Shreckengost, DOE HHSA Workers 1- 10, and DOES 1 through 20, and each of them, were acting under color of state law when they jointly acted, agreed, and/or conspired to violate Plaintiffs' constitutional rights by, but not limited to, the performance of unwarranted and non-consensual medical examinations and procedures on Plaintiffs children as described in detail herein above.

123.   As a direct and proximate consequence of said misconduct, Plaintiffs have suffered, and will continue to suffer economic damages as well as but not limited to physical and/or mental anxiety and anguish according to proof at trial.

124.   In doing the things alleged herein, Defendants Kaliha Johnson, Robyn Charlton, Mary Robilotta, Diana Shreckengost, DOE HHSA Workers 1- 10, and DOES 1 through 20, and each of them, acted intentionally and/or with a conscious and callous disregard for Plaintiffs' constitutional rights. As a result, Plaintiffs are entitled to recover punitive damages against the individual defendants according to proof at trial.

## THIRD CLAIM FOR RELIEF – §1983

### *Violation of Plaintiff's Due Process Right to Be Free From Deception in the Presentation of Evidence to the Juvenile Court*

(By All Plaintiffs Against Defendants Kaliha Johnson, Robyn Charlton, Mary Robilotta, Diana Shreckengost, DOE HHSA Workers 1- 10, and DOES 1 through 20, inclusive.)

125.   Plaintiff incorporates the above allegations of fact and law as though fully set forth herein.

126.   The right to familial association guaranteed under the Fourteenth Amendment is so "clearly established" such that any reasonable HHSA worker in Defendants'

situation would know it is unlawful to remove a child from the care, custody and control of its parents, and continue to detain such child(ren) for a prolonged period of time, based on knowingly false evidence, and/or based on Juvenile Court order's which the particular worker(s) or agent(s) fraudulently obtained, or had reason to know were fraudulently obtained.

127. It is similarly clearly established that it is a violation of the constitution to present deceptive evidence, in whatever form, against a parent in juvenile court proceedings. (*Hardwick v. Cty. of Orange*, (9th Cir. 2017) 844 F.3d 1112, 1118-19; "No official with an IQ greater than the room temperature in Alaska could claim that he or she did not know that the conduct at the center of this case violated both state and federal law. The social workers in this case are alleged to have knowingly and maliciously violated the law in their attempt to sever [Plaintiff's] protected relationship with her [daughter]. Perjury is a crime under both federal and California state law, as is the knowing submission of false evidence to a court. 18 U.S.C. § 1621; Cal. Penal Code § 118. Both crimes make no distinction between criminal and civil proceedings. This malicious criminal behavior is hardly conduct for which qualified immunity is either justified or appropriate.").

128. At all times relevant herein, there existed a clearly established due process right of individuals not to be subjected to the deliberate presentation of false or perjured evidence, and/or the suppression of material exculpatory information in court proceedings and/or in documents submitted with recommendations or requests made to the court by County HHSA workers. Any reasonable HHSA worker would know that it is a due process violation to lie, exaggerate, fabricate evidence, and/or suppress material exculpatory evidence in court reports and other documents filed with the juvenile court, and/or relied upon by subsequent social workers.

129. Defendants Kaliha Johnson, Robyn Charlton, Mary Robilotta, Diana
Shreckengost, DOE HHSA Workers 1- 10, and DOES 1 through 20, and each of
them, had the affirmative and self evident duty to be truthful, accurate, and
complete in petitions, reports, and documents submitted to the juvenile court – a
court with power to adjudicate substantial rights, including legal and custodial
rights of children and parents. Similarly, Defendants Kaliha Johnson, Robyn
Charlton, Mary Robilotta, Diana Shreckengost, DOE HHSA Workers 1- 10, and
DOES 1 through 20 had an equal duty to refrain from using improper and
deceptive means to obtain judicial orders sustaining recommendations,
disparaging, and/or otherwise impairing or impinging upon Plaintiffs' due process
rights and/or rights of, and attendant, to familial association.

130. Defendants Kaliha Johnson, Robyn Charlton, Mary Robilotta, Diana
Shreckengost, DOE HHSA Workers 1- 10, and DOES 1 through 20, and each of
them, either singularly or jointly acted to together to deliberately or recklessly
present false statements and/or omit and/or actively suppress known exculpatory
material in their reports filed in the Juvenile Court.

131. With respect to Defendants Johnson and Charlton, on information and belief and
in the alternative, they also filed or caused to be filed an application for a warrant
to detain the children on, or about, June 14, 2019. In the "Statement of Cause,"
signed under penalty of perjury and submitted to the Juvenile Court, Defendants
Johnson and Charlton inserted the same false and fabricated information alleged
herein above as was submitted in their fraudulent Detention Report.[11]

---

[11]This allegation is asserted in the alternative merely to preserve Plaintiffs' judicial
deception claims arising from any deception in any warrant application – just in case a
warrant application actually *was* filed and then simply withheld from the 827 production
in spite of the Juvenile Court's order that such documents be produced on April 12,
2021. It is doubtful that Defendants would have flouted the Juvenile Court's order.
However, out of an abundance of caution, this allegation has been plead to preserve the
claim if it is discovered that facts exist to support it.

132.   This deceptive conduct caused J.P.1, N.P., and J.P.2's continued and prolonged detention out of their family home and out of the loving care of their parents, in the beginning Ruth, then later Kristoffor upon his return from deployment.

133.  Defendants Kaliha Johnson, Robyn Charlton, Mary Robilotta, Diana Shreckengost, DOE HHSA Workers 1- 10, and DOES 1 through 20, and each of them, were acting under color of state law when they jointly acted, agreed, and/or conspired to violate Plaintiffs' constitutional rights by, but not limited to, engaging in deception in the presentation of evidence to the juvenile court.

134.  The actions of these Defendants, and each of them,  were undertaken with a known and deliberate indifference to Plaintiffs' rights, and/or with the specific intention of harming Plaintiffs.

135.  These Defendants, and each of them, maliciously conspired to violate Plaintiffs' constitutional rights including their rights arising under the First and Fourteenth Amendments to the United States Constitution by, but not limited to, presenting knowingly false, fraudulent, and misleading evidence to the Juvenile Court on a continuing basis for the specific purpose of detaining and continuing to detain the Pope children from their parents' care, custody and control without proper or just cause and/or authority by maliciously denying Plaintiffs' their right to a fair hearing, and by spreading lies, maliciously refusing to provide exculpatory evidence, and presenting fabricated evidence to the Juvenile Court during the pendency of the dependency proceedings all in violation of their obligations arising under the First and Fourteenth Amended to the United States Constitution.

136.  By these actions These Defendants, and each of them, interfered and/or attempted to interfere with Plaintiffs' constitutional rights to familial association.

137.  As a direct and proximate consequence of this violation, Plaintiffs have suffered, and will continue to suffer economic damages as well as but not limited to physical and/or mental anxiety and anguish according to proof at trial.

138.   Defendants Kaliha Johnson, Robyn Charlton, Mary Robilotta, Diana Shreckengost, DOE HHSA Workers 1- 10, and DOES 1 through 20, and each of them, acted intentionally and/or with a conscious disregard for Plaintiffs' constitutional rights. As a result of this conduct, Plaintiffs are entitled to recover punitive damages against the individual defendants.

### FOURTH CLAIM FOR RELIEF

### *Monell Related Claims*

(By Plaintiffs Against Defendant County of San Diego)

139.   Plaintiff incorporates the above allegations of fact and law as though fully set forth herein.

140.   Defendant County of San Diego, including through its entity HHSA, and those individuals in their official capacity who had supervisory and/or policy making authority, had a duty to Plaintiffs to establish, implement and follow policies, procedures, customs and/or practices which confirm with, and provide for the protections guaranteed Plaintiffs under the United States Constitution, including those under the First and Fourteenth Amendments. This includes, without limitation, the protection of the right to substantive and procedural due process.

141.   Defendant County of San Diego also had a duty to use reasonable care to select, assign, supervise, train, control and review the activities of all their agents, officers, employees and those acting under them, including within HHSA, so as to protect these constitutional rights; and to refrain from acting with deliberate indifference to the constitutional rights of Plaintiffs in order to avoid causing the injuries and damages alleged herein.

### Count One

### *Unwarranted Seizure*

142.   Based on the duties charged to its HHSA workers, including the powers to seize a child from his or her parents' custody, San Diego County knew or should have known of the need to establish the customs, policies, and/or procedures required to

protect the civil rights of parents and children with whom their agents regularly came into contact, and of the need to adequately train its HHSA workers.

143.   At the time of the underlying events, the County's customs relating to the removal of a child from its parent's custody and/or the seeking unwarranted and non-consensual examinations of the removed child included, but were not limited to:

   a.   The custom of removing children from their parent's custody without consent, court order, and/or exigent circumstances (i.e., imminent danger of serious bodily injury).

   b.   The custom of removing children from their parent's custody without first performing a reasonable investigation.

   c.   The custom of seizing children from their parent's custody without consent, court order, and/or exigency, based on a hope that further investigation could turn up facts suggesting the seizure was justified.

   d.   The custom to not intercede in and/or prevent the removal of a child from his or her parent's custody without consent, court order, and/or exigency.

   e.   The custom of interrogating and/or examining a child outside the presence of its parent(s) – without judicial authorization or parental consent – when there is no specific, reasonable, and articulable evidence that the child is in immediate risk of suffering serious bodily injury.

   e.   The custom to always seek forensic investigatory medical examinations on children – without parental consent, court order, and/or exigent circumstances.

144.   When Johnson, Robilotta, and Charlton, agreed to seize, participated in the seizure, and/or seized J.P.1, N.P., and J.P.2 from their parents' custody, they were acting pursuant to and in accordance with San Diego County's child removal customs. Indeed, J.P.1, N.P., and J.P.2's seizure received DHS supervisor

1
2
3
4

approval. When Defendants Johnson, Robilotta, and Charlton, sought the forensic investigatory medical examinations on J.P.1, N.P., and J.P.2, without parental consent, court order, and/or exigent circumstances, they were acting pursuant to and in accordance with San Diego County's customs.

5
6
7
8
9
10
11

145. J.P.1, N.P., and J.P.2's unwarranted seizure and/or the failure to prevent the seizure, was not an isolated incident. Instead, San Diego County HHSA workers regularly seized children from their parent's custody without consent, court order, and/or exigency – as is the customary practice at San Diego County and DHS. These unlawful seizures have resulted in lawsuits and claims against multiple offending HHSA workers (for violation of constitutional rights) and San Diego County (for its customs being the moving force behind these violations).

12
13
14
15
16

146. J.P.1, N.P., and J.P.2's unwarranted and non-consensual forensic investigatory medical examinations, were not an isolated incident. Instead, San Diego County HHSA workers regularly seek unwarranted and non-consensual forensic investigatory medical examinations for children – as is the customary practice at San Diego County and DHS.

17
18
19
20
21
22
23
24
25
26
27

147. San Diego County regularly receives and/or is aware of complaints, leveled against its HHSA workers, claiming that the HHSA workers seized children without parental consent, court order, and/or exigency. San Diego County never investigates or disciplines its HHSA workers who seize children from their parents' custody without consent, court order, and/or exigency. San Diego County never investigates or disciplines its HHSA workers who seek forensic investigatory medical examinations for children without parental consent, court order, and/or exigent circumstances. San Diego County did not investigate or discipline the individual Defendants, for (1) seizing, or participating in the seizure of, J.P.1, N.P., and J.P.2 without consent, court order, and/or exigency, (2) failing to stop J.P.1, N.P., and J.P.2's unwarranted removal, and (3) seeking forensic

28

investigatory medical examinations for children without parental consent, court order, and/or exigent circumstances.

148. San Diego County refuses to admit that its HHSA workers commit a constitutional violation when they (1) seize a child from his or her parent's custody without consent, court order, and/or exigency, and (2) seeks forensic investigatory medical examinations – and continues to do so. San Diego County denies that Johnson, Robilotta, and Charlton, violated Plaintiffs' rights when J.P.1, N.P., and J.P.2 were seized without consent, court order, and/or exigency. San Diego County denies that individual Defendants, violated Plaintiffs' rights when J.P.1, N.P., and J.P.2 were subjected to forensic investigatory medical examinations without parental consent, court order, and/or exigent circumstances. San Diego County ratified and/or approved of J.P.1, N.P., and J.P.2's unwarranted seizure and/or the forensic investigatory medical examinations for J.P.1, N.P., and J.P.2

149. San Diego County failed to train its HHSA workers and agents on the constitutional rights of a parent and child, including but not limited to:

   a.   The circumstances under which a court order must be obtained prior to removing a child from the custody of his or her parent(s).

   b.   The fact that a court order or parental consent must be obtained prior to removing a child from the custody of his or her  parent(s), when there was no exigency.

   c.   That a child cannot be removed without a court order or parental consent, unless there is "specific, articulable evidence" that a child is in immediate danger of suffering serious bodily injury.

   d.   That a social worker cannot remove a child without a court order or consent, based on the hope that further investigation could turn up facts suggesting that an exigency existed.

   e.   That a child cannot be removed from their parent's custody without first performing a reasonable investigation.

COMPLAINT FOR DAMAGES

41

f.  That a child cannot be interrogated or examined outside the presence of his or her parent(s) – without judicial authorization or parental consent – when there is no specific, reasonable, and articulable evidence that the child is in immediate risk of suffering serious bodily injury.

g.  That a child cannot be subjected to a forensic investigatory medical examination – without parental consent, court order, and/or exigent circumstances.

h.  That a parent, being placed under arrest, is entitled to arrange for the care of his or her child.

i.  That the arrest of a parent does not permit an unwarranted seizure – by itself.

150.  San Diego County's failure to train its HHSA workers and/or agents on these established constitutional rights was a substantial factor in causing Plaintiffs' harm. Without adequate training, Johnson, Robilotta, and Charlton were unfamiliar with and oblivious to Plaintiffs' constitutional rights, when they seized J.P.1, N.P., and J.P.2, and subjected them to forensic investigatory medical examinations – without parental consent, court order, and/or exigency.

151.  San Diego County knew or should have known that a parent and child cannot be separated and that a child cannot be subjected to a forensic investigatory medical examination without consent, court order, and/or exigency. But, the County knowingly refrained from (1) revising its customs, and (2) training its HHSA workers that a child cannot be removed or subjected to a forensic investigatory medical examination without consent, court order, and/or exigency. In addition, San Diego County refused to investigate or discipline its HHSA workers for removing J.P.1, N.P., and J.P.2, and subjecting them to forensic investigatory medical examinations – without parental consent, court order, and/or exigency.

152. These actions, and/or inactions, of San Diego County were the moving force behind the Plaintiffs' injuries, as alleged herein; and as a result, Plaintiffs have sustained general and special damages, in an amount to be proven at trial.

### Count Two

### *Unwarranted Forensic Medical Exam/Procedures*

153. As detailed above, County of San Diego regularly and systematically performed, and to this day continues to perform on a regular basis, non-consensual unwarranted invasive forensic medical examinations upon children in relation to whom referrals of suspected child abuse have been received.

154. San Diego County regularly requests these medical examinations be performed without notifying either parent prior to the examination even though the County has known since at least the year 2000 that parents have a constitutional right to be present for their child's medical procedures. Moreover the County regularly requests that parents be excluded from the examination room in violation of those same constitutional rights.

155. The County, at all relevant times, had a duty to use reasonable care to select, assign, supervise, train, control and review the activities of all its agents, officers, employees and those acting under them, so as to protect the constitutional rights of Plaintiffs and to refrain from acting with deliberate indifference to the constitutional rights of Plaintiffs in order to avoid causing the injuries and damages alleged herein.

156. Based on the duties charged to the County of San Diego, its policymaking officials knew or should have known of the need to establish such customs, policies, and practices as were required to protect the rights of children and parents to remain free of unwarranted non-consensual forensic medical examinations and medical procedures.

157. At the time of the underlying events, the regularly established customs and practices of the Defendant County that were followed, adhered to, complied with,

and carried out by the individual Defendants in this case were the moving force that caused the violations of the Plaintiffs constitutional rights including, but not limited to the following policies, customs, and/or practices:

a.    The custom and/or practice of subjecting children to unwarranted non-consensual forensic medical examinations.

b.    The custom and/or practice to exclude a parent from the examination room during the forensic medical examination.

c.    The custom and/or practice of barring a parent from access to the child's medical records even though the parent retains medical rights.

d.    The custom and/or practice of subjecting children to unwarranted non-emergency medical procedures, including vaccinations without a parent's knowledge and/or consent.

e.    The custom and/or practice of subjecting children to unwarranted non-consensual vaccinations.

f.    The custom and/or practice to never notify a parent that vaccinations will be performed on their child.

g.    The unwritten policy of acting with deliberate indifference to the rights of children and parents with whom Defendants' agents can regularly be expected to come into contact by failing and/or refusing to implement a practice of regular and adequate training and/or supervision, and/or by failing to train and/or supervise their respective officers, contractors, agents, and/or employees, in providing and ensuring compliance with the constitutional protections guaranteed to individuals, including those under the First, Fourth, and Fourteenth Amendments, relative to a parent and child's medical rights when performing actions related to child abuse investigations.[12]

---

[12] The above list is not exhaustive. Plaintiffs may seek leave to amend this Complaint as additional information is discovered.

158. When the individual Defendants either performed or directed that the Pope children be forensically examines and/or be vaccinated, as the case may be, they were acting pursuant to and in accordance with San Diego County's customs, unwritten policies, and practices with regard to conducting such examinations and vaccinations without first obtaining a warrant or parental consent under non-emergency circumstances.

159. As a matter of routine, the County of San Diego never investigates or disciplines its HHSA employees, contractors, and/or agents who perform forensic investigatory medical examinations and/or vaccinations on children – without consent, court order, exigency. Nor does the County as a matter of practice even inquire to determine whether there was a basis to perform the examinations and/or vaccinations. Here, Sand Diego County did not investigate or discipline the individual Defendants for performing forensic investigatory medical examinations and/or vaccinations on these or any other children.

160. Moreover, Defendant San Diego County refuses to admit that performing a forensic medical examination and/or vaccinations without parental consent, court order, and/or exigent circumstances violates a parent's and child's  constitutional rights. Defendant denies that either it or the individual Defendants violated Plaintiffs' rights when Defendants subjected the Pope childrn to an unwarranted forensic investigatory medical examination without parental consent, court order.

161. Similarly,  Defendant denies that either it or the individual Defendants violated Plaintiffs' rights when Defendant Shreckengost subjected J.P.1 to a secret and unwarranted medical procedure, i.e., a vaccination without parental consent, court order.

162. Defendant County of San Diego ratified and/or approved of the Pope children's non-consensual unwarranted forensic investigatory medical examinations and vaccination.

163.   Defendant County of San Diego knowingly and with deliberate indifference failed to train its HHSA employees and/or agents on the constitutional rights of a parent and child, including but not limited to:

a.   That a child cannot be examined outside the presence of his or her parent(s) – without judicial authorization or parental consent – when there is no specific, reasonable, and articulable evidence that the child is in immediate risk of suffering serious bodily injury.

b.   That a child cannot be subjected to a forensic investigatory medical examination – without parental consent, court order, and/or exigent circumstances.

c.   That an independent investigation and/or inquiry must be performed to determine whether or not there is a basis for performing an unwarranted and non-consensual forensic investigatory medical examination on a child.

d.   That a child cannot be subjected to vaccinations – without parental consent or court order.

164.   Without adequate training, the individual Defendants, and each of them, were unfamiliar with and oblivious to Plaintiffs' constitutional rights, when they subjected the Pope children to a forensic investigatory medical examination – without parental consent, court order, and/or exigency and or vaccinated J.P.1.

165.   San Diego County's non-consensual unwarranted forensic medical examination of the Pope children was not an isolated incident specific to their  circumstances. On the contrary, such warrantless non-consensual medical examinations and vaccinations are routine, regular and recurring events, and are perpetrated by San Diego County on a daily basis in the same or similar circumstances as alleged herein.

166.   The non-consensual unwarranted vaccinations inflicted on J.P.1 was not an isolated incident specific to his circumstances. On the contrary, such warrantless

non-consensual vaccinations are routine, regular and recurring events, and are perpetrated by Defendants on a daily basis in the same or similar circumstances as alleged herein.

167. The County of San Diego has engaged in each of the above customs and/or practices on an ongoing and continuous basis since well before the events described herein, and continues to engage in said practices on an ongoing and daily basis, and will continue to do so until ordered to stop.

168. These customs, policies, and/or practices of Defendant County were the moving force behind, and the direct and proximate cause of the injuries sustained by Plaintiffs. As a result, Plaintiffs have sustained general and special damages, to an extent and in an amount to be proven separately at trial. In addition, Plaintiffs have incurred, and will continue to incur, attorneys' fees, costs and expenses, including those as authorized by 42 U.S.C. § 1988, to an extent and in an amount subject to proof at, and after, trial.

### Count Three

### *Judicial Deception*

169. The County and its policymaking officials knew, or in the exercise of reasonable care, should have known of the need to establish customs, policies, and practices required to protect the aforementioned civil rights of children with whom their agents regularly came into contact – and to adequately train its HHSA employees regarding constitutionally appropriate policies and practices.

170. Defendant County of San Diego established, adopted, followed, and/or implemented and/or turned a blind eye to customs, and/or practices which were followed, complied with, and carried out by the individual Defendants, and each of them when they violated Plaintiffs constitutional rights by engaging in deception in the presentation of evidence to the juvenile court, among other things.

171. At the time of the underlying events, the regularly established customs and practices of the County of San Diego and the HHSA were followed, adhered to,

complied with, and carried out by the individual Defendants, and each of them, were the moving force, that is, the actual, direct, and proximate cause of the violations of Plaintiffs' constitutional rights including, but not limited to:

     a.    The custom and/or practice of including false, inaccurate, exaggerated, misleading, and/or untrue factual statements in the documents and/or reports filed with the juvenile court.

     b.    The custom and/or practice of suppressing and/or omitting known exculpatory evidence from documents and/or reports filed with the juvenile court.

     c.    The custom and/or practice of permitting a supervisor to sign a document and/or court report without personal knowledge as to whether the statements made therein were complete and/or true, in an effort to bolster the credibility of the document, and/or report.

     d.    The custom and/or practice of placing alleged statements of third party witnesses in quotation marks when in fact those third party witnesses did not say was the HHSA worker claimed. The purpose of such practice is to lend further weight and credibility to false and/or fabricated information the particular HHSA worker presents to the Juvenile Court.

172. When Defendants, and each of them, engaged in deception in the presentation of evidence to the juvenile court, they were acting pursuant to and in accordance with the County's regularly established customs and/or practices. Indeed, the reports and/or other documents, filed with the juvenile court in the underlying dependency case at issue here, were reviewed and approved by HHSA supervisors.

173. The individual Defendants' presentation of false, fabricated, incomplete and fraudulently misleading evidence to the juvenile court was not an isolated incident specific to Plaintiffs' circumstances or the circumstances of this particular case. Instead, the County and its HHSA workers regularly include false statements,

and/or suppress known exculpatory evidence, in reports and/or other documents filed in the juvenile court. Such deceptive conduct by County HHSA workers has resulted in lawsuits and claims against multiple offending HHSA workers (for similar violations of constitutional rights) and San Diego County (for its customs being the moving force behind these violations). These include, but are not limited to, the following: **(1)** *Marshall v. County of San Diego*, State Case No. 37-2008-00085115-CU-CR-CTL; and **(2)** *Kemper v. County of San Diego*, State Case No. 37-2010-00094707-CU-CR-CTL. Yet, the County of San Diego has habitually and deliberately turned a blind eye to the problem and refrained from taking any reasonable steps to rectify it.

174. County of San Diego has engaged in each of the customs and/or practices identified above on an ongoing and continuous basis since at least 2005, if not earlier, and continues to engage in these practices on an ongoing and daily basis.

175. The County of San Diego regularly receives and/or is aware of complaints, leveled against its HHSA workers, claiming that the social workers are engaging in deception in the presentation of evidence in the juvenile court.

176. Yet, for whatever reason, the County of San Diego never investigates or disciplines its HHSA workers (including those named as Defendants in the other lawsuits identified above) who engage in deception in the presentation of evidence to the juvenile court. The County of San Diego consistently fails to investigate or discipline social workers and their supervisors who are involved in constitutional violations so that violations of citizen's constitutional rights have not only become accepted, but are customary.

177. The County did not investigate or discipline the individual Defendants in this case for making false statements, and/or suppressing known exculpatory evidence, in reports or other documents they filed in the juvenile court.

178. The County habitually refuses to admit that its HHSA workers commit a constitutional violation when they make false statements, and/or suppress known

exculpatory evidence, in reports or other documents filed in the juvenile court – and continues to do so. The County denies that the individual Defendants in this case violated Plaintiffs' rights when they made false statements, and/or suppressed exculpatory evidence, in reports or other documents filed in the juvenile court. The County ratified and/or approved the inclusion of false statements, and/or suppression of known exculpatory evidence, in reports or other documents filed in the juvenile court.

179. The Defendant County of San Diego is aware that its HHSA workers frequently make false statements and/or suppress known exculpatory evidence, in reports or other documents filed in the juvenile court. Yet, Defendant County of San Diego has made the knowing and conscious decision to refrain from promulgating a policy and recurrent training to prevent such misconduct, and has consistently and knowingly failed to provide any training to their social workers to inform them of the rights of parents and children to not be lied about in court reports and the requirement that all material exculpatory evidence is required to be presented to the juvenile court.

180. The Defendant County of San Diego's decision to disregard these constitutional protections in the face of a known need for such policies to prevent the specific misconduct alleged herein above, *i.e.*, the known need for a specific policy prohibiting the aforementioned misconduct, is itself a "policy" decision which constitutes a policy of deliberate indifference.

181. This policy of deliberate indifference, and the lack of prophylactic policies and training in the face of a known need for such policies and training was a substantial factor in causing the Plaintiff harm, in that individual Defendants, and each of them, followed and acted pursuant to the regularly established customs, practices, and well known and accepted standard operating procedures of HHSA when they made false statements and/or suppress known exculpatory evidence, in

1  reports or other documents filed in the juvenile court – none of which was

2  constitutionally permissible.

3  182. The County of San Diego has openly taken the position that it is not clearly

4  established and/or understood that a social worker could not lie and/or fabricate

5  evidence in proceedings before the juvenile court. The County of San Diego has

6  also taken the position that a social worker does not violate constitutional rights

7  when they suppress exculpatory evidence in juvenile proceedings. These

8  "positions" constitute unwritten policies of the County.

9  183. Without such policies, procedures, customs and/or practices in place, the County

10  of San Diego HHSA Workers have been allowed and permitted to engage in

11  conduct that was in violation of Plaintiff's constitutional rights as more

12  specifically set out in the General Allegations above.

13  184. Defendant County's failure to adopt appropriately prophylactic policies and

14  training was the moving force behind the violations of Plaintiffs' constitutional

15  rights. Such failures include, but are not limited to the following:

16      a.  The County of San Diego did not have a written policy, procedure,

17          custom, practice and/or recurrent training delineating the

18          constitutional protections afforded to a parent and child by the First

19          and Fourteenth Amendments.

20      b.  The County of San Diego did not have a written policy, procedure,

21          custom, practice and/or recurrent training instructing that a county

22          social worker must disclose all known exculpatory evidence to the

23          juvenile court.

24      c.  The County of San Diego did not have a written policy, procedure,

25          custom, practice and/or recurrent training instructing that a county

26          social worker is precluded from including false statements in

27          documents or reports to the juvenile.

28

d.   The County of San Diego did not have a written policy, procedure, custom, or practice requiring its social workers to be complete, honest, and accurate in their reports to the court.

e.   The County of San Diego did not have a written policy, procedure, custom, or practice requiring its social workers and social worker supervisors to have personal knowledge of the facts and/or statements made in a petition, document, and/or report, when attesting to the veracity of those allegations, facts, and/or statements.

f.   The County of San Diego did not have a written policy, procedure, custom, or practice requiring its social workers and social worker supervisors to conduct an independent investigation to determine whether the allegations, facts, and/or statements in a petition, document, and/or report were true, before attesting to the veracity of those allegations, facts, and/or statements.

g.   The County of San Diego did not have a policy or procedure that addressed California Government Code, §820.21, *i.e.* civil immunity for a social worker is lost if they commit perjury, fabricate evidence, or fail to provide known exculpatory evidence.

185.   By deliberately refraining from promulgating any of the aforementioned policies, procedures, customs, practices and/or training, the County permitted the aforementioned basic policy decisions to be made by the lower level social workers in the field. As a result, the Defendant County of San Diego's policy, custom, and/or practice – as established, adopted, and implemented by the individual Defendants in this case, and each of them, was to make false statements and/or suppress known exculpatory evidence in reports and documents filed with the juvenile court, and to continue to detain the children or otherwise cause the continued detention of the children even thought it was known that there was no legitimate "true" basis to do so.

186.   These policies, customs, and/or practices – that disregard the Plaintiffs' constitutional protections – were a substantial factor in causing harm to the Plaintiffs'. Thus, as a matter of law, because there was no formal policy preventing the aforementioned misconduct, even though one was obviously needed, the social workers on the line acted on behalf of the County in making final policy decisions – which is exactly what they did when they made false statements and/or suppressed known exculpatory evidence in reports and documents filed with the juvenile court.

187.   The state of the law regarding the constitutional protections afforded to parents and a child by the First and Fourteenth Amendments was clearly established well before June 2019. As such, the Defendant County of San Diego knew before 2019 that its HHSA workers required recurrent training on the constitutional protections afforded to parents and children.

188.   Despite this knowledge, the Defendant County of San Diego deliberately failed to train or, alternatively, deliberately failed to provide recurrent and updated training to its HHSA workers on the following constitutional protections:

    a.   That a social worker must disclose all known inculpatory and exculpatory evidence to the juvenile court.

    b.   That a social worker must be truthful, honest, and accurate when reporting and/or presenting evidence to the juvenile court.

    c.   That a social worker is precluded from lying to and/or including false statements and/or suppressing important information from documents or reports to the juvenile court.

    d.   That a social worker must disclose all known exculpatory evidence in documents and/or reports that will be relied upon by subsequent social workers.

e.    That a social worker is precluded from lying to and/or including false statements and/or suppressing important information from documents and/or reports that will be relied upon by subsequent social workers.

f.    That quotation marks can only be used when the speaker's words are being reproduced verbatim.

189. Defendant County of San Diego's deliberate failure to train its HHSA workers on these established constitutional protections was a substantial factor in causing the Plaintiffs harm, in that HHSA agents were unfamiliar with and oblivious to the Plaintiffs constitutional rights, when they made false statements and/or suppressed known exculpatory evidence in reports and documents filed with the juvenile court, and then continued to detain the children from their Plaintiffs' care for a period of months even though they knew there was no legitimate basis to do so.

190. The practice of turning a deliberate blind eye to the need for further or adequate training by ignoring repeated violations of the rights of children and parents with whom HHSA agents can regularly be expected to come into contact by failing and/or refusing to implement a practice of regular and adequate training and/or supervision, and/or failing to train and/or supervise its officers, agents, employees and state actors, in providing and ensuring compliance with the constitutional protections guaranteed to individuals, including those under the First and Fourteenth Amendments to the United States Constitution.

191. Defendant County of San Diego, including by and through its entity HHSA and its policymaking officials, breached its duties and obligations to Plaintiffs by, but not limited to, failing to establish, implement and follow the correct and proper constitutional policies, procedures, customs and practices; by failing to properly select, supervise, train, control, and review its agents and/or employees as to their compliance with constitutional safeguards; and by deliberately permitting the individual Defendants, and each of them, to engage in the unlawful and

1  unconstitutional conduct as herein alleged, with a total and deliberate indifference
2  to Plaintiff's rights.

3  192. Defendant County of San Diego knew, or should have known, that by breaching
4  the above-mentioned duties and obligations that it was reasonably foreseeable that
5  its agency policies, practices, customs, and usages would, and did, directly cause
6  Plaintiffs to be injured and damaged.

7  193. These actions, and/or inactions, of the Defendant County of San Diego were the
8  moving force behind, and direct and proximate cause of Plaintiffs' injuries. As a
9  result, Plaintiffs has sustained general and special damages, to an extent and in an
10  amount to be proven at trial.

## JURY DEMAND

12  Plaintiffs Ruth and Kristoffor Pope demand a jury trial as to all issues so triable.

## PRAYER

14  **WHEREFORE**, Ruth and Kristoffor Pope pray for judgment against Defendants,
15  and each of them, as to all causes of action, as follows:

16  1.  General damages and special damages according to proof, but in no event less than
17  $1,000,000;

18  2.  As against the individual, human being, Defendants, punitive damages as allowed
19  by law;

20  3.  Attorneys fees and costs pursuant to 42 U.S.C. § 1988, and any other appropriate
21  statute;

22  4.  Injunctive relief as allowed by law;

23  5.  Such further relief as the Court deems just and proper.

24  Dated: June 11, 2021          THE LAW OFFICES OF SHAWN A. MCMILLAN, APC

25                                /s/ Shawn A. McMillan
26                                Shawn A. McMillan, Esq.
27                                Stephen D. Daner, Esq.
                                  Attorneys for Ruth and Kristoffor Pope

28

# EXHIBIT "A"

---

# EXHIBIT "A"

Case 3:21-cv-01102-JO-MMP    Document 1    Filed 06/11/21    PageID.58    Page 58 of 60

Currently: 65 °F. Partly sunny. (Weather station: San Diego - North Island, USA). See more current weather ›

Select month: [ June 2019 ]

### June 2019 Weather in San Diego — Graph



Wednesday, June 12, 2019, 12:00 pm — 6:00 pm

## 70 / 68 °F
Scattered clouds.

Humidity: 72%
Barometer: 29.94 "Hg

W
Wind: 9.943 mph

Sat, Jun 1   Sun, Jun 2   Mon, Jun 3   Tue, Jun 4   Wed, Jun 5   Thu, Jun 6   Fri, Jun 7   Sat, Jun 8   Sun, Jun 9   Mon, Jun 10   Tue, Jun 11   Wed, Jun 12   Thu, Jun 13   Fri, Jun 14   Sat, Jun 15   Sun, Jun 16   Mon, Jun 17   Tue, Jun 18   Wed, Jun 19   Thu, Jun 20   Fri, Jun 21   Sat, Jun 22   Sun, Jun 23   Mon, Jun 24   Tue, Jun 25   Wed, Jun 26   Thu, Jun 27   Fri, Jun 28   Sat, Jun 29   Sun, Jun 30

See weather overview

### High & Low Weather Summary for June 2019

| | Temperature | Humidity | Pressure |
|---|---|---|---|
| High | 78 °F (Jun 30, 12:52 pm) | 93% (Jun 7, 1:52 am) | 30.02 "Hg (Jun 7, 1:52 am) |
| Low | 60 °F (Jun 2, 1:52 am) | 50% (Jun 30, 12:52 pm) | 29.85 "Hg (Jun 1, 4:52 am) |
| Average | 65 °F | 76% | 29.94 "Hg |

* Reported Jun 1 12:52 am — Jun 30 11:52 pm, San Diego. Weather by CustomWeather, © 2021

Note: Actual official high and low records may vary slightly from our data, if they occured in-between our weather recording intervals... More about our weather records

### San Diego Weather History for June 12, 2019

Show weather for: [ June 12, 2019 ]

| Time | Conditions | | Comfort | | | | |
|---|---|---|---|---|---|---|---|
| | | Temp | Weather | Wind | Humidity | Barometer | Visibility |
| 12:52 am Wed, Jun 12 | | 63 °F | Passing clouds. | No wind ↓ | 90% | 29.97 "Hg | 8 mi |
| 1:52 am | | 64 °F | Passing clouds. | 5 mph ↑ | 90% | 29.96 "Hg | 10 mi |
| 2:52 am | | 64 °F | Low clouds. | 3 mph ↓ | 87% | 29.96 "Hg | 10 mi |
| 3:52 am | | 63 °F | Low clouds. | No wind ↓ | 87% | 29.95 "Hg | 10 mi |
| 4:52 am | | 63 °F | Passing clouds. | 3 mph ↓ | 87% | 29.94 "Hg | 10 mi |
| 5:52 am | | 63 °F | Partly sunny. | 3 mph ↗ | 90% | 29.95 "Hg | 9 mi |
| 6:52 am | | 62 °F | Partly sunny. | 3 mph ↗ | 90% | 29.96 "Hg | 7 mi |

| Time | | Temp | Weather | Wind | Humidity | Barometer | Visibility | |
|---|---|---|---|---|---|---|---|---|
| 6:52 am | | 62 °F | Partly sunny. | 3 mph | 90% | 29.96 "Hg | 7 mi | |
| 7:52 am | | 63 °F | Low clouds. | No wind | 90% | 29.98 "Hg | 7 mi | |
| 8:52 am | | 66 °F | Partly sunny. | No wind | 78% | 29.98 "Hg | 8 mi | |
| 9:52 am | | 67 °F | Scattered clouds. | 7 mph | 79% | 29.97 "Hg | 10 mi | |
| 10:52 am | | 68 °F | Passing clouds. | 9 mph | 76% | 29.97 "Hg | 10 mi | |
| 11:52 am | | 69 °F | Scattered clouds. | 9 mph | 73% | 29.98 "Hg | 10 mi | |
| 12:52 pm | | 69 °F | Scattered clouds. | 8 mph | 73% | 29.97 "Hg | 10 mi | |
| 1:52 pm | | 69 °F | Scattered clouds. | 10 mph | 73% | 29.96 "Hg | 10 mi | |
| 2:52 pm | | 70 °F | Scattered clouds. | 10 mph | 71% | 29.95 "Hg | 10 mi | |
| 3:52 pm | | 70 °F | Scattered clouds. | 10 mph | 71% | 29.93 "Hg | 10 mi | |
| 4:52 pm | | 69 °F | Scattered clouds. | 9 mph | 73% | 29.92 "Hg | 10 mi | |
| 5:52 pm | | 68 °F | Scattered clouds. | 10 mph | 73% | 29.92 "Hg | 10 mi | |
| 6:52 pm | | 66 °F | Scattered clouds. | 9 mph | 78% | 29.92 "Hg | 10 mi | |
| 7:52 pm | | 64 °F | Partly sunny. | 7 mph | 81% | 29.92 "Hg | 10 mi | |
| 8:52 pm | | 64 °F | Passing clouds. | 6 mph | 81% | 29.93 "Hg | 10 mi | |
| 9:52 pm | | 64 °F | Overcast. | 7 mph | 81% | 29.95 "Hg | 10 mi | |
| 10:52 pm | | 64 °F | Overcast. | 3 mph | 81% | 29.96 "Hg | 10 mi | |
| 11:52 pm | | 63 °F | Overcast. | 5 mph | 84% | 29.95 "Hg | 10 mi | |

Advertising

Weather by CustomWeather, © 2021

Jun 1  Jun 2  Jun 3  Jun 4  Jun 5  Jun 6  Jun 7  Jun 8  Jun 9  Jun 10  Jun 11  Jun 12  Jun 13  Jun 14  Jun 15  Jun 16  Jun 17  Jun 18  Jun 19  Jun 20  Jun 21  Jun 22  Jun 23  Jun 24  Jun 25  Jun 26  Jun 27  Jun 28  Jun 29  Jun 30

See weather overview



© Time and Date AS 1995–2021