1
Shawn A. McMillan, Esq. – SBN: 208529
attyshawn@netscape.net
2
Stephen D. Daner, Esq. – SBN: 259689
steve.mcmillanlaw@gmail.com
3
THE LAW OFFICES OF SHAWN A. MCMILLAN, APC
4955 Via Lapiz
4
San Diego, California 92122
Telephone: (858) 646-0069
5
Facsimile: (858) 746-5283
6
Attorneys for Plaintiffs Ruth Pope,
Kristoffor Pope
7

8

9
**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF CALIFORNIA**

10
Ruth Pope, an individual; Kristoffor
Pope, an individual
11
                    Plaintiffs,
12
        vs.
13
COUNTY OF SAN DIEGO, a public
14
entity; Kaliha Johnson, an individual;
Robyn Charlton, an individual;
15
Kimberly Lawhead, an individual;
Mary Robilotta, an individual; Diana
16
Shreckengost, an individual; DOE
HHSA Workers 2- 10, known but
17
unidentified individuals; and DOES 1
through 20, inclusive.
18
19
                    Defendants.
20

21

22

23

24

25

26

27

28

Case No.: 3:21-CV–1102-JLS-BGS

**FIRST AMENDED COMPLAINT
FOR DAMAGES**

Claim 1:      42 U.S.C. §1983
              (Deception in Warrant
              Application; Unwarranted
              Seizure)

Claim 2:      42 U.S.C. §1983
              (Coerced/Unwarranted
              Medical Exams and
              Procedures)

Claim 3:      42 U.S.C. §1983
              (Judicial Deception,
              Unnecessary/Excessive
              Duration of Continued
              Detention)

Claim 4:      *Monell*-Related Claims

              – Count One
                (Unwarranted Medical
                Exam/Procedures)

              – Count Two
                (Judicial Deception)

**JURY TRIAL DEMANDED**

**Jurisdiction and Venue**

1.  This action is brought pursuant to 42 U.S.C. §1983 to seek redress for Defendants' actions taken under color of law which are alleged to have violated Plaintiffs' rights under the United States Constitution. Defendants' conduct deprived Plaintiffs of their fundamental constitutional rights secured under the United States Constitution's First, Fourth, and Fourteenth Amendments, and under federal law.

2.  Jurisdiction is conferred by 28 U.S.C. §§1343(a)(3) and 1343(a)(4), which provides for original jurisdiction in this Court of all suits brought pursuant to 42 U.S.C. §1983. Jurisdiction is also conferred by 28 U.S.C. §1331 because the claims for relief derive from the United States Constitution and the laws of the United States.

3.  The acts and omissions complained of herein occurred in the County of San Diego, and it is believed that all living Defendants currently reside in the County of San Diego. Venue is proper in the District Court for the Southern District of California.

4.  Plaintiff makes the following allegations and claims upon personal belief, investigation of their counsel, and on information and belief.

**The Parties**

5.  At all times relevant to this Complaint, Plaintiff Ruth Pope, was a resident of San Diego County, California. Ruth is J.P.1 (DOB: 06/01/2014), N.P. (DOB: 06/24/2017), and J.P.2's(DOB: 06/03/2019) mother.

6.  At all times relevant to this Complaint, Plaintiff Kristoffor Pope, was a resident of San Diego County, California. Kristoffor is J.P.1 (DOB: 06/01/2014), N.P. (DOB: 06/24/2017), and J.P.2's(DOB: 06/03/2019) father.

7.  Defendant County of San Diego ("County") is a public entity of which the San Diego County Health and Human Services Agency ("HHSA") is a subdivision. The County operates Polinski Children's Center ("Polinski").

8.      At all times relevant to this Complaint, HHSA Worker Kaliha Johnson ("Johnson") was an individual residing in the County of San Diego, and an officer, agent, and/or employee of the County of San Diego and HHSA. At all relevant times alleged herein, she was acting under color of law in doing the things alleged herein.

9.      At all times relevant to this Complaint, HHSA Worker Robyn Charlton ("Charlton") was an individual residing in the County of San Diego, and an officer, agent, and/or employee of the County of San Diego and HHSA. At all relevant times alleged herein, she was acting under color of law in doing the things alleged herein.

10.     At all times relevant to this Complaint, HHSA Worker Mary Robilotta ("Robilotta") was an individual residing in the County of San Diego, and an officer, agent, and/or employee of the County of San Diego and HHSA. At all relevant times alleged herein, she was acting under color of law in doing the things alleged herein.

11.     At all times relevant to this Complaint, HHSA Worker Kimberly Lawhead ("Lawhead") was an individual residing in the County of San Diego, and an officer, agent, and/or employee of the County of San Diego and HHSA. At all relevant times alleged herein, she was acting under color of law in doing the things alleged herein. By this amendment, Plaintiff substitutes Ms. Lawhead as a Defendant in the action in the place of DOE HHSA Worker 1. At the time of the drafting of the initiating complaint, Plaintiff was unaware of the role Ms. Lawhead played in the events and was unaware of her identity. Since that time, Plaintiff has obtained many, but not all, of the records in the underlying juvenile dependency proceeding. Review of those records revealed, for the first time, that Ms. Lawhead participated in obtaining a removal warrant by drafting the application and statement of cause. As appears in greater detail below, Ms. Lawhead verified the truth and veracity of the facts set out in the statement of cause even though she did

1  not participate in the underlying investigation and thus had no personal knowledge
2  of the "facts" set forth therein.

3  12.   At all times relevant to this Complaint, HHSA Worker Diana Shreckengost
4  ("Shreckengost") was an individual residing in the County of San Diego, and an
5  officer, agent, and/or employee of the County of San Diego and HHSA. At all
6  relevant times alleged herein, she was acting under color of law in doing the things
7  alleged herein.

8  13.   ***Left Intentionally Blank***

9  14.   ***Left Intentionally Blank***

10  15.   ***Left Intentionally Blank***

11  16.   At all times relevant to this Complaint, DOE HHSA Workers 2 - 10 were
12  individuals residing in the County of San Diego, and officers, agents, and/or
13  employees of the County of San Diego and HHSA. Plaintiff is ignorant of the true
14  names and capacities of those DOE HHSA Worker Defendants sued herein as
15  DOE HHSA Workers 2 - 10, and for that reason has sued such Defendants under
16  such fictitious names. Plaintiffs will seek leave of Court to amend this Complaint
17  to identify the DOE HHSA Worker Defendants when their identities have been
18  ascertained. Each of the fictitiously named DOE HHSA Worker Defendants was in
19  some manner liable and legally responsible for the harms sustained by Plaintiff in
20  that their conduct caused the damages and injuries set forth herein.

21  17.   Hereinafter, when referred to collectively, the Defendants in paragraphs 7 through
22  16, inclusive, may occasionally be referred to as the HHSA DEFENDANTS.

23  18.   Plaintiffs are ignorant of the true names and capacities of those Defendants sued
24  herein as Defendant DOES 1 through 20, and for that reason have sued such
25  Defendants under such fictitious names. Plaintiffs will seek leave of Court to
26  amend this Complaint to identify the DOE Defendants when their identities have
27  been ascertained. Each of the fictitiously named DOE Defendants was in some
28  manner liable and legally responsible for the harms sustained by Plaintiffs in that

1    their conduct caused the damages and injuries set forth herein.

2    19.   Whenever this Complaint makes reference to any act of "Defendants," such

3          allegations shall be deemed to mean all named Defendants, or their officers,

4          agents, managers, representatives, employees, heirs, assignees, customers, tenants,

5          who did or authorized such acts while actively engaged in the operation,

6          management, direction or control of the affairs of Defendants (or any of them) and

7          while acting within the course and scope of their duties, except as specifically

8          alleged to the contrary.

9    20.   At all times relevant to this Complaint, Defendants, and each of them including all

10         DOE Defendants, were the knowing agents and/or alter egos of one another.

11         Defendants directed, ratified, and/or approved each other's conduct and that of

12         each other's agents or employees. Defendants, and each of them including all DOE

13         Defendants, agreed upon, approved or ratified each other's conduct, or otherwise

14         conspired together to commit all of the acts and/or omissions alleged herein.

15   21.   The HHSA Defendants, and each of them, were at all relevant times acting within

16         the course and scope of their duties as employees of the County of San Diego.

17   22.   The HHSA Defendants, and each of them, were at all relevant times acting in

18         conformance with the regularly established customs and practices of the County of

19         San Diego.

20   23.   The HHSA Defendants, and each of them, were at all relevant times acting under

21         color of law

22                              **COMMON ALLEGATIONS**

23         –   ***Ruth and Kristoffor Get Married and Start Their Family***

24   24.   Kristoffor Pope joined the United States Navy on March 8, 2011. He was stationed

25         in Bangor, Washington with the Marine Corp Security Force Battalion. He and

26         Ruth North met through mutual friends on Instagram in October 2012. By the

27         beginning of November they were chatting regularly *via* text. By the end of the

28         month they were communicating *via* Facetime for hours at a time. Their

---

relationship flourished. They arranged to meet in Silverdale (Naval Base Bangor), Washington on December 26, 2012. Ruth stayed there with Kristoffor for two weeks. Their romance blossomed and by February 2013, unbeknownst to Ruth, Kristoffor was in contact with her closest friends and family seeking their blessings to pursue his proposal of marriage.

25.   On Thursday, March 7, 2013, Ruth returned to Washington for a visit. Kristoffor picked her up at the airport and the two went for a walk on Alki Beach. Kristoffor proposed and Ruth accepted. Two days later they were married in Port Orchard Washington.

26.   On June 1, 2014, J.P.1 was born at the Naval Hospital in Bremerton, Washington. In August 2015, the Pope family executed orders to Port Hueneme, California. Kristoffor and Ruth wanted a daughter dearly. In February 2016, Ruth learned that she was pregnant with a baby girl. But the baby suffered from holoprosencephaly and was stillborn on May 7, 2016. Although the loss was crushing, Ruth and Kristoffor kept trying, and by November 2016, Ruth was pregnant with N.P.

27.   N.P. was born in Port Hueneme on June 24, 2017. About a year and a half later, in September 2018, Ruth discovered she was pregnant with J.P.2. a short time later, Kristoffor was sent to Lackland AFB, in San Antonio, for intense training until the end of October. Upon his return the family executed orders to San Diego, California. Kristoffor was assigned to the USS Boxer.

   *– Ruth Tends to The Children While Kristoffor is on Deployment*

28.   On May 1, 2018, Kristoffor  deployed to the middle east for combat operations. On June 3, 2018, with Kristoffor on deployment, J.P.2 was born at Best Start Birth Center with the assistance of Ruth's doula, Venice Cotton. In advance of his birth, Ruth prepared for the postpartum period. She made arrangements for her mother in law, Corina Pope, to stay in San Diego and help out after the baby was born. She also made arrangements with Ms. Cotton to stay in the home to care for J.P.2 for eight days following his birth. Ruth had a close network of friends and extended

family in the Southern California area who she could rely on for help with the children and emotional support while Kristoffor was on deployment.

29.  The weekend before J.P.2 was born, Ruth's sister in law, Courbine Pope, came down from Ventura to help Ruth prepare the home for the new baby. That Saturday, the two spent the day putting away Kristoffor's work-out equipment to make a safe space for J.P.1 to play during the day. They essentially transformed their two car garage into a safe play area for J.P.1. They made enough space so that J.P.1 would have an area to ride his little bike and play with his various toys.[1]
   *– Corina Pope Looks After J.P.1 and N.P. For The First Few Days After J.P.2's Birth; Ms. Cotton Assists With The Baby at Night*

30.  J.P.2 was born in the early morning hours of June 3, 2018. Ruth returned home that same morning. Ruth's sister in law, Courbine Pope, took care of the older boys that day while Ruth rested and took care of the baby. Ms. Cotton, came to stay in the home later in the evening. For the next five days, Ms. Cotton would arrive by 10:30 p.m. and stayed to assist throughout the night. She normally departed around 6:00 a.m. Between June 3rd and June 12th, Courbine came down to visit Ruth and assist with the older boys.

31.  Corina Pope and her grand-daughter, Treasure, arrived on June 4, 2018. During the day Corina would take J.P.1 and N.P. to stay at their cousin's house in Mira Mesa, while Treasure would stay with Ruth and help with the baby. The boys normally returned home in the evening. Treasure and Corina would feed and bathe the older boys and help get them ready for bed. Once J.P.1 and N.P. were settled in for the night, Ms. Cotton would help Ruth with the baby.

32.  On June 7, 2018, Corina and Treasure returned to their respective homes in Mississippi and Modesto, CA. Ruth's close friend, Suemy Miller, took the boys to

---

[1]The Pope's only owned one car at the time, so this arrangement worked out really well in terms of creating a fairly large and safe area where J.P.1 and N.P. could play in-doors.

1   stay over at her house for the rest of the weekend after Corina and Treasure left.
2   She returned the boys the following Monday. Going forward, Ruth arranged for
3   Ms. Cotton, the doula, to come earlier in the afternoon to assist in caring for J.P.1
4   and N.P. Ms. Cotton would then supervise the boys and assist with their end-of-
5   day routine, i.e., she made sure the boys were fed, bathed, and put to bed for the
6   evening. Before leaving, Ms. Cotton would typically check in with Ruth to see if
7   anything further was needed. This was the daily life pattern at the Pope home until
8   Tuesday, June 11, 2018.

9   33.   In anticipation of no longer having Ms. Cotton's help, Ruth made arrangements
10      with a family friend to come over and help out for a few hours, i.e., take care of
11      J.P.1 and N.P. in the late morning on June 12th so that Ruth could focus on the
12      baby and chores around the house – and maybe get a little rest.

13      *– J.P.1 Teases His Little Brother Relentlessly; Ruth Separates the Boys*

14   34.   The morning of June 12, 2018, Ruth awoke to the shrill sound of N.P.'s screams.
15      She headed toward N.P.'s room, which he shared with J.P.1, and found N.P.
16      running down the hall. From the sound of his screams and cries, she thought he
17      was injured. But, being only one year old, he was unable to communicate what
18      was going on. Ruth checked his body for injuries and found nothing notable. She
19      calmed him down, took him to the restroom to potty, and put him back to bed.
20      Ruth returned to her room. About ten minutes later, she heard loud thumping
21      noises coming from the boys' room. She went to their room and found J.P.1
22      wrapped in his blanket jumping up and down on the bed. She told him to stop and
23      chastised him about waking and teasing his little brother. He paused for a moment,
24      then continued jumping. Ruth disciplined him appropriately. **[2]**

25   35.   Although Ruth had planned to let J.P.1 and N.P. spend the day at her friend's

26

27         [2]A parent has a right to reasonably discipline his or her child and may administer
28   reasonable corporal punishment. *Gonzalez v. Santa Clara Cty. Dep't of Soc. Servs*., 223
     Cal. App. 4th 72 (2014). See also, *In re D.M.*, 242 Cal. App. 4th 634, 640-41 (2015).

house if she invited them, after J.P.1's behavior she decided that the two should be separated. Ruth told J.P.1 that if invited, he would not be allowed to go, but instead would stay at home with her.

36. Ruth sent a text to her friend explaining what had happened that morning and how J.P.1 was continuing to tease his little brother by waking him up early every morning and was being generally disobedient. Ruth told her friend that J.P.1 would not be allowed to come to her house that day, but instead would stay home and play in the play area in the garage separate and apart from his little brother, N.P.

37. Since the boys were up, Ruth went ahead and got them dressed, cleaned up, fed and ready for the day. June 12, 2019, was a nice, typical, June day in San Diego. It was between 63 and 70 degrees throughout the day – with a high of 70 degrees at around 3:00 p.m. There were scattered clouds and a light breeze of about 8-10 miles per hour all day. (A true and correct copy of the historical weather on June 12, 2019, is attached hereto as **Exhibit A** and incorporated herein by this reference as if set forth in full.)

38. After breakfast, Ruth told J.P.1 that he was not allowed to play with N.P. and that he would not be allowed to go when Ruth's friend came to pick up N.P. J.P.1 was unhappy about it, but took it in stride. He went to his play area in the garage and played with his toys and his little bike for most of the morning. Every now and then he would come inside to use the restroom and get different toys. Ruth checked on him every fifteen to twenty minutes. She would periodically bring him snacks and water and talk to him about the events of the day and how he might improve his behaviors.

39. At some point in the late morning or early afternoon Ruth heard the car door slam. She went downstairs to check on J.P.1 and found him playing with the car. She told him to stop and stayed with him for a few minutes to chit chat and watch him play. After a short time, Ruth went back upstairs to tend to the baby and other

1   chores. Ruth was unaware at the time that J.P.1 had slammed his finger-tip in the
2   car door.

3   40.   Ruth continued to follow her established daily routine of caring for the children
4         and completing chores around the house – periodically going to the play area to
5         check on J.P.1 and spend time interacting with him, reading stories, playing
6         together with his toys, and the like.

7   *– HHSA Receives a Call Alleging That J.P.1 Had Been Locked in The Garage*
8   *"All Day" as a Form of Punishment*

9   41.   Sometime during the early afternoon of June 12, 2019, HHSA received an
10        anonymous call reporting that Ruth had "locked J.P.1 in the garage" as a form of
11        punishment. Allegedly, among other things, the reporting party claimed that J.P.1
12        was "unable to exit the garage of his own accord" and that "he had been locked
13        inside all day." In fact, the reported allegations were not true. J.P.1 had not been
14        "locked in the garage all day." As described in greater detail below, the "play
15        area" in the Pope home was located on the third level of the home, in the garage.
16        While it was true that J.P.1 had been directed to play in that area of the home for
17        the a large part of the day, at no time was J.P.1 confined to the area – rather, he
18        was free to come and go, so long as he stayed away from his younger brother.

19  42.   Defendants Johnson and Robilotta were assigned to investigate the referral. At the
20        time they initiated their "investigation," they refrained from attempting to contact
21        the reporting party to determine the true nature of the reported allegations, and
22        instead went directly to the Pope home.

23  *– La Mesa Police and HHSA Agents Come to The Pope Home to Investigate a*
24  *Call*

25  43.   At around 3:00 p.m. J.P.1 heard a knock on the garage door. Frightened, he
26        stopped playing with his toys and ran upstairs to tell Ruth. A short time later, Ruth
27        heard a knock at the front door. When she answered, she found two La Mesa
28        Police officers. They told her they had been "informed" that she "locked J.P.1"in

1    the garage all day and requested entry into the home to check on J.P.1. The

2    officers were accompanied by Defendants Johnson and Robilotta.

3    44.   Ruth allowed the officers and Defendants Johnson and Robilotta to enter and

4          inspect her home. They found the home to be tidy, in proper order, and safe for

5          children. There was plenty of food in the refrigerator and the children appeared to

6          be clean, well fed, and generally well cared for. The play area in the garage was

7          noted to be tidy and well organized with plenty of room for J.P.1 to move and

8          play. His bike was there along with various toys which were scattered around –

9          J.P.1 had obviously been playing there when they arrived.

10   45.   Defendant Robilotta interviewed J.P.1. Defendant Johnson interviewed Ruth

11         separately accompanied by Officer Rost.

12   46.   When questioned, Ruth explained what had happened earlier in the morning (see

13         paragraphs 34 - 39, *supra*) and that as a result, J.P.1 was not allowed to play

14         together with his little brother that day. When asked about whether or not she

15         "locked" J.P.1 in the garage, she explained that he was *not* "locked" in the garage

16         and that he was free to come and go as needed.[3] But, he was not allowed to play

17         with N.P. She also explained that she had set a timer to remind her to check on

18         him every twenty minutes and had done so throughout the day.

19   47.   When questioned about whether or not she used corporal punishment as a means

20         of disciplining J.P.1, she stated that she had paddled him in the past but not on that

21         day or even recently.[4] She further explained that neither her nor her husband, who

22         was currently on deployment, had used corporal punishment to discipline J.P.1 for

23         "quite some time," opting instead to use other methods like timeouts and loss of

24

25         _____

26         [3]This was verified by the fact that when J.P.1 heard the police knock on the garage
         door, J.P.1 ran upstairs to get Ruth – as noted in the police report.

27         [4]As noted *supra*, a parent has a right to reasonably discipline his or her child and
         may administer reasonable corporal punishment. *Gonzalez v. Santa Clara Cty. Dep't of*
28       *Soc. Servs.*, 223 Cal. App. 4th 72 (2014). See also, *In re D.M.*, 242 Cal. App. 4th 634,
         640-41 (2015).

1    privileges.

2    48.   Defendant Robilotta, accompanied by Officer Jensen, took J.P.1 outside to

3    interview him in private. Officer Jensen was present for the entirety of J.P.1's

4    interview. During his interview he was questioned about an apparent injury on his

5    mouth and left arm. In response, J.P.1 told Robilotta that he had fallen at the

6    playground days prior. J.P.1 had no other apparent injuries.

7    *– Defendants Robilotta and Johnson Coerce Ruth Into Signing Their "Safety*

8    *Plan" and Sending J.P.1 to Stay Overnight With a Close Family Friend*

9    49.   In spite of the tidy appearance of the home and the fact that the children appeared

10   to be in good health and well cared for, Defendants Johnson and Robilotta openly

11   discussed removing all of Ruth's children right then and there. They told Ruth that

12   J.P.1 would have to leave for the night and presented her with a document they

13   called a "safety plan." The obvious implication, at least insofar as Ruth understood

14   the situation, was that if she did not agree, her children would be seized and

15   detained that afternoon. Ruth questioned them about their "safety plan" and what

16   it meant. Instead of responding to her questions, Johnson in an arrogant and

17   haughty manner ordered her to "just sign the plan."

18   50.   Ruth, having just overheard Johnson and Robilotta talking about taking all of her

19   children if she did not cooperate, felt she had no choice but to sign their plan or

20   face losing all of her children right then and there. [5]

21   51.   Facing what Ruth perceived to be Defendant Johnson and Robilotta's credible

22   threat to seize her children that afternoon if she did not agree to their "plan," Ruth

23   felt she had no real or rational choice other than to cooperate with Defendants'

24

25         [5]It bears note that at this point in time, there had been no determination by the
26   police officers present that a crime against any of the children in the home had been or
     would be committed. Had either of the officers been of the opinion that Ruth posed an
27   imminent threat of serious harm to any of her children, they would have taken immediate
     action. As far as the police were concerned, they were just there to perform a "welfare
28   check." Finding the children appeared to be well supervised, well cared for, and not in
     any imminent danger, the police departed.

1   coercive demands. Hence, under extreme duress, she permitted J.P.1 to be placed
2   overnight with her close friend, Almira Perry.

3   52.   Recognizing that N.P. and J.P.2 would not be in any danger whatsoever if left in
4         Ruth's care, Johnson and Robilotta departed. Distraught, Ruth immediately called
5         Ms. Cotton, and told her what had just happened.

6         *– Defendants Johnson and Robilotta Create False Entries in Their Contact*
7         *Notes*

8   53.   At some point in time after Johnson and Robilotta left Ruth's home, they entered
9         the "notes" of their "contacts" that evening into the CWS/CMS system.

10  54.   The CWS/CMS system is a state wide database owned, operated, and maintained
11        by the State of California. All California counties have access to it and are
12        required to enter their child welfare services data into it. There is a particular
13        function available in the CWS/CMS system called "Contact Notes." It is also
14        sometimes referred to as the "Delivered Services Log." All county HHSA workers,
15        like Robilotta and Johnson are trained that the Contact Notes/Delivered Service
16        Logs are to be completed at or near the time of the events recorded. They are also
17        trained that the information recorded there is required to be truthful, honest,
18        accurate, and complete. The reason for this requirement is that other HHSA
19        workers who perform other functions in the case will read, and rely on, the
20        Contact Notes/Delivered Service Logs in making important case decisions; and,
21        on occasion, the material in the Contact Notes/Delivered Service Logs may even
22        be relied upon by the judge assigned to the juvenile dependency case, if a
23        dependency case is filed.

24  55.   When Johnson and Robilotta entered their "notes" into the Contact
25        Notes/Delivered Service Logs they knowingly inserted false information and
26        omitted known exculpatory information, this false and incomplete information was
27        subsequently copied and pasted, and engrossed upon in the Warrant Application
28        filed by Defendant Lawhead, and in the Detention and Jurisdiction Reports filed

---

FIRST AMENDED COMPLAINT FOR DAMAGES

1   later in the case.[6]

2   *– J.P.1 is Subjected to an Unwarranted, Non-Consensual, Highly Invasive*

3   *Forensic/Investigatory Medical Examination*

4   56.   Later that same evening, i.e., June 12, 2019, at around 7:00 p.m., Defendant

5   Johnson called Ruth on the Telephone. Johnson explained that she had spoken

6   with her supervisor, Robyn Charlton, and that the two decided J.P.1 would be

7   subjected to what Johnson claimed was a "routine" medical examination at Balboa

8   Naval Medical Center in the morning. [7] Johnson then ordered Ruth to bring N.P.

9   and J.P.2 to the same facility in the morning for what Johnson termed "routine"

10   medical examinations.[8] Johnson ordered Ruth to be there with the boys by no later

11   than 12:00, noon. Ruth questioned Johnson saying "I don't like this. I know what

12   you people do. You like to take little black boys from their families and I have

13   three of them." Johnson responded saying, "you don't have a choice – be there on

14   time," and hung up the phone. Ruth felt fearful and intimidated and as if she had

15   no choice but to comply.

16   57.   Ruth again called Ms. Cotton, her doula, and told her what had happened. Ms.

17   Cotton, came to Ruth's home to console and advise her. Ms. Cotton stayed with

18   Ruth until approximately 9:30 p.m. She told Ruth she knew someone who might

19   be able to give her some advice and would try to get the two in contact the next

---

[6]In order to avoid duplication and the creation of a bloviated complaint, the specific false information, as set out in the allegations relating to the warrant application and Detention Report, is incorporated herein by this reference as if set forth in full herein.

[7]As it turns out, Defendant Johnson had made arrangements for all of the boys to undergo a forensic/investigatory medical examination without first obtaining either a warrant or Ruth's consent.

[8]At no point in time did Johnson ever explain to Ruth that it was her undisclosed intention to subject all of the boys to highly intrusive forensic medical examinations designed to uncover evidence of child abuse. Instead, when questioned about the nature of the proposed examinations, Johnson responded by falsely stating they were merely "routine." Even so, Ruth still objected. But, felt that under the circumstances, she had no choice in the matter.

FIRST AMENDED COMPLAINT FOR DAMAGES

13

1    morning. Ruth was so distraught that she didn't sleep at all that night.

2    58.   Early the next morning, June 13, 2019, Ms. Cotton texted Ruth the telephone

3          number for Cjambreka Frett, a licensed foster care provider for the County of San

4          Diego. Ruth called Ms. Frett and gave her a quick summary of what had happened

5          the day before. She also told Ms. Frett that she had been ordered to bring her two

6          younger children in for a "routine" medical examination. Ms. Frett recommended

7          that Ruth put together her own written safety plan, along with a list of names and

8          phone numbers of Ruth's close friends and family who were in her support system

9          so that it could be provided to Defendants Johnson and Robilotta when Ruth met

10         them at the hospital. Ms. Frett also instructed Ruth to bring with her any records of

11         therapy or other deployment support services which Ruth had already initiated

12         and/or arranged for prior to June 12, 2019.

13   59.   Once Ruth had done as Ms. Frett suggest, she gathered N.P. and J.P.2 and brought

14         them to the hospital to meet Defendants Robilotta and Johnson as she had been

15         ordered to do the night before. Having been instructed by Johnson to do so the

16         previous evening, Ms. Perry brought J.P.1. separately. Ms. Perry arrived about the

17         same time as Ruth and the younger boys.

18   60.   When Ruth, Ms. Perry, and the boys walked into the facility, Johnson and

19         Robilotta were there waiting. Ruth handed Johnson Ruth's safety plan and list of

20         contact information for her support group along with her records of therapy and

21         other deployment support services that had been arranged well before Kristoffor's

22         deployment. Johnson took the papers, rolled her eyes at Ruth, and handed the

23         papers to Robilotta. Robilotta and Johnson said something Ruth could not hear,

24         and snickered amongst themselves. Johnson immediately separated Ruth from

25         J.P.1. and took him to sit in a different area of the waiting room away from Ruth.

26         Johnson ordered Ruth to stay away from J.P.1, then left the room.

27   61.   After waiting just a short period of time, Defendant Johnson returned to the

28         waiting room and instructed J.P.1 to come with her saying, "we're ready for him."

1    Upon hearing this, Ruth got up to walk with them to the exam room. Johnson

2    barked at Ruth, "Don't get up, you are not allowed." Believing she had no say in

3    the matter, Ruth complied with Johnson's unlawful order excluding her from

4    J.P.1's examination. At that point in time, Ruth was of the objective belief and

5    understanding that these Defendants had taken custody of J.P.1 and that she had

6    no choice but to follow Defendants' unwarranted instructions.

7    62.    Unbeknownst to Ruth, J.P.1 was subjected to an intrusive forensic/investigatory

8    medical examination at approximately 1:00 p.m. at the specific request and

9    instruction of Defendants Robilotta and Johnson. Only much later did Ruth learn

10   that during J.P.1's non-consensual unwarranted forensic medical exam he was

11   stripped naked, laid on a table, and subjected to a close and detailed examination

12   including a close examination and manipulation of his external genitalia – even

13   though there were no allegations of sexual abuse of any kind.

14   63.    Even though Johnson excluded Ruth from J.P.1's forensic medical exam, both

15   Johnson and Robilotta attended the entirety of the child's  highly intrusive,

16   invasive, and traumatic examination – they even took pictures.

17   64.    At no point in time did Johnson or Robilotta disclose to Ruth the nature or extent

18   of J.P.1's intended forensic/investigatory medical examination or obtain her

19   consent to it. Nor did either Johnson or Robilotta obtain a court order or warrant

20   allowing for such an intrusive examination prior to conducting it. Moreover, at no

21   point in time did either Johnson or Robilotta obtain a court order or warrant which

22   would have permitted them to exclude Ruth from J.P.1's highly intrusive and

23   traumatic investigatory examination of his naked body and sex organs. Absent

24   such an order, Ruth had a constitutional right to attend and be present at all of

25   J.P.1's medical events, including this one. At no point in time did Ruth ever

26   consent to such an examination.

27   65.    The only explanation ever provided to Ruth regarding the nature of J.P.1's

28   examination was provided by Johnson the night before when she said it was

---

FIRST AMENDED COMPLAINT FOR DAMAGES

15

1    required, and that it was a matter of "routine." At no point in time did Ruth

2    consent to allow her son to be examined in such an intrusive manner, nor did she

3    consent to be excluded from the examination room. [9]

4    *– Defendant Johnson Interferes With Ruth's Access to J.P.1's Medical Records*

5    *and Treatment*

6    66.   During his forensic/investigatory medical examination J.P.1 disclosed that the day

7    prior, June 12, 2019, he had accidentally slammed his finger in the car door when

8    playing in the garage. As a result of the disclosure, at approximately 2:00 p.m.,

9    J.P.1 was taken for an X-Ray exam. Ruth trailed behind in an effort to comfort her

10    son. When they arrived at radiology, the X-Ray technician asked Ruth if she

11    would like a copy of the X-Ray once it was completed. Before Ruth could

12    respond, Defendant Johnson rushed to intervene. Without any legal or rational

13    basis to do so (particularly without first having obtained a warrant or other similar

14    court order to withhold the child's medical records), Johnson instructed the X-Ray

15    technician that Ruth was not permitted to see the X-Rays or know the results.

16    Johnson then proceeded to loudly proclaim to all staff present that Ruth was not to

17    be given any of J.P.1's medical records or information.

18    *– Without Ruth's Knowledge or Consent, and Without First Obtaining a*

19    *Warrant to Authorize it, Defendant Johnson Orders a Full Body X-Ray of N.P.*

20    *and J.P2*

21    67.   When it came to the baby's (J.P.2) turn, the doctor completed a visual examination

22    in Ruth's presence. Unbeknownst to Ruth at the time, Johnson and Robilotta had

23    met in private with the doctor and, after consulting with Defendant Charlton to

24

25    _____

26    [9]On June 15, 2019, Ruth was presented with a form titled "Consent For Examination and Treatment" for J.P.1. Upon presentment she was told that she was "required" to sign the form if she wanted to be notified and present at J.P.1's intake exam

27    at Polinsky as well as any future medical appointments and/or procedures. Nothing other than that was told to her regarding the contents of the form. At no point in time did Ruth

28    knowingly, intelligently, or voluntarily agree that her child, J.P.1 could be subjected to future *non-emergency* medical procedures without her advance knowledge and consent.

obtain her consent and agreement, decided to subject J.P.2 to a full-body skeletal X-Ray and more detailed forensic medical examination the following day once Johnson and Robilotta had seized the children and taken Ruth out of the picture.

68.   Without Ruth's knowledge or consent and without first obtaining a court order or warrant to permit it, Defendants directed that a full skeletal survey be completed on J.P.2. This was accomplished the following day in spite of the fact that J.P.2 had no apparent injuries, and in spite of the fact that there were no allegations related to him in any way. At the time these Defendants made the decision to do these things, the baby appeared to be in good health, did not appear to be suffering from any form of injury or distress, and otherwise appeared to be a happy healthy baby. Moreover, according to all the information these Defendants had gathered to-date, Ruth had always been appropriate with the baby, and had never administered any form of corporal punishment to him.

69.   There was no apparent exigent circumstance that would have obviated the requirement that Defendants first obtain either a warrant or consent before subjecting J.P.2 to either a non-consensual forensic medical examination or a full body X-Ray at that point in time. At no point in time did Ruth ever consent to either of these procedures.

70.   Meanwhile, Ruth and the children continued to wait around at the hospital for Johnson and Robilotta's further instructions.

71.   During the time Ruth was waiting at the facility for the various tests, interviews, and examinations of her children to be completed, unbeknownst to Ruth, Defendant Johnson contacted Defendant Lawhead and requested that Ms. Lawhead draft and file an application for a protective custody warrant to detain all of Ruth's children.

/ / /

/ / /

1

2

3

*– Without Personally Conducting Any Investigation Whatsoever, Kimberly Lawhead Drafts and Files Her Application for Protective Custody Warrant and Signs it Under Penalty of Perjury;*

4    72.   In her warrant application Defendant Lawhead swore under penalty of perjury that

5          the following statements were true when in fact they were not true: 1) "The mother

6          stated that she spoke with Jordan on Tuesday night (06/1112019) and explained

7          that if he woke Noah up at 6 a.m. he would be placed in the garage as

8          punishment;" [10] 2) "The mother was not clear on the sequence of events between

9          Noah waking up at 6 a.m. and Jordan going down into the garage at l0 a.m. for his

10         punishment;" [11] 3) The mother stated that Jordan told her that he "does it to stress

11         her out, disrespect her, and so that his daddy will come home from deployment." [12]

12         4) "The mother reported that it was the father's idea to send Jordan to the garage

13         for punishment so that she could get a break;" [13] 5) "The mother repeatedly stated

14         Jordan is 'malicious and does things to stress me out.'" [14] 6) "When asked if she

15         had any supports to help care for Jordan, she stated she had friends that were

16

---

17    [10]This is false. Ruth never said this at all. What Ruth told Johnson was that she had

18    explained to J.P.1 the night before, that he would get in trouble if he woke his brother up

      the next morning – that's it. Moreover, Ruth never said that J.P.1 had been "placed in the

19    garage as punishment." In fact, what she said was that the garage was J.P.1's regular play

      area.

20    [11]This is a false statement. First, Ruth was both clear and consistent in her

21    recounting the events of the morning. See section above titled "– J.P.1 Teases His Little

      Brother Relentlessly; Ruth Separates the Boys." Secondarily, the statement regarding

22    "going down to the garage for punishment" is simply false. Ruth never said J.P.1 had

      been sent to the garage as "punishment." What she said was that J.P.1's play area was in

      the garage, and that it was a safe space for him to play unattended.

23

24    [12]This, as with the other identified "statements" is also false. Ruth never said the

      quoted words, at all. Its made up.

25    [13]This is totally false. Ruth never said any such thing. What Ruth said, was that

26    prior to J.P.2's birth, Kristofor had suggested that Ruth create a play area in the garage

      for J.P.1; and, that acting on Kristofor's suggestion, Ruth and Courbine Pope had

27    rearranged and cleaned the garage to clear a safe space for J.P.1 to play unattended after

      the baby came.

28    [14]This is a totally false statement. Ruth never said Jordan is 'malicious and does

      things to stress me out.' Never! This is a total fabrication.

willing to help by taking him for the day, but she does not feel it is right to reward his behavior with a 'fun day of doing things.'" [15] 7) "This worker explained to the mother that the hot garage from 10:00 a.m. to when this worker arrived at nearly 5:00 p.m., is not an appropriate form of punishment, as he is five years old." [16]

73.   In addition to the foregoing, Defendant Lawhead falsely reported that Ms. Perry stated: 1) "when she was buckling J.P.1 into his car seat J.P.1 stated 'my mom punched me;" [17] 2) that "J.P.1then showed her how the mother punched him in the head, leg, and on his finger;" [18] 3) "I'm just heartbroken over this;" [19] 4) "if it was my opinion, he should not be back in that house at least until his father comes back from deployment;" [20] 5) "Ruth has talked smack about Jordan for a long time, but I never thought she actually did anything like this;" [21] 6) "Ruth has 'talked smack,' Ms. Perry stated she has been frustrated with him since around N.P.'s birth;" 7) "She [Ms. Perry] is glad that CWS was called because she did not know

---

[15]This, while not a totally false statement, is twisted and out of context. What Ruth said, was that she had people in her support system who could help take J.P.1 for a day or a weekend. But, she had a concern that he would establish a cycle of acting out in order to get sent to a friend's house to play, instead of being bored at home.

[16]This statement is untrue. First, as noted in **Exhibit A** hereto, the garage was not "hot;" and, second, J.P.1 was not sent to the garage as a form of "punishment."

[17]This statement by Ms. Lawhead is a lie. Ms. Perry will testify at trial that she did not say any such thing during her conversation with Ms. Johnson or any other county social worker at any time whatsoever, and that J.P.1 never said any such thing to her.

[18] This was also a lie. As with the prior statement, Ms. Perry will testify at trial that she did not say any such thing.

[19]This statement appears to have been intentionally used out of context. Ms. Perry will testify at trial that said words to the effect of "I am heart broken that all this is happening while Kristoffor is on deployment and Ruth is alone. I think its wrong to take the children. They should be at home with their mother."

[20]This is a totally fabricated statement. Ms. Perry will testify at trial that she never said any such thing.

[21]This is also false and totally fabricated. Ms. Perry will testify at trial that she never said any such thing, and that she does not even use that sort of language and that it was "weird."

1
2
3

the extent of the discipline;" [22] 9) "Ruth has said she was frustrated with Noah, but not the same way she talks about Jordan. Who knows though with time it could get worse, too." [23]

4
5
6
7
8

74.   In addition to the foregoing, Defendant Lawhead stated in her Statement of Cause that while Ruth had agreed to safety plan J.P.1 out of the home with Ms. Perry on 06/12/2019, as of 06/13/2019 Ms. Perry was no longer able to care for J.P.1. This was also a lie. In fact, Ms. Perry specifically said that she could keep J.P.1 in her home for the balance of the summer, i.e., until September if needed.

9
10
11
12
13
14
15
16
17
18
19
20
21

75.   Defendant Lawhead also states in her Statement of Cause that "Mother's additional support network was aware of the concerns for some time; however, did not take action to ensure safety for the children." This is false. In fact, Ruth provided Johnson and Robilotta a comprehensive list of her "support network" with each person's contact information on the morning of June 13 at Balboa Naval Hospital several hours before the Warrant Application was filed. On information and belief, none of these Defendants even bothered to contact or interview Ruth's support network even though they had plenty of time, i.e., more than 8 hours to do so. Instead, Lawhead simply lied and stated "Mother's additional support network was aware of the concerns for some time; however, did not take action to ensure safety for the children." This was pure supposition without an support in reality at all. As it turned out, Lawhead never spoke to a single witness, and thus had no evidence in her possession to support her false supposition.

22
23
24

76.   In making each of the foregoing statements in her warrant application, Defendant Lawhead acted with a conscious and knowing disregard for the truth or falsity of

25
26

[22] As with the prior identified statements, this one is also a fabrication. Ms. Perry will testify at trial that she never said any such thing, and that in fact the opposite was and remains true. She never believed CWS should have been involved with this family.

27
28

[23] This statement was also pure fabrication. Ms. Perry never said any such thing. She will testify at trial the conversation only lasted a couple minutes and that the substance of the conversation related to the need to bring J.P.1 to the hospital for an examination the following morning – nothing more.

the information she set forth there.

***– Knowing That The Facts Defendant Lawhead Relied on To Obtain The Warrant Were False, Defendants Johnson and Robilotta Seize All of Ruth's Children***

77. As evening approached, Johnson directed that Ruth and the children move into a private conference room. The children were permitted to come and go and play in the hall. But, Ruth stayed to care for the baby, J.P.2. Because the conference room had windows, Ruth was able to see and loosely supervise J.P.1 and N.P.

78. Approximately four hours later, a doctor came in and told Ruth that the X-Rays revealed that J.P.1's finger tip was broken. This was the first time she learned of J.P.1's injury. Regardless, the fracture was such a minor injury that it did not require any sort of splint or cast.

79. A short time later, Defendant Johnson came back into the conference room and closed the blinds. Ruth had just begun to nurse J.P.2 when Johnson told her that the decision had been made to "remove" all of the children from Ruth's custody. Shocked, stunned, and amazed, Ruth looked out the door for J.P.1 and N.P. She begged Johnson to at least let her hug them and reassure them. Johnson told her not to bother, "we've already got them."

80. Ruth was in shock – devastated. Johnson then directed her to "hurry up and get done feeding the baby so we can take him too." Ruth finished nursing J.P.2 as best she could and changed his diaper and clothes. She struggled to control her despair to keep from upsetting the baby. Johnson stood over her huffing and puffing – impatient to take the baby and leave. Reluctant to just hand over J.P.2, Ruth asked, "Don't you have to have a warrant to take people's kids?" Johnson responded saying, "I don't need to show you a warrant. After you give us the baby, I'll tell you everything you need to know." Ruth put J.P.1 in the stroller. Ruth stood and watched, speechless, as Robilotta pushed the stroller down the hall. Johnson gave Ruth her business card and walked away.

81.  Knowing that the facts defendant Lawhead relied on to obtain the warrant were false, defendants Johnson and Robilotta execute the fraudulently obtained warrant an seize all of Ruth's children

*– J.P.1 is Subjected to Another Physical Examination at Polinsky Children's Center; Ruth Signs a Vague and Ambiguous Consent Form*

82.  On June 15, 2019 Ruth was summoned to Polinsky Children's Center to be present during J.P.1's "intake exam." When she arrived she was handed a packet of papers and directed to fill them out and sign them. One of those forms was titled "Consent for Examination and Treatment." The staff member was impatient and pressured Ruth to sign the forms as she rushed J.P.1 along toward the examination room. Ruth did not have time to review the forms or ask any questions about them. As staff handed her the forms to sign, the staff person specifically told Ruth that "this form will allow us to examine J.P.1 today, and if we need to examine him again or perform any medical procedures in the future you will be informed and allowed to be present."

83.  On the face of the form, Ruth "consented" to J.P.1's proposed "examination" and to  emergency treatment during the time he was reposed with San Diego County. She did not, however, waive any of her rights to notice and/or decision making authority for elective medical procedures. Moreover, in the event of an emergency, the form expressly provided that "a reasonable effort to contact a parent/guardian will be made before medical, dental, or mental health care is begun, if the time conditions permit." The "consent" form also expressly acknowledged Ruth's right to be informed and to be present at medical visits and procedures. Ruth signed the form, under duress, on June 15, 2019.

84.  Immediately after signing the form, J.P.1 was taken in for his exam. J.P.1 was stripped down to his underwear and photographed. The examination was so traumatizing that during the exam, J.P.1 cried and hid under the table – terrified. The exam discovered nothing that was not already known from his extensive

1    forensic exam at Balboa Naval Medical Center just days before.

2    *– Defendant Johnson Files Her Juvenile Dependency Petition; It Contains*
3    *Knowingly False Material Allegations*

4    85.    On June 17, 2019 at 3:59 p.m. Kaliha Johnson filed her Juvenile Dependency
5           Petition to initiate a juvenile dependency action to strip Ruth of custody of her
6           children. There, Defendant Johnson falsely alleged under penalty of perjury that
7           Ruth had broken J.P.1's finger, bruised his face and arm, and confined him to the
8           garage all day. Johnson signed the document after the written phrase "I declare
9           under penalty of perjury under the laws of the State of California that the
10          foregoing and all attachments are true and correct."

11   86.    At the time she drafted and filed her sworn petition containing the above identified
12          false statements, Defendant Johnson had already completed her interviews of J.P.1
13          and Ruth. Hence, Johnson knew that, at least according to J.P.1, he had slammed
14          his finger in the car door by accident (see paragraphs 39 and 60, *supra*). Similarly,
15          with respect to Johnson's allegations that J.P.1 had sustained bruises on his face
16          due to some vaguely alleged conduct by Ruth, J.P.1 had already explained outside
17          of Ruth's presence that he had scratched his face and bruised his arm at the
18          playground days before. (See paragraph 45, *supra*.)

19   *– Defendant Johnson & Charlton Together Submit False and Incomplete*
20   *Information to The Juvenile Court to Support The False Juvenile Dependency*
21   *Petition*

22   87.    On June 17, 2019, Defendants Johnson and Charlton collaborated together to draft
23          and file their Detention Report with the Juvenile Court. Although Charlton was
24          not available to sign the report once it was completed, on information and belief,
25          in spite of her full knowledge of the false and materially incomplete and
26          misleading information it contained, Charlton authorized the Detention Report to
27          be signed on her behalf and filed with the Juvenile Dependency Court. Within the
28          body of their Detention Report, Johnson and Charlton created a false narrative

FIRST AMENDED COMPLAINT FOR DAMAGES

1   replete with false statements, fabricated facts, and incomplete/misleading
2   statements. For example:

3   a.   In their Detention Report Johnson and Charlton state that when they asked
4        J.P.1 how his finger got broken, he responded by stating, and they put this
5        in quotes "My Mom [sic] was punching me and I was getting away from her
6        and she punched my finger." This was not true at all J.P.l didn't say any
7        such thing to them. In fact J.P.1 specifically told Johnson and Robilotta that
8        he had accidentally slammed his finger in the car door when playing on June
9        12, 2019. Charlton was not even present during the conversation referenced
10       and would have had no personal knowledge of it and was deliberately
11       indifferent to the truth or falsity of the information contained in the report.
12       (See paragraphs 39 and 60, *supra*.)

13  b.   In their Detention Report Johnson and Charlton stated that Ruth had
14       "confined" J.P.1 to the "hot" garage and "locked" him in there for 10+
15       hours. This was blatantly false. Specifically, it was not hot at all that day
16       (see paragraph 37, attached **Exhibit A**). Secondarily, J.P.1 was not
17       "confined" or "locked" in the garage. In fact he was free to go in and out as
18       he pleased but was not allowed to play with or tease N.P., or to go out of the
19       home for a play day. (See paragraphs 38 and 40, *supra*.) Lastly, he had not
20       been playing in the garage that day for 10+ hours.

21  c.   In their Detention Report Johnson and Charlton stated during their June 12,
22       2019 interview with Ruth's friend, Almira Perry, that Ms. Perry stated that
23       she believed Ruth was abusive toward J.P.1 and that he should be detained
24       from her care until "the father returns from deployment." These *alleged*
25       statements were totally fabricated by Defendants. During the referenced
26       interview Ms. Perry specifically stated that she thought Ruth was a good
27       parent and that she believed the children were safe in Ruth's care. She
28       never, ever, said that 'Ruth was abusive toward J.P.1 and that he should be

1    detained from her care until "the father returns from deployment."

2    d.    In their Detention Report Johnson and Charlton stated that J.P.1 only had a

3    bottle of water all day. This was a false statement and Defendants knew it

4    when they filed their report. During their interview with Ruth on the

5    afternoon of June 12, she specifically provided them with the details of the

6    day, including what J.P.1 had eaten that day and when. She told them that

7    he had a balanced breakfast and lunch, and snacks throughout the day. She

8    also told them that he had water and fruit juice available for him whenever

9    he wanted. J.P.1 confirmed this during his private interview. Ruth also

10   disclosed to Johnson and Robilotta that she has been a Certified nutrition

11   therapist since 2016, and is very aware of what J.P.1's nutritional needs

12   where and how to meet them.

13   e.    In their Detention Report Johnson and Charlton falsely stated that J.P.1

14   "reported to PSW Robilotta" during his interview on June 12, 2019, that he

15   did not "play when he was in the garage" but instead that he laid down all

16   day on a cardboard box. Johnson's report of the substance of this

17   conversation is false. J.P.1 never said these things. In fact, what he said was

18   that he had been playing in the garage with his bike and toys. He confirmed

19   this during his forensic interview as well.

20   f.    In their Detention Report Johnson and Charlton stated that "On 6/15/2019,

21   Dr. Villarroel findings from Noah's forensic medical exam found abrasions

22   on his abdomen." This is a technically true statement. However, these

23   Defendants went on to state "The mother did not provide history to explain

24   the injuries." This portion of the report is utterly false. In fact, when

25   Johnson questioned Ruth about the scratches, Ruth explained that the light

26   scratches on N.P.'s belly came about as a result of N.P., who was then in the

27   process of being potty trained, yanking his pull-up diapers too quickly and

28   as a result scraping his abdomen with the rough part of the velcro on his

FIRST AMENDED COMPLAINT FOR DAMAGES

25

1         pull-ups as well as his fingernails.

2      g.     In their Detention Report Johnson and Charlton stated that on June 13th,

3         during J.P.1's medical exam at Balboa Ruth disclosed potentially abusive

4         behaviors to the doctor. The alleged conversation reported by Johnson was

5         totally fabricated – IT NEVER HAPPENED! Ruth was completely and

6         totally excluded from J.P.1's medical examination and she never spoke to

7         the doctor about J.P.1 at all. Moreover, Johnson had expressly prohibited

8         the medical staff from communicating with Ruth that day. (See paragraphs

9         54-57, *supra*.)

10     h.     In their Detention Report Johnson and Charlton stated that "while trying to

11        obtain a photograph of N.P.'s abdomen, he repeatedly stated 'ouchie.'" This

12        statement by Johnson and Charlton is a total fabrication. Its not true at all, in

13        any respect. When the doctor examined N.P. on June 13th, Ruth was allowed

14        to be present. In fact, he sat in her lap. He did not utter a word during the

15        exam – certainly not "ouchie." Moreover, at this point in time N.P. was

16        nearly non-verbal. (See paragraph 34, *supra*.)

17     i.      In their Detention Report Johnson and Charlton stated that Ruth "hit[] J.P.1

18        with phone charger cords, electrical cords, and punch[ed] him to the point of

19        causing bruising to his head and ears." All of this was false. Ruth had been

20        honest when questioned and openly admitted that she had, in the distant past

21        spanked J.P.1, and on one occasion paddled him with a wooden spoon. [24]

22     j.      In their Detention Report Johnson and Charlton falsely stated that "The

23

24         [24]In *Gonzalez v. Santa Clara Cty. Dep't of Soc. Servs*., 223 Cal. App. 4th 72

25   (2014), A report of child abuse alleged that plaintiff mother spanked her daughter with a
       wooden spoon and caused bruises. There, the court found that the use of a wooden spoon

26   to administer a spanking does not necessarily exceed the bounds of reasonable parental
       discipline and more generally that it is not *ipso facto* unlawful for a parent to spank a
       child for disciplinary purposes with an object other than the hand. See also, *In re D.M*.,

27   242 Cal. App. 4th 634, 640-41 (2015); A parent's spanking of his or her children on the
       buttocks with his or her bare hand and with a sandal does not categorically constitute

28   "serious physical harm" sufficient to invoke dependency jurisdiction.

1   explanation provided by the mother as to how J.P.1 sustained [the scrapes

2   on his face, arm, and leg] on the playground are not consistent with the

3   injuries." This statement by Defendants, while being a mere statement of

4   opinion, presents totally false/fabricated "facts" as a basis for their opinion.

5   Namely, no such conversation was ever had with Ruth. Ruth was never

6   asked about how J.P.1 sustained the mentioned injuries. Rather, when J.P.1

7   was interviewed by Robilotta (along with Officer Jensen, who wore a

8   recording device) he stated that he sustained the injury playing at the

9   playground. Ruth never said anything about the bruises because she never

10  asked. (See paragraph 45, *supra*.)

11  k.   In their Detention Report Johnson and Charlton state that Ruth was "the

12       only adult in the home" leaving the children at a high level of risk. This was

13       also false, and they knew it. (See paragraphs 28-32, and 52-54, *supra*.)

14  l.   In their Detention Report Johnson and Charlton state that Ruth did not have

15       a support system in place to help care for the children, which put the

16       children at risk. This was also false, and Defendants  knew it at the time

17       they drafted their report. (See paragraphs 28, 52, and 54, *supra*.)

18  m.   In their Detention Report Johnson and Charlton stated that "The mother

19       reported that it was the father's idea to send J.P.1 to the garage for

20       punishment." Nothing was further from the truth. Again, as with other

21       statements in the Detention Report these Defendants twisted Ruth's

22       statements in order to support the false narrative that she was an abusive

23       mother. Ruth never said "that it was the father's idea to send J.P.1 to the

24       garage for punishment." In truth, Ruth told Johnson that Kristoffor was on

25       deployment and very difficult to get a hold of. She went on to explain that

26       Kristoffor had agreed that it would be fine if Ruth moved his work-out

27       equipment out of the way in the garage while he was out to sea in order to

28       make a safe place for the boys to play once the baby came.

---

FIRST AMENDED COMPLAINT FOR DAMAGES

1
2
3
4
5
6
7
8
9

    n.     In their Detention Report Johnson and Charlton stated that both parents consistently used physical punishment on J.P.1. This was an intentionally misleading statement. During her interview on June 12, 2019, Ruth disclosed that in the past she had spanked J.P.1 but that had been a long time ago. (See paragraph 44, *supra*.) Even though Johnson was aware that Ruth no longer used corporal punishment on a consistent basis, Johnson refrained from reporting this exculpatory information to the Juvenile Court in her Detention Report and in fact, actively suppressed the information substituting false information instead (See paragraph 71(I), *supra*.)

10
11
12
13
14
15

    o.     In their Detention Report Johnson and Charlton state that a warrant had been obtained which would have allowed J.P.1, N.P., and J.P.2 to be lawfully removed from Ruth. The obvious implication being that another judge had already reviewed these facts and found the children to be in danger. However, on information and belief, this was not an accurate statement either. [25]

16
17

The above list is intended as exemplar only and is not to be considered as an exhaustive list of the false statements reported to the Juvenile Court by Defendants

18
19
20

---

21
22
23
24
25
26
27
28

[25]In an effort to test the accuracy of this particular statement, Plaintiffs' counsel filed an 827 petition specifically seeking copies of "All warrants/court orders issued by the Court." Plaintiff's 827 Petition was granted on April 12, 2021. There, the Juvenile Court ordered that "The petitioner has demonstrated by a preponderance of the evidence that the records requested are necessary and have substantial relevance to the legitimate needs of the petitioner. After an in camera review, the court determines that all of the documents requested may be disclosed. The court releases the documents and orders the redaction of identifying information of other minors; names, addresses and telephone numbers of reporting parties; social security numbers, dates of birth and driver's licenses numbers." All responsive court documents were produced to Mr. McMillan on, or about, April 19, 2021. No warrant or other similar court order authorizing the seizure and/or detention of the Pope children on June 13, 2019 exists. Similarly, no warrant authorizing the forensic/investigatory medical examinations including the full-skeletal X-Ray of either J.P.2 or N.P. exists. Lastly, there is no warrant or similar court order allowing any of the Pope children to be vaccinated without the parent's foreknowledge and consent. As appears *infra*, J.P.1 was secretly vaccinated at Defendants Shreckengost and Straub's direction.

1   Johnson and Charlton in their Detention Report. [26]

2   88.   In spite of Johnson and Charlton's knowledge that the statements contained in

3         their Detention Report created a false and fraudulent narrative of Ruth as an

4         abusive and dangerous mother Johnson signed the report on her own, and as noted

5         *supra*, Charlton authorized another worker to sign on her behalf and submit it to

6         the Juvenile Court.

7   89.   At the time they did these things, Defendants Johnson and Charlton knew, or

8         through the exercise of reasonable diligence should have known, that many of the

9         important facts set out in their Detention Report were materially false and/or

10        materially incomplete and misleading. Nonetheless, they  caused their fraudulent,

11        incomplete, and misleading, Detention Report to be filed with the Juvenile Court.

12  90.   When they submitted their fraudulent, incomplete, and misleading, Detention

13        Report to the Juvenile Court, due to their extensive training and experience,

14        Johnson and Charlton knew with certainty that their Detention Report would be

15        the primary evidentiary document the juvenile court would rely on in making its

16        decision at the Detention Hearing (which is akin to an arraignment in the criminal

17        context). When they submitted their Detention Report it was Johnson and

18        Charlton's intention that the juvenile court accept their fraudulent report into

19        evidence, accept the statements therein as true, accurate, and complete, and render

20        its decision based on the "facts" contained in their fraudulent Detention Report.

21        *– Mislead by Johnson and Charlton's False Narrative of Abuse, Judge Bubis*

22        *Detains The Pope Children; However He Gives Johnson and Charlton*

23        *Discretion to Take Corrective Action – Which They Refrain From Doing*

24  91.   On June 18, 2019, the Detention Hearing was held at approximately 10:00 a.m.

25

26          [26]On information and belief, J.P.1's interviews (particularly those where police
27  were present) were recorded as indicated in the police reports. It is anticipated that upon
    receipt of those recordings through the discovery process more false statements and
28  suppressions by these defendants will come to light. The same holds true of J.P.1's
    forensic interview.

FIRST AMENDED COMPLAINT FOR DAMAGES

29

before Judge Gary M. Bubis. There, the judge read and considered the "facts" contained in Johnson and Charlton's fraudulent Detention Report, accepted the report into evidence, and relied upon it in deciding that the Pope children should continue to be detained from Ruth's care. At the same hearing, however, Judge Bubis also ordered that Defendant Johnson had "discretion" to allow the children to return home to Ruth without further order of the court – thus putting the power to correct their actions directly in Defendant Johnson and Charlton's hands. Nonetheless, Defendants Johnson and Charlton continued to detain all of the children from Ruth's care and custody instead of sending them home even though they knew the evidence against Ruth was largely concocted and false.

*– The Children Are Placed First At Polinski Children's Center, Then in Foster Care*

92. On, or about, June 14, 2019, J.P.1 and N.P. were place at Polinski Children's Center. Based on information and belief, Defendant Shreckengost directed that J.P.2 be placed with foster parents "Charity and Sean," who lived more than an hour from Ruth's home. This made it particularly difficult for Ruth to deliver breast milk for J.P.2.

93. The next day Ruth was able to obtain Charity and Sean's contact information and to talk with Charity about the situation. She told Charity that J.P.2 was breast feeding at the time of his seizure and requested that she be permitted to provide Charity with pumped breast milk during the time he was placed in Charity's home. Charity was kind and sympathetic. She agreed to help Ruth continue providing J.P.2 breast milk. The two also discussed Ruth's desire to have J.P.2 circumcised and that he remain on a delayed vaccination schedule. Charity, holding similar views agreed to do what she could to conform to Ruth's wishes.

94. Due to restrictions imposed by DOE HHSA Workers (presumably Defendant Shreckengost) in contravention of Ruth's rights to manage the continued medical care of J.P.2, he was not able to timely be circumcised.

FIRST AMENDED COMPLAINT FOR DAMAGES

95.   On, or about, June 27, 2019, N.P. was released from Polinksi Children's Center to Sean and Charity's custody. He remained there with J.P.2 until the Court ordered their release back to Ruth on or about July 18, 2019. But by this time, it was too late for J.P.2 to be circumcised. His doctor instructed Ruth that she would have to revisit the issue when he turned 5 years old. It bears note that at this point in time no court order had been issued to restrict Ruth's ability to make medical decisions for her children, or otherwise restricting her ability to participate in and/or manage their healthcare.

96.   On June 27, 2019, J.P.1was released from Polinski Children's Center back to Amira Perry where he remained until July 3rd when he was transferred to the care of Ruth's close family member, Terrilynette Minor. J.P.1 was permitted to stay with the Minor family for only a short time.

**_– Ruth Meets Defendant Shreckengost For the First Time on July 2, 2019 at a Child and Family Team Meeting_**

97.   On July 2, 2019, there was a Child/Family Team meeting held. This was the first time Ruth met Melinda Straub's supervisor, Defendant Shreckengost, face-to-face. Several members of Ruth's support system attended the meeting  including CJ Frett, the Minor family, Ruth's cousin Gerald, her attorney (Judith Klein), and several others on conference call. The facilitator noted that she had never seen a CFT with so many support members present.

98.   When the subject of the CFT meeting turned to the best path to getting the children back home, Diana Shreckengost rudely interrupted. Speaking in very punitive terms she said, "you'll get them home when I say you'll get them home. There is no way the little ones are coming back to you unless J.P.1 comes back with them." Ruth's attorney protested saying, "that's not your decision," or words to that effect. Ruth calmly and politely added, "I have the support I need in place." Shreckengost ignored Judy Klien's comments and responded directly to Ruth, "your kids aren't coming home anytime soon, even if you have all the support you

1   need. I don't care." Everyone at the meeting including Melinda Straub, seemed

2   disturbed by Diana Shreckengost's aggressive, condescending, and rude

3   demeanor.

4  99.  Also during the meeting, Shreckengost asked whether or not the children were

5   vaccinated. Ruth responded "yes" to Shreckengost's query.

6  100.  A few days later, on July 7th, J.P.1 was removed from the Minor family, without

7   any reason being provided, and placed back at Polinski Children's Center where

8   he stayed until July 11, 2019, when he was placed with foster parents Ruby and

9   Donna – total strangers to the Pope family. On information and belief, this was

10   ordered to be done as a punitive measure by Defendant Shreckengost to punish

11   Ruth and her attorney for challenging her at the CFT.

12   ***– Melinda Straub and Defendant Diana Shreckengost File Their***

13   ***Jurisdiction/Disposition Report on July 8, 2019; The Report Repeats and***

14   ***Rephrases The Prior False Material Contained in The Detention Report and***

15   ***Omits Known Material Exculpatory Information***

16  101.  Upon completion of the Detention Hearing on June 18th, Melinda Straub was

17   assigned as the case carrying worker. Defendant Diana Shreckengost was her

18   direct supervisor.

19  102.  Part of Ms. Straub's job duties included the duty to continue to investigate and

20   manage the case after the Detention Hearing. Pursuant to state regulations and San

21   Diego County policies in place at the time, it was also Ms. Straub's obligation to

22   conduct a thorough and complete re-investigation of the allegations contained in

23   the Detention Report – which included the obligation to re-interview the witnesses

24   identified in the Detention Report to ensure the accuracy of what they were

25   reported to have said, and to obtain a more thorough and complete understanding

26   of the underlying issues that led the family to be before the Court in the first place.

27  103.  Upon completion of her investigation, Ms. Straub was supposed to honestly,

28   accurately, and completely report her findings and information to the Juvenile

1  Court, including all exculpatory information. Along those lines, to the extent her

2  re-investigation uncovered any inaccuracies in the Detention Report, it was her

3  duty to so inform the Court, and correct them. Then, based on the new and/or

4  engrossed information uncovered, make recommendations to the Court regarding

5  how best to deal with the child and/or the family.

6  104.  On information and belief, notwithstanding her duties and obligations as noted

7  above, Ms. Straub was specifically instructed by Defendant Shreckengost to

8  forego any re-investigation of the "facts" reported in the earlier Detention Report,

9  and instead merely to cut and paste those "facts" into her Jurisdiction/Disposition

10  Report – which Ms. Straub did.

11  105.  In addition to simply copying and pasting the materially false allegations

12  contained in the Detention Report, Straub and Shrekengost expanded upon and

13  supplemented them with their own false and materially misleading statements. For

14  example, in their Jurisdiction Report they state: 1) "The mother has identified that

15  she would like to see at least the younger two children return home while she

16  continues to work on her parenting skills, under the constant supervision of either

17  her friend and/or her mother in law;" [27] 2) That Ruth stated she had "scaled back"

18  beating J.P.1; [28] 3) that Ruth stated she "typically disciplines J.P.1 by spanking

19  him [in a particular manner;" [29] 4) that Ruth did not want J.P.1 returned to her

20  immediately but instead wanted to "transition" J.P.1 back to home slowly so that

---

[27]This was a false and/or a materially misleading statement. In fact, at no time did Ruth state that "she would like to see at least the younger two children return home while she continues to work on her parenting skills, under the constant supervision of either her friend and/or her mother in law." What she said was that she "wanted all of her children returned to her." As stated, the Jurisdiction Report leaves the impression that Ruth did not want J.P.1 home.

[28]This was a false and/or materially misleading statement. What Ruth had said, in truth, was "I told [Defendant Johnson] spanking is not an effective form of discipline for J.P.1. We haven't spanked him in nearly a year."

[29]This was a false and/or materially misleading statement. What Ruth had said, in truth, was "I told [Defendant Johnson] spanking is not an effective form of discipline for J.P.1. We haven't spanked him in nearly a year."

1    the two would not feel "unnecessary" pressure. [30]

2    106.   Upon completion of her report, Defendant Shreckengost signed the

3           Jurisdiction/Disposition Report on July 8, 2019, and caused it to be filed with the

4           Juvenile Dependency Court the following day.

5    107.   At the time Defendant Shreckengost filed the Jurisdiction/Disposition Report she

6           knew, or through the exercise of reasonable diligence should have known, that

7           many of the important facts set out in the Detention Report were materially false

8           and/or materially incomplete and misleading. Nonetheless, Shreckengost filed her

9           report with the Juvenile Court.

10   108.   When she submitted the Jurisdiction/Disposition Report to the Juvenile Court, due

11          to he extensive training and experience, Shreckengost knew with certainty that her

12          Jurisdiction/Disposition Report would be accepted into evidence and relied on by

13          the Court in making its decisions at the Jurisdiction/Disposition hearing. When she

14          submitted her Jurisdiction/Disposition Report it was Shreckengost's intention that

15          the Juvenile Court accept the Jurisdiction/Disposition Report into evidence, accept

16          the statements therein as true, accurate, and complete, and render its decision

17          based on the "facts" contained in it, at least in part.

18   109.   On July 10, 2019, Ruth contested the "allegations" set out in the Petition and

19          various reports, and the Juvenile Court set a "special hearing" to address Ruth's

20          repeated request that her boys be sent home to her. At that same hearing, Judge

21          Bubis expressly granted Shrekengost "discretion" to return Ruth's children to her.

22          But, Shrekengost refused to do so. But for Shreckengost's and Straub's knowingly

23          false statements and intentionally omitted material exculpatory information, on

24          information and belief, Judge Bubis would have released the children home to

25          Ruth immediately.

26

27   [30]This was patently false. Ruth never said any such thing. In fact, Ruth repeatedly
     sought return of all of her children and even offered Defendants multiple plans to ensure
28   their prompt and safe return home. Each of such plans were intentionally omitted from
     Defendants' various reports and ignored.

1
2
***– Ruth Responds to Shreckengost's Threats and Takes Steps to Get Her Boys Ordered Returned***

110.   As soon as she learned what had happened, Corina Pope started making arrangements to come back to support Ruth during this difficult time. On July 15th, she was able to return from Mississippi to stay with Ruth and help bring the boys home.

111.   Meanwhile, J.P.1 had done very poorly while at Polinski, and was consistently begging to come home – Defendant Shreckengost was aware of this, but simply did not care. In addition, Ruth felt at this point that Shreckengost's conduct had become retaliatory and punitive. In particular Defendant Shreckengost had taken the position that Ruth would not get her children back unless and until Shreckengost allowed it.

112.   In advance of Corina's return, Ruth's attorney requested a special hearing to request that the Court order the return of Ruth's sons. The hearing was set for July 11, 2019. The hearing was held. There, the Court agreed that the boys should be ordered home and set a further hearing for July 18, 2019.

113.   On July 18, 2019, Judge Bubis ordered that J.P.2 and N.P. be released back home to Ruth. At the same hearing, through her attorney, Ruth requested that J.P.1 also be permitted to return home. In response to the evidence and arguments of counsel, Judge Bubis ordered that the HHSA Agency had discretion to return J.P.1 to Ruth also. He mused that they [HHSA] probably wouldn't exercise that discretion, and went on to opine that it was safe for J.P1 to return to Ruth at that time, especially in light of the fact that Corina Pope had returned to stay with the family.

114.   Judge Bubis's words fell on deaf ears. By this time significant friction had developed between Ruth and Defendant Shreckengost. Their relationship had soured to the point that Shreckengost openly used her control over J.P.1 and his placement as a punitive tool to work out her angst on Ruth.

FIRST AMENDED COMPLAINT FOR DAMAGES

1   ***– On July 29, 2019, Ms. Ruby, J.P.1's Foster Parent, Secretly Took J.P.1 to The***
2   ***Doctor, at Defendant Shreckengost's Direction, and Had Him Vaccinated***

115.  At the July 18th hearing Judge Bubis took special note of Ruth's initiative in proactively seeking and completing services, therapy, and a parenting skills classes through the Navy Fleet and Family Center. He spoke highly of Ruth when he granted her request to return N.P. and J.P.2. With respect to J.P.1, however, Judge Bubis was reluctant and noted that J.P.1 had some behavioral issues that might need to be addressed. But, he was willing to consider returning J.P.1 at the next hearing. The judge again reiterated that the "Agency" had discretion to return J.P.1 home at any time without further order of the court.

116.  At no point in time did the Court or Ruth authorize the agency to take J.P.1 off of his delayed vaccination schedule. At no point in time in July 2019, was J.P.1 "scheduled" to be vaccinated.

117.  On July 28, 2019, Ruth and her mother-in-law, Corina, went to Ruby's home to pick J.P.1 up for church. When they returned from church, Ruth stayed in the car while Corina walked with J.P.1 to the front door. When Ruby came out she asked Corina "does the mother usually go to all the doctor's appointments?" Corina responded, "yes, every one." That was the end of the conversation. [31]

118.  On July 30, 2019, Ruth and J.P.1 had a regular visitation at Incredible Families. While painting with him Ruth noticed his left arm seemed to be in pain. She examined his arm. There was a band aid on his upper arm near his shoulder. Ruth asked him. "What happened baby?" J.P.1 responded, "Ms. Donna took me to the doctor yesterday and they gave me shots. I told them I didn't want to. But, they did it anyway and it still hurts." J.P.1 started crying and said, "and you weren't even

---

[31]On July 29th, J.P.1 secretly received the following shots: IPV, DtaP, MMR, HepB, VZV, and HepA. Had Schrekengost spoken to Ruth – and obtained her consent, or sought to, before ordering J.P.1's secret vaccinations, she would have learned that J.P.1 had already received the following vaccinations: HepB, RV1, RV5, IPV, HIB, PCV13, MMR, and HepA.

1   there." Livid, Ruth stepped out of the room briefly to call her attorney to let her
2   know what happened.

3   119.   That evening Ruth spoke with Corina about what happened. Corina had a good
4   relationship with Ruby and called her on the telephone to ask about J.P.1's visit to
5   the doctor. She put the call on speakerphone. Ruby explained that she did not take
6   him to the appointment, that it was Donna, her daughter. Ruby passed the phone to
7   Donna. Donna then explained that they had to take him – they had no choice.
8   Donna continued, "[Shreckengost] said to make the appointment. I knew mother
9   attended all appointments, so I asked her about the scheduling. She told me not to
10  worry about it and ***not*** to tell the mother." Donna ended the conversation saying,
11  "I just did what CPS told me to do."

12  120.   The next day, August  1, 2019, J.P.1 was moved from the placement with Ruby
13  and Donna and placed back with Terrilynette and Steve Minor. They picked him
14  and his things up that morning. J.P.1 was very glad to at least be back with family.
15  *– Krsitoffor Returns From Deployment, But Shrekengost Refuses to Return*
16  *J.P.1*

17  121.   On November 17, 2019, Kristoffor returned from deployment. In spite of the fact
18  that he had not been present during any of the events that led up to the children
19  being removed and detained, on information and belief, Defendant Shreckengost
20  directed that he be only allowed monitored visits with J.P.1. Shreckengost
21  demanded that Kristoffor take classes and go to therapy stating that he "would not
22  be allowed to be alone with J.P.1 unless he did as he was told." This was
23  Shreckengost's directive in spite of the fact that months prior, Judge Bubis had
24  stated his opinion that the boys were in no danger in the home, and had granted
25  Shreckengost discretion to release them without further court orders.

26  / / /

27

28  / / /

---

FIRST AMENDED COMPLAINT FOR DAMAGES

*– Defendant Shreckengost and Ms. Straub Are Replaced by a New HHSA Team; Kistoffor and Ruth Are Allowed Unsupervised Visits; J.P.1 Transitions Home; The Case is Closed*

122. Kristoffor was was not allowed to have unsupervised visits with J.P.1 until November 25th, after Shreckengost had been replaced as the supervisor on the case by Tonya Brown.

123. By early December, both Kristoffor *and* Ruth were allowed unsupervised visits, and by the beginning of January 2020, efforts were well under way to transition J.P.1 back home with his family. J.P.1 was approved for overnight visits in early February and the first such visit occurred on February 6th.

124. Also, in early February, the process had been started to send J.P.1 home. On, or about, March 14th, Ruth picked J.P.1 up from school and took him home for good. The case was dismissed and jurisdiction was terminated on August 11, 2020.

125. Plaintiffs are informed and believe and on such basis allege that notwithstanding the misconduct of the individual Defendants named herein, none of these Defendants has been disciplined in any way for the conduct alleged herein. Moreover, Plaintiffs are informed and believe and on such basis allege, that the County of San Diego has never disciplined a single one of its HHSA workers for unlawfully seizing a child without first obtaining a warrant, directing that a child be medically examined without parental consent or a warrant, and/or ordering that a child be secretly vaccinated without first obtaining a warrant. Moreover, Plaintiffs allege on information and belief that San Diego County has never disciplined a single one of its HHSA workers for being dishonest in their court reporting and other filings with the Juvenile Court, and that as a matter of custom and practice, such behavior is deliberately left unaddressed by HHSA management.

/ / /

/ / /

**FIRST CLAIM FOR RELIEF – §1983**

*Deception in Warrant Application; Unwarranted Seizure*

(By All Plaintiffs Against Defendants Kaliha Johnson, Robyn Charlton, Mary Robilotta, Kimberly Lawhead, DOE HHSA Workers 1- 10, and DOES 1 through 20, inclusive.)

**Count 1**

*Deception in the Presentation of Evidence In Support of Warrant Application*

(Against Defendant Kimberly Lawhead, DOE HHSA Workers 1- 10, and DOES 1 through 20, inclusive.)

126.   Plaintiff incorporates the above allegations of fact and law as though fully set forth herein.

127.   It is clearly established that it is a violation of the constitution to present deceptive evidence, in whatever form, against a parent in juvenile court proceedings. (*Hardwick v. Cty. of Orange*, (9th Cir. 2017) 844 F.3d 1112, 1118-19; "No official with an IQ greater than the room temperature in Alaska could claim that he or she did not know that the conduct at the center of this case violated both state and federal law. The social workers in this case are alleged to have knowingly and maliciously violated the law in their attempt to sever [Plaintiff's] protected relationship with her [daughter]. Perjury is a crime under both federal and California state law, as is the knowing submission of false evidence to a court. 18 U.S.C. § 1621; Cal. Penal Code § 118. Both crimes make no distinction between criminal and civil proceedings. This malicious criminal behavior is hardly conduct for which qualified immunity is either justified or appropriate.").

128.   At all times relevant herein, there existed a clearly established due process right of individuals not to be subjected to the deliberate presentation of false or perjured evidence, and/or the suppression of material exculpatory information in court proceedings and/or in documents submitted with recommendations or requests made to the court by County HHSA workers. Any reasonable HHSA worker in Defendant Lawhead's situation would know that it is a due process violation to lie,

1
2
3

exaggerate, fabricate evidence, and/or suppress material exculpatory evidence in warrant applications attested to under penalty of perjury and filed with the juvenile court.

4
5
6
7
8
9

129.   Defendants Kimberly Lawhead, DOE HHSA Workers 1- 10, and DOES 1 through 20, and each of them, had the affirmative and self evident duty to be truthful, accurate, and complete in their warrant applicaitons. Similarly, Defendant Kimberly Lawhead, DOE HHSA Workers 1- 10, and DOES 1 through 20 had a duty to refrain from using improper and deceptive means to obtain judicial orders authorizing the seizure and detention of children from their parents.

10
11
12
13
14

130.   Defendants Kimberly Lawhead, DOE HHSA Workers 1- 10, and DOES 1 through 20, and each of them, either singularly or jointly acted to together to deliberately or recklessly present false statements and/or omit and/or actively suppress known material exculpatory information from their warrant application filed in the Juvenile Court.

15
16
17
18
19
20
21
22

131.   With respect to Defendant Lawhead, she filed or caused to be filed an application for a warrant to detain the children on, or about, June 14, 2019. In the "Statement of Cause," signed under penalty of perjury and submitted to the Juvenile Court, Defendant Lawhead took the false information provided to her by Johnson and Charlton and engrossed it with more false information of her own then submitted her application for a warrant knowing that at minimum her augmented "information" was false and without any evidentiary support. (See ¶71 - ¶76, *supra*).

23
24
25
26
27
28

132.   Absent Defendant Lawhead's insertion of such false, incomplete, and deceptive information, the Juvenile Court would not have granted her warrant application. Lawhead's deceptive conduct caused J.P.1, N.P., and J.P.2's initial seizure, and continued the prolonged detention out of their family home and out of the loving care of their parents, in the beginning Ruth, then later Kristoffor upon his return from deployment.

133.   Defendants Kimberly Lawhead, DOE HHSA Workers 1- 10, and DOES 1 through 20, and each of them, were acting under color of state law when they jointly acted, agreed, and/or conspired to violate Plaintiffs' constitutional rights by, but not limited to, engaging in deception in the presentation of evidence to the juvenile court.

134.   The actions of these Defendants, and each of them,  were undertaken with a known and deliberate indifference to Plaintiffs' rights, and/or with the specific intention of harming Plaintiffs.

135.   These Defendants, and each of them, maliciously conspired to violate Plaintiffs' constitutional rights including their rights arising under the First and Fourteenth Amendments to the United States Constitution by, but not limited to, presenting knowingly false, fraudulent, and misleading evidence to the Juvenile Court on a continuing basis for the specific purpose of detaining and continuing to detain the Pope children from their parents' care, custody and control without proper or just cause and/or authority by maliciously denying Plaintiffs' their right to a fair hearing, and by spreading lies, maliciously refusing to provide exculpatory evidence, and presenting fabricated evidence to the Juvenile Court during the pendency of the dependency proceedings all in violation of their obligations arising under the First and Fourteenth Amended to the United States Constitution.

136.   By these actions These Defendants, and each of them, interfered and/or attempted to interfere with Plaintiffs' constitutional rights to familial association.

137.   As a direct and proximate consequence of this violation, Plaintiffs have suffered, and will continue to suffer economic damages as well as but not limited to physical and/or mental anxiety and anguish according to proof at trial.

138.   Defendants Kimberly Lawhead, DOE HHSA Workers 1- 10, and DOES 1 through 20, and each of them, acted intentionally and/or with a conscious disregard for Plaintiffs' constitutional rights. As a result of this conduct, Plaintiffs are entitled to recover punitive damages against the individual defendants.

**Count 2**

*Unwarranted Seizure*

(Against Defendants Kaliha Johnson, Robyn Charlton, Mary Robilotta, DOE HHSA Workers 1- 10, and DOES 1 through 20, inclusive)

139.   Plaintiff incorporates the above allegations of fact and law as though fully set forth herein.

140.   At all times relevant herein, the right to familial association guaranteed under the First, Fourth, and Fourteenth Amendments to the United States Constitution was clearly established, such that any reasonable social services agent faced with the circumstances presented here would know that it is unlawful to seize a child from the care, custody, and control of his or her parent(s) or to question, threaten, examine, or search a child in the absence of exigent circumstances, without first obtaining the parent's knowing, intelligent, and *voluntary* consent unless a warrant or similar court order has first been *lawfully* been obtained.

141.   Moreover, the right to familial association guaranteed under the Fourteenth Amendment is so "clearly established" such that any reasonable HHSA worker in these Defendants' situation would know it is unlawful to remove a child from the care, custody and control of its parents, and continue to detain such child(ren) based on knowingly false evidence, and/or based on Juvenile Court order's which the particular worker(s) or agent(s) fraudulently obtained, or had reason to know had been obtained based on false and/or materially misleading evidence.

142.   Here, Defendants Kaliha Johnson, Robyn Charlton, Mary Robilotta, DOE HHSA Workers 1- 10, and DOES 1 through 20, and each of them, knew or had good reason to know that the information upon which Defendant Lawhead based her warrant application was materially false and/or materially misleading in that absent the false and/or misleading information, the Juvenile Court would not have issued the warrant to detain the Pope children.

---

FIRST AMENDED COMPLAINT FOR DAMAGES

143.   Nonetheless, even though these Defendants knew the warrant to detain the Pope children was based on materially false and misleading evidence, they executed the warrant anyway. [32]

144.   Defendants Kaliha Johnson, Robyn Charlton, Mary Robilotta, DOE HHSA Workers 1- 10, and DOES 1 through 20, and each of them, were acting under color of state law when they jointly acted, and/or agreed to violate Plaintiffs' constitutional rights by, but not limited to, seizing, removing, and/or detaining J.P.1, N.P., and J.P.2 from Ruth's care, custody, and/or control.

145.   At the time Defendants Kaliha Johnson, Robyn Charlton, Mary Robilotta, DOE HHSA Workers 1- 10, and DOES 1 through 20, and each of them seized the children, none of the defendants were in possession of specific articualble facts sufficient to support a reasonable suspicion that each of the children, independently, were in immediate danger of suffering severe bodily injury or death in the time it would have taken to obtain a warrant. Similarly, these Defendant, and each of them, failed to even consider whether there were lesser intrusive alternative means available to avert whatever specific injury might have befallen the children had they been left in their mother's care for the few hours it would have taken to obtain a warrant authorizing their removal from Ruth's care and custody.

146.   Prior to J.P.1, N.P., and J.P.2's unwarranted seizure, Defendants Kaliha Johnson, Robyn Charlton, Mary Robilotta, DOE HHSA Workers 1- 10, and DOES 1 through 20, and each of them, discussed the proposed warrantless seizure. They all agreed and/or approved of the decision to forgo obtaining judicial authorization prior to seizing J.P.1, N.P., and J.P.2 from Ruth's care, custody, and/or control.

---

[32]Analytically, under the circumstances present, the seizure should be treated as if no warrant was obtained at all.

147. Defendants Kaliha Johnson, Robyn Charlton, Mary Robilotta, DOE HHSA Workers 1- 10, and DOES 1 through 20, and each of them together, were joint and/or integral participants in J.P.1, N.P., and J.P.2's seizure from Ruth's care, custody, and/or control.

148. Prior to seizing J.P.1, N.P., and J.P.2 Defendants Kaliha Johnson, Robyn Charlton, Mary Robilotta, DOE HHSA Workers 1- 10, and DOES 1 through 20, and each of them, failed to conduct a reasonable investigation which included interviewing all relevant witnesses.

149. Prior to seizing J.P.1, N.P., and J.P.2, Defendants Kaliha Johnson, Robyn Charlton, Mary Robilotta, DOE HHSA Workers 1- 10, and DOES 1 through 20, and each of them, failed to even attempt to determine whether lesser intrusive alternative means existed to ameliorate any percieved need to remove J.P.1, N.P., and J.P.2's from Ruth's care. Nor did any of the defendants obtain Ruth's *voluntary* consent to the children's removal.

150. As a direct and proximate consequence of Kaliha Johnson, Robyn Charlton, Mary Robilotta, DOE HHSA Workers 1- 10, and DOES 1 through 20's conduct, Plaintiffs have suffered, and will continue to suffer, damages, including but not limited to, physical and/or mental anxiety and anguish according to proof at trial.

151. In doing the things alleged, Defendants Kaliha Johnson, Robyn Charlton, Mary Robilotta, DOE HHSA Workers 1- 10, and DOES 1 through 20, and each of them, acted intentionally and/or with a conscious disregard for Plaintiffs' rights. Consequently, Plaintiffs are entitled to recover punitive damages against these individual defendants.

/ / /

/ / /

/ / /

1

## SECOND CLAIM FOR RELIEF

2

### *Non-Consensual Unwarranted Forensic Medical Examinations,*

3

### *Medical Procedures, and Vaccinations*

4  (By All Plaintiffs Against Defendants Kaliha Johnson, Robyn Charlton, Mary Robilotta,

5  Diana Shreckengost, DOE HHSA Workers 1- 10, and DOES 1 through 20, inclusive.)

6  152.  Plaintiff incorporates the above allegations of fact and law as though fully set

7  forth herein.

8  153.  At all relevant times, the constitutional right to remain free of non-consensual

9  intrusive forensic medical examinations and to make decisions regarding the

10  medical care of one's children was so "clearly established" that any reasonable

11  HHSA worker in Defendants' circumstances would know that it is a violation of

12  Plaintiffs' constitutional rights to subject the child to a forensic medical

13  examination without just cause, parental consent, or a court order/warrant

14  authorizing the examination. *See*, *Swartwood v. County of San Diego*, 2014 U.S.

15  Dist. LEXIS 182020, *58-59 (S.D. Cal. Sept. 30, 2014) "[T]he Constitution

16  assures parents, in the absence of parental consent, physical examinations of their

17  child may not be undertaken for investigative purposes at the behest of state

18  officials unless a judicial officer has determined, upon notice to the parents, and an

19  opportunity to be heard, that grounds for such an examination exist and that the

20  administration of the procedure is reasonable under all the circumstances."]; *see*

21  *also*, *Mann v. Cty. of San Diego*, 907 F.3d 1154, 1163 (9th Cir. 2018).

22  154.  Defendants Johnson, Charlton, and Robilotta violated said rights first when they

23  directed that such an unwarranted forensic/investigational medical examination be

24  performed without first obtaining a warrant or knowing and voluntary parental

25  consent; then again when they excluded Ruth from J.P.1's exam on June 14, 2019

26  without any just or legal cause. Finally, Defendant Johnson further violated Ruth's

27  constitutional rights when she instructed medical staff to refrain from providing

28

---

1    Ruth with any information relative to J.P.1's diagnosis, treatment, and/or care on

2    June 14, 2019.

3  155.  In addition to the foregoing, parents also have a guaranteed constitutional right

4    arising from the liberty interest in family association to be with their children

5    while they are receiving medical attention or undergoing medical procedures.

6    *Wallis ex rel. Wallis v. Spencer*, 202 F.3d 1126, 1141-1142 (9th Cir. 1999). This

7    right includes the right of parents to make important medical decisions for their

8    children. *Id.* at 1141.

9  156.  Defendant Shreckengost, without a lawfully obtained court order, and without first

10    informing Ruth and obtaining her consent directed that J.P.1 be administered one

11    or more vaccinations. In doing so, she even went so far as to direct that Ruth not

12    be informed of the event and that it be kept a secret from her. At the time

13    Sheckengost did this, she was fully aware that pursuant to the extant Juvenile

14    Court order Ruth maintained full authority over medical decision making for J.P.1.

15    This was a blatant violation of Ruth's parental rights. See, *Mann v. Cty. of San*

16    *Diego*, supra, 907 F.3d at 1164, "[Defendant's] failure to provide parental notice

17    or to obtain consent violated [Ruth and Kristoffor's] Fourteenth Amendment

18    rights..."

19  157.  No reasonable HHSA agent in Defendant Shreckengost's position could have

20    believed that the above mentioned conduct was lawful or even abstractly

21    justifiable. In fact it was not.

22  158.  These Defendants, and each of them, had an affirmative duty and obligation to

23    recognize, acknowledge, and respect Plaintiffs' constitutional rights and to

24    conduct themselves in a manner that confirms, provides for the preservation of,

25    and does not violate those rights. These rights include, without limitation, the right

26    to privacy, family integrity and the right to remain free of non-consensual

27    unwarranted forensic medical examinations, the right to be present at such

28    examinations absent an affirmative showing of good cause for exclusion, the right

to control and participate in medical decisions relative to their children – all arising under the First, Fourth, and Fourteenth Amendments to the United States Constitution.

159.   Defendants Kaliha Johnson, Robyn Charlton, Mary Robilotta, Diana Shreckengost, DOE HHSA Workers 1- 10, and DOES 1 through 20, and each of them, were acting under color of state law when they jointly acted, agreed, and/or conspired to violate Plaintiffs' constitutional rights by, but not limited to, the performance of unwarranted and non-consensual medical examinations and procedures on Plaintiffs children as described in detail herein above.

160.   As a direct and proximate consequence of said misconduct, Plaintiffs have suffered, and will continue to suffer economic damages as well as but not limited to physical and/or mental anxiety and anguish according to proof at trial.

161.   In doing the things alleged herein, Defendants Kaliha Johnson, Robyn Charlton, Mary Robilotta, Diana Shreckengost, DOE HHSA Workers 1- 10, and DOES 1 through 20, and each of them, acted intentionally and/or with a conscious and callous disregard for Plaintiffs' constitutional rights. As a result, Plaintiffs are entitled to recover punitive damages against the individual defendants according to proof at trial.

## THIRD CLAIM FOR RELIEF – §1983

### *Violation of Plaintiff's Due Process Right to Be Free From Deception in the Presentation of Evidence to the Juvenile Court*

(By All Plaintiffs Against Defendants Kaliha Johnson, Robyn Charlton, Mary Robilotta, Diana Shreckengost, Kimberly Lawhead, DOE HHSA Workers 1- 10, and DOES 1 through 20, inclusive.)

162.   Plaintiff incorporates the above allegations of fact and law as though fully set forth herein.

163.   The right to familial association guaranteed under the Fourteenth Amendment is so "clearly established" such that any reasonable HHSA worker in Defendants'

1   situation would know it is unlawful to remove a child from the care, custody and

2   control of its parents, and continue to detain such child(ren) for a prolonged period

3   of time, based on knowingly false evidence, and/or based on Juvenile Court

4   order's which the particular worker(s) or agent(s) fraudulently obtained, or had

5   reason to know were fraudulently obtained.

6   164.   It is similarly clearly established that it is a violation of the constitution to present

7   deceptive evidence, in whatever form, against a parent in juvenile court

8   proceedings. (*Hardwick v. Cty. of Orange*, (9th Cir. 2017) 844 F.3d 1112,

9   1118-19; "No official with an IQ greater than the room temperature in Alaska

10   could claim that he or she did not know that the conduct at the center of this case

11   violated both state and federal law. The social workers in this case are alleged to

12   have knowingly and maliciously violated the law in their attempt to sever

13   [Plaintiff's] protected relationship with her [daughter]. Perjury is a crime under

14   both federal and California state law, as is the knowing submission of false

15   evidence to a court. 18 U.S.C. § 1621; Cal. Penal Code § 118. Both crimes make

16   no distinction between criminal and civil proceedings. This malicious criminal

17   behavior is hardly conduct for which qualified immunity is either justified or

18   appropriate.").

19   165.   At all times relevant herein, there existed a clearly established due process right of

20   individuals not to be subjected to the deliberate presentation of false or perjured

21   evidence, and/or the suppression of material exculpatory information in court

22   proceedings and/or in documents submitted with recommendations or requests

23   made to the court by County HHSA workers. Any reasonable HHSA worker

24   would know that it is a due process violation to lie, exaggerate, fabricate evidence,

25   and/or suppress material exculpatory evidence in court reports and other

26   documents filed with the juvenile court, and/or relied upon by subsequent social

27   workers.

28

166. Defendants Kaliha Johnson, Robyn Charlton, Mary Robilotta, Diana Shreckengost, Kimberly Lawhead, DOE HHSA Workers 1- 10, and DOES 1 through 20, and each of them, had the affirmative and self evident duty to be truthful, accurate, and complete in petitions, reports, and documents submitted to the juvenile court – a court with power to adjudicate substantial rights, including legal and custodial rights of children and parents. Similarly, Defendants Kaliha Johnson, Robyn Charlton, Mary Robilotta, Diana Shreckengost, Kimberly Lawhead, DOE HHSA Workers 1- 10, and DOES 1 through 20 had an equal duty to refrain from using improper and deceptive means to obtain judicial orders sustaining recommendations, disparaging, and/or otherwise impairing or impinging upon Plaintiffs' due process rights and/or rights of, and attendant, to familial association.

167. Defendants Kaliha Johnson, Robyn Charlton, Mary Robilotta, Diana Shreckengost, Kimberly Lawhead, DOE HHSA Workers 1- 10, and DOES 1 through 20, and each of them, either singularly or jointly acted to together to deliberately or recklessly present false statements and/or omit and/or actively suppress known material exculpatory evidence in their reports filed in the Juvenile Court.

168. With respect to Defendants Johnson, Charlton, and Lawhead, they also filed or caused to be filed an application for a warrant to detain the children on, or about, June 14, 2019. In the "Statement of Cause," signed under penalty of perjury and submitted to the Juvenile Court, Defendant Lawhead took the false information provided to her by Johnson and Charlton and engrossed it with more false information of her own then submitted her application for a warrant knowing that at minimum her augmented "information" was false and without any evidentiary support.

169.  The Juvenile Court accepted the various filings by these Defendants into evidence and relied on it in making its decisions. But for the submission of said false and

materially misleading information/evidence the Juvenile Court would not have issued its various orders permitting the detention and/or continued detention of the children. This deceptive conduct by Defendants, and each of them, caused J.P.1, N.P., and J.P.2's initial seizure, and continued the prolonged detention out of their family home and out of the loving care of their parents, in the beginning Ruth, then later Kristoffor upon his return from deployment.

170. Defendants Kaliha Johnson, Robyn Charlton, Mary Robilotta, Diana Shreckengost, Kimberly Lawhead, DOE HHSA Workers 1- 10, and DOES 1 through 20, and each of them, were acting under color of state law when they jointly acted, agreed, and/or conspired to violate Plaintiffs' constitutional rights by, but not limited to, engaging in deception in the presentation of evidence to the juvenile court.

171. The actions of these Defendants, and each of them,  were undertaken with a known and deliberate indifference to Plaintiffs' rights, and/or with the specific intention of harming Plaintiffs.

172. These Defendants, and each of them, maliciously conspired to violate Plaintiffs' constitutional rights including their rights arising under the First and Fourteenth Amendments to the United States Constitution by, but not limited to, presenting knowingly false, fraudulent, and misleading evidence to the Juvenile Court on a continuing basis for the specific purpose of detaining and continuing to detain the Pope children from their parents' care, custody and control without proper or just cause and/or authority by maliciously denying Plaintiffs' their right to a fair hearing, and by spreading lies, maliciously refusing to provide exculpatory evidence, and presenting fabricated evidence to the Juvenile Court during the pendency of the dependency proceedings all in violation of their obligations arising under the First and Fourteenth Amended to the United States Constitution.

173. By their actions these Defendants, and each of them, interfered and/or attempted to interfere with Plaintiffs' constitutional rights to familial association.

174.   As a direct and proximate consequence of this violation, Plaintiffs have suffered, and will continue to suffer economic damages as well as but not limited to physical and/or mental anxiety and anguish according to proof at trial.

175.   Defendants Kaliha Johnson, Robyn Charlton, Mary Robilotta, Diana Shreckengost, Kimberly Lawhead, DOE HHSA Workers 1- 10, and DOES 1 through 20, and each of them, acted intentionally and/or with a conscious disregard for Plaintiffs' constitutional rights. As a result of this conduct, Plaintiffs are entitled to recover punitive damages against the individual defendants.

### FOURTH CLAIM FOR RELIEF

### *Monell Related Claims*

(By Plaintiffs Against Defendant County of San Diego)

176.   Plaintiff incorporates the above allegations of fact and law as though fully set forth herein.

177.   Defendant County of San Diego, including through its entity HHSA, and those individuals in their official capacity who had supervisory and/or policy making authority, had a duty to Plaintiffs to establish, implement and follow policies, procedures, customs and/or practices which confirm with, and provide for the protections guaranteed Plaintiffs under the United States Constitution, including those under the First and Fourteenth Amendments. This includes, without limitation, the protection of the right to substantive and procedural due process.

178.   Defendant County of San Diego also had a duty to use reasonable care to select, assign, supervise, train, control and review the activities of all their agents, officers, employees and those acting under them, including within HHSA, so as to protect these constitutional rights; and to refrain from acting with deliberate indifference to the constitutional rights of Plaintiffs in order to avoid causing the injuries and damages alleged herein.

/ / /

/ / /

1

**Count One**

2

***Unwarranted Forensic Medical Exam/Procedures***

3   179.   As detailed above, County of San Diego regularly and systematically performed,

4          and to this day continues to perform on a regular basis, non-consensual

5          unwarranted invasive forensic medical examinations upon children in relation to

6          whom referrals of suspected child abuse have been received.

7   180.   San Diego County regularly requests these medical examinations be performed

8          without notifying either parent prior to the examination even though the County

9          has known since at least the year 2000 that parents have a constitutional right to be

10         present for their child's medical procedures. Moreover the County regularly

11         requests that parents be excluded from the examination room in violation of those

12         same constitutional rights.

13   181.   The County, at all relevant times, had a duty to use reasonable care to select,

14         assign, supervise, train, control and review the activities of all its agents, officers,

15         employees and those acting under them, so as to protect the constitutional rights of

16         Plaintiffs and to refrain from acting with deliberate indifference to the

17         constitutional rights of Plaintiffs in order to avoid causing the injuries and

18         damages alleged herein.

19   182.   Based on the duties charged to the County of San Diego, its policymaking officials

20         knew or should have known of the need to establish such customs, policies, and

21         practices as were required to protect the rights of children and parents to remain

22         free of unwarranted non-consensual forensic medical examinations and medical

23         procedures.

24   183.   At the time of the underlying events, the regularly established customs and

25         practices of the Defendant County that were followed, adhered to, complied with,

26         and carried out by the individual Defendants in this case were the moving force

27         that caused the violations of the Plaintiffs constitutional rights including, but not

28         limited to the following policies, customs, and/or practices:

a. The custom and/or practice of subjecting children to unwarranted non-consensual forensic medical examinations.

b. The custom and/or practice to exclude a parent from the examination room during the forensic medical examination.

c. The custom and/or practice of barring a parent from access to the child's medical records even though the parent retains medical rights.

d. The custom and/or practice of subjecting children to unwarranted non-emergency medical procedures, including vaccinations without a parent's knowledge and/or consent.

e. The custom and/or practice of subjecting children to unwarranted non-consensual vaccinations.

f. The custom and/or practice to never notify a parent that vaccinations will be performed on their child.

g. The unwritten policy of acting with deliberate indifference to the rights of children and parents with whom Defendants' agents can regularly be expected to come into contact by failing and/or refusing to implement a practice of regular and adequate training and/or supervision, and/or by failing to train and/or supervise their respective officers, contractors, agents, and/or employees, in providing and ensuring compliance with the constitutional protections guaranteed to individuals, including those under the First, Fourth, and Fourteenth Amendments, relative to a parent and child's medical rights when performing actions related to child abuse investigations.[33]

184. When the individual Defendants either performed or directed that the Pope children be forensically examined and/or be vaccinated, as the case may be, they were acting pursuant to and in accordance with San Diego County's customs,

---

[33] The above list is not exhaustive. Plaintiffs may seek leave to amend this Complaint as additional information is discovered.

unwritten policies, and practices with regard to conducting such examinations and vaccinations without first obtaining a warrant or parental consent under non-emergency circumstances.

185.   As a matter of routine, the County of San Diego never investigates or disciplines its HHSA employees, contractors, and/or agents who perform forensic investigatory medical examinations and/or vaccinations on children – without consent, court order, exigency. Nor does the County as a matter of practice even inquire to determine whether there was a basis to perform the requested examinations and/or vaccinations. Here, San Diego County did not investigate or discipline the individual Defendants for performing the alleged unwarranted forensic investigatory medical examinations and/or vaccinations on these or any other children.

186.   Moreover, Defendant San Diego County refuses to admit that performing a forensic medical examination and/or vaccinations without parental consent, court order, and/or exigent circumstances violates a parent's and child's  constitutional rights. Defendant denies that either it, or the individual Defendants, violated Plaintiffs' rights when Defendants subjected the Pope children to an unwarranted forensic investigatory medical examination without parental consent, court order.

187.   Similarly,  Defendant denies that either it or the individual Defendants violated Plaintiffs' rights when Defendant Shreckengost subjected J.P.1 to a secret and unwarranted medical procedure, i.e., a vaccination without parental knowledge, consent, or court order.

188.   Defendant County of San Diego ratified and/or approved of the Pope children's non-consensual unwarranted forensic investigatory medical examinations and vaccination.

189.    Defendant County of San Diego knowingly and with deliberate indifference failed to train its HHSA employees and/or agents on the constitutional rights of a parent and child, including but not limited to:

a.    That a child cannot be examined outside the presence of his or her parent(s) – without judicial authorization or parental consent – when there is no specific, reasonable, and articulable evidence that the child is in immediate risk of suffering serious bodily injury.

b.    That a child cannot be subjected to a forensic investigatory medical examination – without parental consent, court order, and/or exigent circumstances.

c.    That an independent investigation and/or inquiry must be performed to determine whether or not there is a basis for performing an unwarranted and non-consensual forensic investigatory medical examination on a child.

d.    That a child cannot be subjected to vaccinations – without parental consent or court order.

190.    Without adequate training, the individual Defendants, and each of them, were unfamiliar with and oblivious to Plaintiffs' constitutional rights, when they subjected the Pope children to a forensic investigatory medical examination – without parental consent, court order, and/or exigency and or vaccinated J.P.1.

191.    San Diego County's non-consensual unwarranted forensic medical examination of the Pope children was not an isolated incident specific to their circumstances. On the contrary, such warrantless non-consensual medical examinations and vaccinations are routine, regular and recurring events, and are perpetrated by San Diego County on a daily basis in the same or similar circumstances as alleged herein.

192.   The non-consensual unwarranted vaccinations inflicted on J.P.1 was not an isolated incident specific to his circumstances. On the contrary, such warrantless non-consensual vaccinations are routine, regular and recurring events, and are perpetrated by Defendants on a daily basis in the same or similar circumstances as alleged herein.

193.   The County of San Diego has engaged in each of the above customs and/or practices on an ongoing and continuous basis since well before the events described herein, and continues to engage in said practices on an ongoing and daily basis, and will continue to do so until ordered to stop.

194.   These customs, policies, and/or practices of Defendant County were the moving force behind, and the direct and proximate cause of the injuries sustained by Plaintiffs. As a result, Plaintiffs have sustained general and special damages, to an extent and in an amount to be proven separately at trial. In addition, Plaintiffs have incurred, and will continue to incur, attorneys' fees, costs and expenses, including those as authorized by 42 U.S.C. § 1988, to an extent and in an amount subject to proof at, and after, trial.

## Count Two

### *Judicial Deception*

195.   The County and its policymaking officials knew, or in the exercise of reasonable care, should have known of the need to establish customs, policies, and practices required to protect the aforementioned civil rights of children with whom their agents regularly came into contact – and to adequately train its HHSA employees regarding constitutionally appropriate policies and practices.

196.   Defendant County of San Diego established, adopted, followed, and/or implemented and/or turned a blind eye to customs, and/or practices which were followed, complied with, and carried out by the individual Defendants, and each

of them when they violated Plaintiffs constitutional rights by engaging in deception in the presentation of evidence to the juvenile court, among other things.

197. At the time of the underlying events, the regularly established customs and practices of the County of San Diego and the HHSA were followed, adhered to, complied with, and carried out by the individual Defendants, and each of them, were the moving force, that is, the actual, direct, and proximate cause of the violations of Plaintiffs' constitutional rights including, but not limited to:

    a.    The custom and/or practice of including false, inaccurate, exaggerated, misleading, and/or untrue factual statements in the documents and/or reports filed with the juvenile court.

    b.    The custom and/or practice of suppressing and/or omitting known exculpatory evidence from documents and/or reports filed with the juvenile court.

    c.    The custom and/or practice of permitting a supervisor to sign a document and/or court report without personal knowledge as to whether the statements made therein were complete and/or true, in an effort to bolster the credibility of the document, and/or report.

    d.    The custom and/or practice of placing alleged statements of third party witnesses in quotation marks when in fact those third party witnesses did not say was the HHSA worker claimed. The purpose of such practice is to lend further weight and credibility to false and/or fabricated information the particular HHSA worker presents to the Juvenile Court.

198. When Defendants, and each of them, engaged in deception in the presentation of evidence to the juvenile court, they were acting pursuant to and in accordance with the County's regularly established customs and/or practices. Indeed, the reports

1
2
and/or other documents, filed with the juvenile court in the underlying dependency
case at issue here, were reviewed and approved by HHSA supervisors.

3   199.  The individual Defendants' presentation of false, fabricated, incomplete and
4          fraudulently misleading evidence to the juvenile court was not an isolated incident
5          specific to Plaintiffs' circumstances or the circumstances of this particular case.
6          Instead, the County and its HHSA workers regularly include false statements,
7          and/or suppress known exculpatory evidence, in reports and/or other documents
8          filed in the juvenile court. Such deceptive conduct by County HHSA workers has
9          resulted in lawsuits and claims against multiple offending HHSA  workers (for
10         similar violations of constitutional rights) and San Diego County (for its customs
11         being the moving force behind these violations). These include, but are not limited
12         to, the following: **(1)** *Marshall v. County of San Diego*, State Case No.
13         37-2008-00085115-CU-CR-CTL; and **(2)** *Kemper v. County of San Diego*, State
14         Case No. 37-2010-00094707-CU-CR-CTL; **(3)** *Garcia v. County of San Diego et*
15         *al.*, 15cv0189JLS(NLS); **(4)** *D.C. v. County of San Diego et al*., 18-cv-0013-
16         WQH-DEB.  Yet, the County of San Diego has habitually and deliberately turned
17         a blind eye to the problem and refrained from taking any reasonable steps to
18         rectify it.

19   200.  County of San Diego has engaged in each of the customs and/or practices
20         identified above on an ongoing and continuous basis since at least 2005, if not
21         earlier, and continues to engage in these practices on an ongoing and daily basis.

22   201.  The County of San Diego regularly receives and/or is aware of complaints, leveled
23         against its HHSA workers, claiming that the social workers are engaging in
24         deception in the presentation of evidence in the juvenile court.

25   202.  Yet, for whatever reason, the County of San Diego never investigates or
26         disciplines its HHSA workers (including those named as Defendants in the other
27         lawsuits identified above) who actually do engage in deception in the presentation

28

of evidence to the juvenile court. The County of San Diego consistently fails to investigate or discipline social workers and their supervisors who are involved in alleged constitutional violations so that violations of citizen's constitutional rights have not only become accepted, but are customary.

203.  The County did not investigate or discipline the individual Defendants in this case for making false statements, and/or suppressing known exculpatory evidence, in reports or other documents they filed in the juvenile court.

204.  The County habitually refuses to admit that its HHSA workers commit a constitutional violation when they make false statements, and/or suppress known exculpatory evidence, in reports or other documents filed in the juvenile court – and continues to do so. The County denies that the individual Defendants in this case violated Plaintiffs' rights when they made false statements, and/or suppressed exculpatory evidence, in reports or other documents filed in the juvenile court. The County ratified and/or approved the inclusion of false statements, and/or suppression of known exculpatory evidence, in reports or other documents filed in the juvenile court.

205.  The Defendant County of San Diego is aware that its HHSA workers frequently make false statements and/or suppress known exculpatory evidence, in reports or other documents filed in the juvenile court. Yet, Defendant County of San Diego has made the knowing and conscious decision to refrain from promulgating a policy and recurrent training to prevent such misconduct, and has consistently and knowingly failed to provide any training to their social workers to inform them of the rights of parents and children to not be lied about in court reports and the requirement that all material exculpatory evidence is required to be presented to the juvenile court.

206.  The Defendant County of San Diego's decision to disregard these constitutional protections in the face of a known need for such policies to prevent the specific

1    misconduct alleged herein above, *i.e.*, the known need for a specific policy
2    prohibiting the aforementioned misconduct, is itself a "policy" decision which
3    constitutes a policy of deliberate indifference.

4    207.   This policy of deliberate indifference, and the lack of prophylactic policies and
5    training in the face of a known need for such policies and training was a
6    substantial factor in causing the Plaintiff harm, in that individual Defendants, and
7    each of them, followed and acted pursuant to the regularly established customs,
8    practices, and well known and accepted standard operating procedures of HHSA
9    when they made false statements and/or suppress known exculpatory evidence, in
10   reports or other documents filed in the juvenile court – none of which was
11   constitutionally permissible.

12   208.   The County of San Diego has openly taken the position that it is not clearly
13   established and/or understood that a social worker could not lie and/or fabricate
14   evidence in proceedings before the juvenile court. The County of San Diego has
15   also taken the position that a social worker does not violate constitutional rights
16   when they suppress exculpatory evidence in juvenile proceedings. These
17   "positions" constitute unwritten policies of the County.

18   209.   Without such policies, procedures, customs and/or practices in place, the County
19   of San Diego HHSA Workers have been allowed and permitted to engage in
20   conduct that was in violation of Plaintiff's constitutional rights as more
21   specifically set out in the General Allegations above.

22   210.   Defendant County's failure to adopt appropriately prophylactic policies and
23   training was the moving force behind the violations of Plaintiffs' constitutional
24   rights. Such failures include, but are not limited to the following:

25   a.   The County of San Diego did not have a written policy, procedure,
26   custom, practice and/or recurrent training delineating the

27
28

---

1    constitutional protections afforded to a parent and child by the First

2    and Fourteenth Amendments.

3    b.    The County of San Diego did not have a written policy, procedure,

4          custom, practice and/or recurrent training instructing that a county

5          social worker must disclose all known exculpatory evidence to the

6          juvenile court.

7    c.    The County of San Diego did not have a written policy, procedure,

8          custom, practice and/or recurrent training instructing that a county

9          social worker is precluded from knowingly including false statements

10         in documents or reports to the juvenile.

11   d.    The County of San Diego did not have a written policy, procedure,

12         custom, or practice requiring its social workers to be complete,

13         honest, and accurate in their reports (and other filings) with the court.

14   e.    The County of San Diego did not have a written policy, procedure,

15         custom, or practice requiring its social workers and social worker

16         supervisors to have personal knowledge of the facts and/or statements

17         made in a petition, document, and/or report, when attesting to the

18         veracity of those allegations, facts, and/or statements.

19   f.    The County of San Diego did not have a written policy, procedure,

20         custom, or practice requiring its social workers and social worker

21         supervisors to conduct an independent investigation to determine

22         whether the allegations, facts, and/or statements in a petition,

23         document, and/or report were true, before attesting to the veracity of

24         those allegations, facts, and/or statements.

25   g.    The County of San Diego did not have a policy or procedure that

26         addressed California Government Code, §820.21, *i.e.* civil immunity

27

28

---

1            for a social worker is lost if they commit perjury, fabricate evidence,

2            or fail to provide known exculpatory evidence.

3    211.  By deliberately refraining from promulgating any of the aforementioned policies,

4         procedures, customs, practices and/or training, the County permitted the

5         aforementioned basic policy decisions to be made by the lower level social

6         workers in the field. As a result, the Defendant County of San Diego's policy,

7         custom, and/or practice – as established, adopted, and implemented by the

8         individual Defendants in this case, and each of them, was to make false statements

9         and/or suppress known exculpatory evidence in reports and documents filed with

10        the juvenile court, and to continue to detain the children or otherwise cause the

11        continued detention of the children even thought it was known that there was no

12        legitimate "true" basis to do so.

13   212.  These policies, customs, and/or practices – that disregard the Plaintiffs'

14        constitutional protections – were a substantial factor in causing harm to the

15        Plaintiffs'. Thus, as a matter of law, because there was no formal policy preventing

16        the aforementioned misconduct, even though one was obviously needed, the social

17        workers on the line acted on behalf of the County in making final policy decisions

18        – which is exactly what they did when they made false statements and/or

19        suppressed known exculpatory evidence in reports and documents filed with the

20        juvenile court.

21   213.  The state of the law regarding the constitutional protections afforded to parents

22        and a child by the First and Fourteenth Amendments was clearly established well

23        before June 2019. As such, the Defendant County of San Diego knew before 2019

24        that its HHSA workers required recurrent training on the constitutional protections

25        afforded to parents and children.

26

27

28

214. Despite this knowledge, the Defendant County of San Diego deliberately failed to train or, alternatively, deliberately failed to provide recurrent and updated training to its HHSA workers on the following constitutional protections:

   a.   That a social worker must disclose all known inculpatory and exculpatory evidence to the juvenile court.

   b.   That a social worker must be truthful, honest, and accurate when reporting and/or presenting evidence to the juvenile court.

   c.   That a social worker is precluded from lying to and/or including false statements and/or suppressing important information from documents or reports to the juvenile court.

   d.   That a social worker must disclose all known exculpatory evidence in documents and/or reports that will be relied upon by subsequent social workers.

   e.   That a social worker is precluded from lying to and/or including false statements and/or suppressing important information from documents and/or reports that will be relied upon by subsequent social workers.

   f.   That quotation marks can only be used when the speaker's words are being reproduced verbatim.

215. Defendant County of San Diego's deliberate failure to train its HHSA workers on these established constitutional protections was a substantial factor in causing the Plaintiffs harm, in that HHSA agents were unfamiliar with and oblivious to the Plaintiffs constitutional rights, when they made false statements and/or suppressed known exculpatory evidence in reports and documents filed with the juvenile court, and then continued to detain the children from their Plaintiffs' care for a period of months even though they knew there was no legitimate basis to do so.

216. The practice of turning a deliberate blind eye to the need for further or adequate training by ignoring repeated violations of the rights of children and parents with

1   whom HHSA agents can regularly be expected to come into contact by failing
2   and/or refusing to implement a practice of regular and adequate training and/or
3   supervision, and/or failing to train and/or supervise its officers, agents, employees
4   and state actors, in providing and ensuring compliance with the constitutional
5   protections guaranteed to individuals, including those under the First and
6   Fourteenth Amendments to the United States Constitution.

7   217.   Defendant County of San Diego, including by and through its entity HHSA and its
8   policymaking officials, breached its duties and obligations to Plaintiffs by, but not
9   limited to, failing to establish, implement and follow the correct and proper
10   constitutional policies, procedures, customs and practices; by failing to properly
11   select, supervise, train, control, and review its agents and/or employees as to their
12   compliance with constitutional safeguards; and by deliberately permitting the
13   individual Defendants, and each of them, to engage in the unlawful and
14   unconstitutional conduct as herein alleged, with a total and deliberate indifference
15   to Plaintiff's rights.

16   218.   Defendant County of San Diego knew, or should have known, that by breaching
17   the above-mentioned duties and obligations that it was reasonably foreseeable that
18   its agency policies, practices, customs, and usages would, and did, directly cause
19   Plaintiffs to be injured and damaged.

20   219.   These actions, and/or inactions, of the Defendant County of San Diego were the
21   moving force behind, and direct and proximate cause of Plaintiffs' injuries. As a
22   result, Plaintiffs has sustained general and special damages, to an extent and in an
23   amount to be proven at trial.

24   **JURY DEMAND**

25   Plaintiffs Ruth and Kristoffor Pope demand a jury trial as to all issues so triable.

26   ///
27   ///
28

1

## **PRAYER**

2      **WHEREFORE**, Ruth and Kristoffor Pope pray for judgment against Defendants,

3   and each of them, as to all causes of action, as follows:

4   1.      General damages and special damages according to proof, but in no event less than

5          $1,000,000;

6   2.      As against the individual, human being, Defendants, punitive damages as allowed

7          by law;

8   3.      Attorneys fees and costs pursuant to 42 U.S.C. § 1988, and any other appropriate

9          statute;

10  4.      Injunctive relief as allowed by law;

11  5.      Such further relief as the Court deems just and proper.

12     Dated: October 25, 2021          THE LAW OFFICES OF SHAWN A. MCMILLAN, APC

13                                      /s/ Shawn A. McMillan
14                                      Shawn A. McMillan, Esq.
                                        Stephen D. Daner, Esq.
15                                      Attorneys for Ruth and Kristoffor Pope

16

17

18

19

20

21

22

23

24

25

26

27

28