UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RUTH POPE, an individual; KRISTOFFER POPE, an individual,<br><br>        Plaintiffs,<br><br>v.<br><br>COUNTY OF SAN DIEGO, a public entity; KALIHA JOHNSON, an individual; ROBYN CHARLTON, an individual; MARY ROBILOTTA, an individual; DIANA SHRECKENGOST, an individual; DOE HHSA Workers 1-10, known but unidentified individuals; and DOES 1 through 20, inclusive,<br><br>        Defendants. | Case No.:  21-CV-1102-JO-MMP<br><br>**ORDER GRANTING PLAINTIFFS' PARTIAL MOTION FOR SUMMARY JUDGMENT AND DENYING DEFENDANT'S PARTIAL MOTION FOR SUMMARY JUDGMENT** |

On June 11, 2021, Plaintiffs Ruth Pope and Kristoffer Pope filed a 42 U.S.C. § 1983 lawsuit against the County of San Diego and various County employees.  Dkt. 1.  They allege that Defendants violated their parental constitutional rights by subjecting their children to invasive examinations and unauthorized medical care while the children were in protective custody.  Dkt. 67, Fourth Amended Complaint ("4 Am. Compl.").

Both Plaintiffs and Defendant County of San Diego filed motions for partial summary judgment on the sufficiency of the form the County used to obtain parent consent

to provide medical care to children in its temporary custody.  Dkts. 95-1 ("Pls.' Mot. Summ. J."); 96-1 ("Def.'s Mot. Summ. J.").  For the reasons stated below, the Court concludes that the consent form at issue was insufficient to waive the parental constitutional rights at stake.

## I.    BACKGROUND

This dispute began when the County assumed protective custody of the Popes' three children following a complaint about Mrs. Pope's treatment of her son.  *See* 4 Am. Compl. ¶¶ 23–27.  On June 12, 2019, the County's Health & Human Services Agency ("HHSA") social workers received an anonymous call informing them that Mrs. Pope had locked her son, J.P.1., in the garage for several hours as a form of punishment.  *Id.* ¶ 23.  In response, La Mesa police officers and two HHSA social workers came to Plaintiffs' home and interviewed Mrs. Pope and J.P.1.[1]  *Id.* ¶¶ 24–30.  Then, after subjecting J.P.1. and his two siblings, N.P. and J.P.2., to investigatory medical exams (physical and psychological assessments that examine whether children have suffered abuse), the County decided to remove the children from the Popes' home and proceeded to seek temporary placement for them.  *Id.* ¶¶ 35–47, 49–51, 63–67.

Following the children's removal from the Popes' home, the County asked Mrs. Pope to sign a medical consent form for her children.  *Id.* ¶¶ 52–60.  On June 15, 2019, the County contacted Mrs. Pope and requested that she come to the Polinsky Children's Center.  *Id.* ¶ 52.  Upon arrival that day, she was handed a form titled, "Consent for Examination and Treatment of a child; to be signed by parent/guardian" (the "Consent Form").  *Id.* ¶¶ 52–54; *see* Dkt. 95-3, Ex. A.  Mrs. Pope then signed the form and dated it June 15, 2019.[2]

---

[1] At the time, Mr. Pope was on a U.S. Navy deployment.  4 Am. Compl. ¶ 22.

[2] The parties dispute the day in which Defendant provided these forms to Mrs. Pope and whether Mrs. Pope signed only one form for J.P.1. or one for each of her children.  Def.'s Mot. Summ. J. at 6 n.2; 4 Am. Compl. ¶¶ 47 n.4, 52.  As Plaintiffs have entered the signed Consent Form into evidence, which Mrs. Pope dated as June 15, 2019, the Court presumes that Mrs. Pope signed the form on this date.  *See* Dkt. 95-3, Ex. A.

*Id.* ¶ 58; *see* Dkt. 95-3, Ex. A.  The Consent Form stated the following with regard to medical care for children in the County's custody:

> I authorize and give my consent for medical, developmental, dental, mental health and other remedial care to be given to the above-named child while he/she is in a facility operated by the Health and Human Services Agency of the County of San Diego or any licensed / certified foster home . . .
>
> Medical, developmental, dental, mental health and other remedial care can include:
> - X-rays, local anesthesia, medical or psychiatric diagnosis or treatment by a licensed physician; or, x-rays, laboratory testing, local anesthesia, dental or surgical diagnosis or treatment by a licensed dentist; and immunizations.
> - Developmental, speech, occupational and physical therapy evaluation and therapeutic interventions.
> - Psychological evaluations, psychotherapy, and/or counseling.
>
> In an emergency, a reasonable effort to contact a parent/guardian will be made before medical, dental, or mental health care is begun, if the time and conditions permit. Unless there is an emergency, the following procedures will not be done unless a parent/guardian is contacted and consents to them, or a Court orders them: Surgery, anesthesia, spinal tap, blood transfusion, HIV testing, and psychotropic medications. . . .

Dkt. 95-3, Ex. A.

The Consent Form did not address whether the County would notify and consult with parents prior to providing non-emergency services to their children in temporary custody.  *Id.*  Although the Consent Form specified that the County would make a reasonable effort to contact parents before administering emergency treatment, the Consent Form did not indicate whether the County would attempt to notify parents before administering non-emergency care.  *Id.*  Nor did the Consent Form explain whether the County would seek affirmative consent for specific non-emergency services as it did for emergency treatment such as surgery or blood transfusions.  *Id.*  Moreover, the Consent Form was silent on whether parents would have the right to be present at non-emergency

21-cv-1102-JO-MMP

medical appointments. *Id.* This silence stood in stark contrast to another portion of the Consent Form regarding the County's investigatory intake medical examinations at the Polinsky Children's Center. *Id.* There, the Consent Form explicitly informed parents that they "have a right to be present" and asked parents to choose between the options of (1) "Yes, I choose to be present at my child's intake exam or (2) "No, I choose not to be present at my child's intake exam [and hereby] waive my right to be present." *Id.*

A few days after the County obtained Mrs. Pope's signature on its Consent Form, a juvenile dependency court held a detention hearing and ordered that the Pope children remain in temporary protective custody. 4 Am. Compl. ¶¶ 61–62. In California, after a child has been taken from his or her parents, the County must file a petition to commence a dependency proceeding. Cal. Welf. & Inst. Code § 290.1. The juvenile court then holds a detention hearing, in which it reviews the County's allegations of abuse or neglect and determines whether the child can safely return home or should temporarily remain in the County's custody. Cal. Welf. & Inst. Code §§ 315, 319.[3] The juvenile court makes these temporary placement decisions pending an official adjudication of the County's abuse allegations, termed a "jurisdictional hearing," in which it decides whether to assume responsibility for the child and declare him or her a dependent of the court. Cal. Welf. &

---

[3] Cal. Welf. & Inst. Code § 319(c)(1): The court shall order the release of the child from custody unless . . . the court finds that continuance in the parent's or guardian's home is contrary to the child's welfare, and any of the following circumstances exist: (A) There is a substantial danger to the physical health of the child or the child is suffering severe emotional damage, and there are no reasonable means by which the child's physical or emotional health may be protected without removing the child from the parent's or guardian's physical custody; (B) There is substantial evidence that a parent, guardian, or custodian of the child is likely to flee the jurisdiction of the court, and, in the case of an Indian child, fleeing the jurisdiction will place the child at risk of imminent physical damage or harm; (C) The child has left a placement in which the child was placed by the juvenile court; (D) The child indicates an unwillingness to return home, if the child has been physically or sexually abused by a person residing in the home.

Inst. Code §§ 300, 315, 319, 355, 356.[4]  In the Popes' case, the juvenile court ordered the three children to remain in the County's temporary custody.  4 Am. Compl. ¶ 61.  In the following months, the juvenile court reviewed the Popes' case and determined that it was safe for the Pope children to return home to their parents.[5]  *Id.* ¶¶ 72–73, 77, 79, 88.  At no point during these proceedings did the juvenile court find that the County's allegations of abuse or neglect were true or declare the children to be dependents of the court.

Before they were reunited with their parents, the Pope children received various medical examinations and treatment.  *Id.* ¶¶ 74–76, 81–85.  On July 12, 2019, N.P. and J.P.2 received routine pediatric examinations, and on July 15, 2019, N.P. received a dental examination.  *Id.* ¶¶ 74–76.  On July 29, 2019, J.P.1's foster parent brought J.P.1 to a medical appointment at the direction of a HHSA social worker, where he received the following vaccinations: IPV, DtaP, MMR, Hep B, VZV, and Hep A.  *Id.* ¶ 84.  On October 31, 2019, J.P.1 was brought to another medical appointment for a series of subsequent

---

[4] At the jurisdictional hearing, the juvenile court considers both the family's and County's evidence and determines whether the County has proven its allegations of abuse or neglect by a preponderance of the evidence.  Cal. Welf. & Inst. Code §§ 355, 356.  If the juvenile court finds that the County has not met its burden, the child will be returned home and the case will be dismissed.  *Id.*  However, if the juvenile court finds that the County has met its burden, it will assume responsibility for the child and have the power to issue decisions it determines are in the child's best interest.  Cal. Welf. & Inst. Code §§ 300, 355, 356, 362.  Following the jurisdictional hearing, the juvenile court holds a dispositional hearing, in which it will determine how to resolve the issues at hand and potentially rule on matters such as the child's residence, the parents' visitation rights, and support services needed for the child.  Cal. Welf. & Inst. Code § 358;  *Guide to Dependency Court – For Parents*, courts.ca.gov, https://www.courts.ca.gov/1205.htm?rdeLocaleAttr=en (last visited March 1, 2024).  Then the juvenile court will hold dependency status review hearings every six months, in which it will review whether the child's circumstances have improved and whether to make further rulings or ultimately dismiss the case.  Cal. Welf. & Inst. Code § 366.

[5] On July 18, 2019, the juvenile court ordered that N.P. and J.P.2 be returned to Mrs. Pope and ordered that the HHSA Agency had discretion to return J.P.1.  4 Am. Compl. ¶¶ 77, 79.  On March 14, 2020, J.P.1 was ultimately returned home.  *Id.* ¶ 88.

vaccinations.   Dkt. 95-3 ("Pope Decl.") ¶¶ 6-8.[6]   Before administering these medical treatments and examinations, the County did not notify the Popes, consult with them and obtain their consent, nor give them an opportunity to attend any of these medical appointments.  *See generally*, Pope Decl.

Based on the above facts, Plaintiffs brought a suit against Defendants, alleging that Defendants deprived them of their Fourteenth Amendment rights to participate in their children's medical care.[7]   4 Am. Compl.   Plaintiffs challenge both (1) the County's handling of their children's forensic medical examinations and (2) its policy to administer non-emergency medical care to children without parental notice, consent, and attendance.  *Id.* ¶¶ 89–158.  Because the County argued, among other things, that the Popes effectively consented to the provision of non-emergency medical care by signing the Consent Form, the sufficiency of the Consent Form emerged as a central issue in this case.  *Id.* ¶¶ 121–123.  In the exercise of its case management discretion, the Court therefore allowed the parties to seek early resolution of this discrete issue by filing cross motions prior to the close of discovery.  Dkt. 93.

Accordingly, on November 17, 2023, the parties filed cross motions for partial summary judgment on Plaintiffs' second claim regarding the County's policy on the administration of non-emergency medical services.  Pls.' Mot. Summ. J.; Def.'s Mot. Summ. J.  The parties' motions address the discrete issue of whether the Popes effectively waived their parental rights to be involved in their children's non-emergency medical care by signing the County's Consent Form.  *Id.*

## II.   LEGAL STANDARD

Summary judgment is appropriate under Rule 56 of the Federal Rules of Civil Procedure if the moving party demonstrates the absence of a genuine issue of material fact

---

[6] Of note, J.P.1.'s vaccines were administered *after* the juvenile court found that the HHSA Agency had discretion to return J.P.1. home on July 18, 2019.  4 Am. Compl. ¶¶ 79, 84.

[7] Plaintiff's operative complaint was filed on May 6, 2023.  4 Am. Compl.

and entitlement to judgment as a matter of law.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A fact is material when, under the governing substantive law, it could affect the outcome of the case.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Freeman v. Arpaio*, 125 F.3d 732, 735 (9th Cir. 1997).  A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party.  *Anderson*, 477 U.S. at 248–50.

A party seeking summary judgment always bears the initial burden of establishing the absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 323.  The moving party can satisfy this burden in two ways: (1) by presenting evidence that negates an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to establish an essential element of the nonmoving party's case on which the nonmoving party bears the burden of proof at trial.  *Id.* at 322–23.  The moving party may also satisfy its initial burden by demonstrating that the opposing party lacks sufficient evidence from which a jury could find an essential element of the opposing party's claim.  *Id.* at 325; *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F. 3d. 1099, 1102 (9th Cir. 2000).

Once the moving party establishes the absence of genuine issues of material fact, the burden shifts to the nonmoving party to set forth facts showing that a genuine issue of disputed fact remains.  *Celotex*, 477 U.S. at 324.  The nonmoving party cannot merely rest on his pleadings, but must direct the court to specific, triable facts by "citing to particular parts of materials in the record."  Fed. R. Civ. P. 56(c)(1)(A); *see Anderson*, 477 U.S. at 250.  The court must view all inferences drawn from the underlying facts in the light most favorable to the nonmoving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  "Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, [when] he [or she] is ruling on a motion for summary judgment."  *Anderson*, 477 U.S. at 255.

///

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### III.   DISCUSSION

The parties ask the Court to decide whether the County's Consent Form effectively waived the Popes' constitutional rights regarding non-emergency medical treatment for their children in protective custody.  In deciding this issue, the Court must first determine the scope of the Popes' substantive due process rights in this context, specifically examining whether their parental rights include notice, consent, and an opportunity to attend their children's non-emergency medical appointments.  If the Court concludes that the Constitution bestows these rights, the Court will then consider whether the language of the County's Consent Form signed by Mrs. Pope was sufficient to effect a valid waiver of those rights.

**A. Constitutional Rights of Parents to Make Medical Decisions for Their Children**

The Court first examines what constitutional rights parents have when the County wishes to administer medical treatments to their child in the protective custody of the state.

The Supreme Court has long recognized the importance of protecting a parent's interest in "the care, custody, and control of their children." *Troxel v. Granville*, 530 U.S. 57, 65 (2000); *see Lehr v. Robertson*, 463 U.S. 248, 257–58 (1983); *Santosky v. Kramer*, 455 U.S. 745, 753 (1982); *Lassiter v. Dep't of Soc. Servs.*, 452 U.S. 18, 27–28 (1981); *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *Prince v. Massachusetts*, 321 U.S. 158, 166 (1944); *Pierce v. Soc'y of Sisters*, 268 U.S. 510, 534–35 (1925); *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923).  "Far more precious than property rights, parental rights have been deemed to be among those essential to the orderly pursuit of happiness by free men, and to be more significant and priceless than liberties which derive merely from shifting economic arrangements." *United States v. Wolf Child*, 699 F.3d 1082, 1091–92 (9th Cir. 2012) (internal citations and quotation marks omitted); *see also Lehr*, 463 U.S. at 258 ("[T]he relationship of love and duty in a recognized family unit is an interest in liberty entitled to constitutional protection.").  Thus, "[i]t is cardinal . . . that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder." *Prince*, 321 U.S. at

166. Importantly, as children are not "the mere creature[s] of the State," they also have a protected interest in receiving care from their parents, whose "natural bonds of affection [presumably] lead [them] to act in the best interests of their children." *Parham v. J. R.*, 442 U.S. 584, 602 (1979) (internal citations and quotation marks omitted).

Naturally, a parent's interest in "the care, custody, and control of their children," *Troxel*, 530 U.S. at 65, encompasses the right to make "medical decisions for their children," *Wallis v. Spencer*, 202 F.3d 1126, 1141 (9th Cir. 2000). This liberty interest is not only rooted in a parent's right to raise one's children, *Stanley*, 405 U.S. at 651, but also in "the traditional presumption that the parents act in the best interests of their child," *Parham*, 442 U.S. at 605. This principle recognizes that "[m]ost children, even in adolescence, simply are not able to make sound judgments concerning many decisions, including their need for medical care or treatment." *Parham*, 442 U.S. at 603. Parents, on the other hand, "can and must make those judgments," because "parents possess what a child lacks in maturity, experience, and capacity for judgment." *Id.* at 602, 603; *see also Mann v. County of San Diego*, 907 F.3d 1154, 1162 (9th Cir. 2018) ("[P]arental consent is critical in medical procedures involving children" "because children rely on parents or other surrogates to provide informed permission for medical procedures that are essential for their care." (internal citations and quotation marks omitted)). Thus, for a child to benefit from informed medical decisions, a parent must be notified of any medical services intended for the child and affirmatively consent to such procedures. *See Mann*, 907 F.3d at 1162 ("[A] parent's right to notice and consent is an essential protection for the child and the parent.").

Stemming from their "liberty interest in family association," parents and children also have the right to be together when a child receives medical care. *Wallis*, 202 F.3d at 1142. Parents must have the opportunity "to be with their children while they are receiving medical attention" or "nearby … if there is a valid reason for excluding them," "in part because of the possibility that a need to make medical decisions will arise." *Id.*; *see also Parham*, 442 U.S. at 603. "Likewise, children have a corresponding right to the love,

comfort, and reassurance of their parents while they are undergoing medical procedures." *Wallis*, 202 F.3d at 1142. Accordingly, parents have a strong liberty interest in not only notice and consent for their children's medical events, but also the opportunity to be near their children during such events.

Importantly, parents retain these rights regardless of the nature of medical procedure. *Parham*, 442 U.S. at 603. The Supreme Court has affirmed that parents presumptively have the "authority to decide what is best for the child," whether the decision concerns committing the child to a mental hospital or simply authorizing a "tonsillectomy, appendectomy, or other medical procedure." *Id.* at 603, 604. This principle holds true irrespective of the severity of the ailment or the invasiveness of the treatment because parents are still better positioned to make "sound judgments" than their children. *Id.* at 603; *see Mann*, 907 F.3d at 1162 ("A parent's due process right to notice and consent is not dependent on the particular procedures," "the environment in which the [services] occur" "whether the procedure is invasive," or "whether the child demonstrably protests" the services). Children's need for the comfort or reassurance of their parents' presence also remains regardless of the nature of medical service. *Wallis*, 202 F.3d at 1142. This is because "[t]he amount of trauma associated" with a medical event for a child "is difficult to quantify and depends upon the child's developmental level, previous trauma exposure, and available supportive resources, among other factors." *Mann*, 907 F.3d at 1162. Thus, a parent's rights to notice, consent, and presence at their children's medical events do not rely on "what procedures are used." *Id.*

While these fundamental parental rights are long established, they are "not absolute." *Mueller v. Auker*, 700 F.3d 1180, 1186 (9th Cir. 2012). "Under certain circumstances, these rights must bow to other countervailing interests and rights, such as the basic independent life and liberty rights of the child and of the State acting as *parens patriae*." *Id.* But courts have only recognized two circumstances in which the constitutional rights of parents to make medical decisions "step aside." *Id.* at 1187. First, these rights may be extinguished where, after a formal hearing in which "all available

sources" were considered and the parents were afforded due process, a neutral adjudicator concludes that the parents neglected or abused their child. *Parham*, 442 U.S. at 606–07 ("[A]bsent a finding of neglect or abuse" by a "neutral fact finder" through a "due process" hearing in which the adjudicator reviews "all available sources," parents retain the authority to make medical decisions for their children*; see Wallis*, 202 F.3d at 1141 (echoing this requirement); *see also Mueller*, 700 F.3d at 1187 (holding that parents "cannot be summarily deprived of [their parental rights] without notice and a hearing"). Second, without such a "due process" hearing, the state can only override parental rights to make medical decisions in "emergency situation[s]" "when the children are subject to immediate or apparent danger or harm." *Id.* at 1187 (internal citations and quotation marks omitted).   Examples of such situations include circumstances where a parent refuses necessary medical care for a child, where a child requires immediate emergency medical care, or where parents pose an imminent threat to their child's health and wellbeing.  *See Pickup v. Brown*, 740 F.3d 1208, 1235 (9th Cir. 2014) ("[S]tates may intervene when a parent refuses necessary medical care for a child."); *Mann*, 907 F.3d at 1162 ("In an emergency medical situation, the County may proceed with medically necessary procedures without parental notice or consent to protect the child's health."); *Mueller*, 700 F.3d at 1187 ("When a child's safety is threatened, that is justification enough for action first and hearing afterward." (internal citation and quotation marks omitted)).  Outside of these two exceptions, parents retain their constitutional rights to notice, consent, and attendance at their children's medical events.

The scope of a parent's rights does not change just because their children are in temporary protective custody.  *See Mueller*, 700 F.3d at 1186–87 (holding that in the protective custody context, parents may not be "summarily deprived" of their right to "care, custody, and control of their child" without due process, except where "the children [are] in imminent danger"); *see also Greene v. Camreta*, 588 F.3d 1011 (9th Cir. 2009) (affirming parents' rights to be involved in their children's medical decisions while their child was in foster care), *vacated in part as moot* 661 F.3d 1201 (9th Cir. 2011); *Mann*,

907 F.3d 1154 (same); *Benavidez v. County of San Diego*, 993 F.3d 1134 (9th Cir. 2021) (same). This is because "[t]he fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State," making the "need for [these] procedural protections" even "more critical." *Santosky*, 455 U.S. at 753. Rather, as explained above, these parental rights can only be extinguished after a formal due process adjudication and a finding of abuse or neglect—a temporary protective custody order is not tantamount to such a finding. *Parham*, 442 U.S. at 606–07. In only permitting the loss of parental rights where either a "neutral fact finder" has found evidence of "abuse or neglect" or a child is in "immediate danger," the courts ensure that a parent's power to make medical decisions "does not automatically transfer" to "some agency or officer of the state" unless warranted. *Id.* at 603, 606–07; *Mueller*, 700 F.3d at 1187. Accordingly, the Court concludes that when the state wishes to provide medical attention to a child in temporary protective custody, it must: "(1) notify the parents;" "(2) obtain either parental consent or a court order in advance;" and "(3) permit the parent to be present at [or nearby] the [medical event]" and that failure to do so absent exigent circumstances amounts to a violation of the parents' Fourteenth Amendment substantive due process rights. *Benavidez*, 993 F.3d at 1150.

Despite the County's arguments to the contrary, these rights do not turn on the type of care administered to children while they are in protective custody.[8] The County insists that because the Ninth Circuit has emphasized the importance of parental notice, consent,

---

[8] The Court recognizes that some district courts have reached the opposite conclusion. *See, e.g., Morales v. County of Mendocino*, No. 16-CV-02429-EMC, 2018 WL 11257426, at *8–9 (N.D. Cal. Feb. 5, 2018) (finding that parents do nott have a right to consent to a mental health evaluation and medication given to their child because they only have the right to make "important [medical] decisions" that either are "investigatory" or concern "invasive or upsetting" procedures); *N.L. v. Child.'s Hosp. Los Angeles*, No. CV1507200ABFFMX, 2016 WL 11520816, at *4 (C.D. Cal. Mar. 25, 2016) ("This Court declines to limit the ability of social and health workers to seek medical examinations for minor in their custody absent an express holding by the Ninth Circuit.")

and attendance during children's forensic "investigatory examinations," that parents *only* retain their rights for these procedures and not for general medical care. *See* Def.'s Mot. Summ. J at 15–16 (relying on *Wallis*, 202 F.3d at 1141; *Greene*, 588 F.3d at 1036–37; *Mann*, 907 F.3d at 1161–62). The Court, however, disagrees with this reading of the case law. While the Ninth Circuit has stressed that parents' and children's rights are "*at their apex*" during these examinations, which frequently involve genital inspections and questions about abuse, it does not follow that these rights are exclusive to these circumstances. *Greene*, 588 F.3d at 1037. Rather, as the Ninth Circuit established in *Mann*, because children's "investigatory examinations" may raise law enforcement consequences for the parents and are often intrusive and traumatic, "[p]arental notice and consent is *even more* warranted" for these procedures than when medical services are "purely for health reasons." *Mann*, 907 F.3d at 1162 (emphasis added). Thus, parental consent is essential for children's medical services for health purposes *and* even more critical when such services carry law enforcement implications and risk potential trauma. *See id.* (clarifying that "it should go without saying" that parental "notice and consent" are "elemental to proper medical treatment" for children). Nothing about this precedent— especially against the backdrop of clearly established rights subject to only to two narrow exceptions—limits parental rights to the context of investigatory examinations. *See Meyer v. County of San Diego*, No. 21-CV-00341-GPC, 2021 WL 4924836, at *7 (S.D. Cal. Oct. 21, 2021) (holding that parents' "constitutional right to be present at their children's medical examinations and to receive notice in advance of such examinations" "does not turn on whether the medical examination is investigatory in nature or not.").

Accordingly, parents retain their rights to notice, consent, and attendance at their children's non-emergency medical services while their children are in temporary protective custody. As the Supreme Court has noted, parents facing loss of their children have a "critical need for procedural protections," making their parental rights to consent to these decisions as important as ever. *Santosky*, 455 U.S. at 753. Because parents in these circumstances still "retain a vital interest" in raising their children, their involvement in

their children's healthcare does not turn on the urgency or severity of the procedure.  *Id.*; *Mann*, 907 F.3d at 1162 (establishing that these fundamental rights are not determined by factors such as "whether the procedure is invasive" or "whether the child demonstrably protests" the services).  Parents, as opposed to the state or foster parents, are the most familiar with their children's medical history and thereby best equipped to make *all* medical judgments on their behalf.  *Parham*, 442 U.S. at 602, 603.  Moreover, during this period of instability, parents' and children's rights to family association are especially important.  Due to the traumatic and difficult nature of being separated from their family, children may be in even greater need for the comfort and reassurance of their parents for minor procedures than they would otherwise require.  *Wallis*, 202 F.3d at 1142.  Thus, giving parents the right to notice, consent, and attendance at their children's non-emergency services is essential to maintain familial bonds.  *Mann*, 907 F.3d at 1162; *Santosky*, 455 U.S. at 753–54.  Therefore, the Court concludes that parents have a right to notice, consent, and presence at their children's non-emergency medical care in addition to investigatory examinations while their children in temporary protective custody.[9]

---

[9] Defendant incorrectly asserts that *Mann* holds that parental consent is not required for routine medical care given to children in protective custody.  Def.'s Mot. Summ. J. at 12–13 (citing *Mann*, 907 F.3d at 1163 ("Nor is the requirement that the County provide parental notice and obtain consent inconsistent with the County's obligation to provide routine or emergency medical care to children in its custody, or with the 2003 juvenile court order that specifically authorized the medical examinations." *Accord Sangraal v. City & Cty. of San Francisco*, No. C 11-04884 LB, 2013 WL 3187384, at *14 (N.D. Cal. June 21, 2013)).  Defendant insists that by citing *Sangraal*, the Ninth Circuit affirmed that parental consent is not needed for routine medical care because the district court there found that there was no clearly established law requiring the county to obtain consent before providing "vitamin k injection, infant formula, and a hearing test" to a child in protective custody.  Def.'s Mot. Summ. J. at 12–13 (citing *Sangraal*, 2013 WL 3187384, at *14).  This is a misleading interpretation of *Sangraal*'s holding.  *Sangraal* permits the provision of medical care without parental consent in "exigent circumstance," not for non-emergency medical procedures.  2013 WL 3187384, at *14–15 ("If exigent circumstances justified removal, then there is no constitutional violation for the CCSF's provision of medical care to an infant in its care."); *see Jones v. City & County of S.F.*, 621 F. App'x 437, 437 (9th Cir. 2015) (affirming because the child was in "imminent danger of harm").  Thus, the Ninth Circuit likely cites *Sangraal* in support of its statement that this is not "inconsistent" with the obligation to provide care in emergency circumstances.  *Mann*, 907 F.3d at 1163.  In fact, the *Mann* court proceeds by noting that the County is *already required*

The Court is not persuaded that its interpretation is either administratively infeasible or in conflict with state law as the County alleges.  Def.'s Mot. Summ. J. at 13–16.  First, with regard to administrative burden, the Ninth Circuit has established that this constitutional obligation is not overly burdensome as the County is already required to provide "parental notice and obtain consent" for "routine" medical care for children in temporary protective custody:  "California law requires County social workers to notify the parent, guardian, or person standing *in loco parentis* of the person, if any, of the care found to be needed before that care is provided" and absent such consent, only permits the County to provide the care "upon order of the court."  *Mann*, 907 F.3d at 1163 (quoting Cal. Welf. & Inst. Code § 369(a)).[10]  As Defendant is already supposed to obtain parental consent prior to providing *any* medical services to children in its temporary protective custody, this Court's interpretation of the County's constitutional obligation—that it must provide parents notice, consent, and opportunity to be present at their children's non-emergency medical events—would be no greater than its existing duties under state law.  *See id.*

Second, the County alleges that giving parents the right to notice, consent, and attendance at non-emergency procedures contradicts California law which grants foster parents these same rights when a child is in their custody.  Def.'s Mot. Summ. J. at 14–15

---

to obtain consent for routine medical care because "California law requires County social workers to notify the parent, guardian, or person standing *in loco parentis* of the person, if any, of the care found to be needed before that care is provided" and permits the County to provide the care "only upon order of the court in the exercise of its discretion."  *Id.* (quoting Cal. Welf. & Inst. Code § 369(a).).

[10] Cal. Welf. & Inst. Code § 369(a): "Whenever a person is taken into temporary custody . . . and is in need of medical, surgical, dental, or other remedial care, the social worker may . . . authorize the performance of the medical, surgical, dental, or other remedial care. The social worker shall notify the parent, guardian, or person standing in loco parentis of the person, if any, of the care found to be needed before that care is provided, and if the parent, guardian, or person standing in loco parentis objects, that care shall be given only upon order of the court in the exercise of its discretion."

(citing Cal. Health & Saf. Code § 1530.6(3)).[11]   While this statute recognizes that foster parents may consent on behalf of the child for "ordinary medical and dental treatment," it does not extinguish the rights of the parents to make these decisions.  Cal. Health & Saf. Code § 1530.6(3).  In fact, California law provides that parents must be informed and give consent before any care is provided, irrespective of the foster parents' rights.  Cal. Welf. & Inst. Code § 369(a) (requiring that for a child in temporary custody, a social worker must provide notice to the parents of any medical care before administering it and that if the parent does not consent, such care can only be provided upon a court order).  Under state law, parents retain their rights over of their children's medical care, unless there are exigent circumstances or the juvenile court orders otherwise following a jurisdictional hearing, mirroring the requirements under the Constitution.  *See* Cal. Welf. & Inst. Code § 369 (establishing that when a child is not yet a dependent of the court, a court may only authorize "need[ed]" medical and dental care where "there is no parent capable of authorizing or willing to authorize" such treatment or where a child needs "immediate emergency medical" care);[12] Cal. Welf. & Inst. Code § 362(a) (establishing that subsequent to a jurisdictional hearing, "the court may make any and all reasonable orders for . . . the child, including medical treatment").  Thus, with regard to their children's non-emergency medical care, parents' rights may only be diminished if, after holding a jurisdictional

---

[11] Cal. Health & Saf. Code § 1530.6(3): "Notwithstanding any other law, persons licensed or approved pursuant to this chapter to provide residential foster care to a child . . . may give the same legal consent for that child as a parent. . . for ordinary medical and dental treatment for the child, including, but not limited to, immunizations, physical examinations, and X-rays. . . ."

[12] Importantly, the statute still requires notice or attempted notice in these circumstances.  Under Cal. Welf. & Inst. Code § 369(b), a court may only order such care if it is "necessary" and after "due notice to the parent, guardian, or person standing in loco parentis" is provided.  *See J.N. v. Superior Ct.*, 156 Cal. App. 4th 523, 532 (2007) (holding that where the court had not yet declared a child to be a dependent of the court, it impermissibly ordered the child off life support because this medical care was not "necessary" to improve, sustain or preserve the child's medical condition, which is what § 369(b) is exclusively limited to).  Similarly, under Cal. Welf. & Inst. Code § 369(d), a social worker must "make reasonable efforts to obtain the consent of, or to notify, the parent, guardian, or person standing in loco parentis prior to authorizing emergency care."

hearing, a juvenile court concludes that the County's allegations are true and declares the children to be dependents of the court. *See J.N. v. Superior Ct.*, 156 Cal. App. 4th 523, 532 (2007) (explaining that until a juvenile court has made "findings based on evidence at a jurisdictional hearing" that the parents committed abuse or negligence, a child's medical care is governed by Cal. Welf. & Inst. Code § 369(a)-(b), *not* § 362).[13]   Accordingly, state law recognizes that a foster parent's authority cannot override parents' fundamental rights to be a part of their child's non-emergency medical decisions merely because their children are in protective custody.

Here, because the Pope children's vaccinations, dental work, and physical examination were neither required by exigent circumstances nor administered subsequent to a due process hearing finding abuse or neglect, the Popes retained their full rights to notice, consent, and opportunity to be present at these medical events.   While the juvenile court decided to leave the Pope children in temporary protective custody during the detention hearing, the hearing itself only addressed where the children should reside pending an official jurisdictional hearing.  4 Am. Compl. ¶¶ 61–62.  Because the court had not yet adjudicated the truth of the County's allegations and declared the children dependents of the court, the Popes' parental rights remained intact after the detention hearing.  *Id.*; Cal. Welf. & Inst. Code §§ 315, 319.  As the Constitution recognizes the importance of parental involvement in their children's medical decisions, the Court finds that the Popes had a constitutional right to participate in all of their children's medical treatment, including non-emergency care, while the children were in the County's custody.

For the above reasons, the Court concludes that Plaintiffs' Fourteenth Amendment fundamental liberty interests include the right: (1) to be notified of the County's intent to

---

[13] Critically, parental notice is still required even when a child has been declared a dependent of the court.  Specifically, a juvenile court may only order a "social worker" to authorize medical and dental care as "necessary" if "it appears to the court that there is no parent, guardian, or person standing in loco parentis capable of authorizing or willing to authorize" such care *after* providing "due notice to the parent, guardian, or person standing in loco parentis."  Cal. Welf. & Inst. Code § 369(c) (emphasis added).

provide non-emergency services to their children, including pediatric examinations, dental care, and immunizations of their children; (2) to consent to any suggested treatment for their children; and (3) to attend or be in proximity to their children during such treatment. *See Benavidez*, 993 F.3d at 1150; *Ulikhanova v. County of Los Angeles*, No. CV 17-9193 FMO (EX), 2018 WL 10111334, at \*7–8 (C.D. Cal. Dec. 14, 2018) (finding that plaintiff plead a viable substantive due process claim in alleging that the government vaccinated her child while in protective custody without her consent).

## B. The Consent Form Alone Did Not Waive Plaintiffs' Constitutional Rights

Having determined the scope of Plaintiffs' parental rights over their children in protective custody (i.e. notice, consent, and attendance), the Court must next evaluate whether the County's Consent Form that Mrs. Pope signed constituted a valid waiver of these rights.

A valid waiver of constitutional rights requires an "intentional relinquishment or abandonment of a known right or privilege:" it must be "voluntary, knowing, and intelligent." *Barker v. Wingo*, 407 U.S. 514, 525 (1972); *Gete v. I.N.S.*, 121 F.3d 1285, 1293 (9th Cir. 1997) (internal citations and quotation marks omitted).   Courts must "indulge every reasonable presumption against waiver" and "not presume acquiescence in the loss of fundamental rights." *United States v. Lopez-Vasquez*, 1 F.3d 751, 754 (9th Cir. 1993) (internal citation and quotation marks omitted).   Importantly, this presumption "appl[ies] equally to criminal and to civil cases." *Gete*, 121 F.3d at 1293 (9th Cir. 1997). Constitutional rights may only be waived if the party claiming waiver can establish by clear and convincing evidence that such waiver was valid. *Id.*; *United States v. Ramos*, 623 F.3d 672, 680 (9th Cir. 2010).

In order to effectively waive a fundamental right, an individual must first understand the nature and scope of the right at risk. *Crespin v. Ryan*, 46 F.4th 803, 809 (9th Cir. 2022). Irrespective of the fundamental right at stake, in order for a waiver to be "knowing," the Supreme Court and Ninth Circuit have repeatedly affirmed that an individual must be informed of her entitled privileges and comprehend the consequences of forfeiting such

rights.  *See e.g.*, *Brookhart v. Janis*, 384 U.S. 1, 4–8 (1966) (explaining that a defendant must understand that in waiving his right to trial, he is effectively pleading guilty and waiving his right to confront and cross-examine witnesses); *Miranda v. Arizona*, 384 U.S. 436, 444–45 (1966) (holding that a defendant must be informed of his right to an attorney and right to remain silent before finding valid waiver of Fifth Amendment rights); *Barker*, 407 U.S. at 525–29 (asserting that it is not the defendant's burden to know his right to a speedy trial and to demand such); *Faretta v. California*, 422 U.S. 806, 835–36 (1975) (concluding that a defendant must be made "aware of the dangers and disadvantage of self-representation" in order to make a knowing and intelligent relinquishment of the right to counsel); *Ostlund v. Bobb*, 825 F.2d 1371, 1373–74 (9th Cir. 1987) (finding that employee could not have waived right to due process hearing where he was not informed of his right to such a hearing); *Palmer v. Valdez*, 560 F.3d 965, 969–70 (9th Cir. 2009) (holding that participation in a bench trial without objection may be sufficient to constitute a jury waiver so long as it is done "knowing[ly]"); *Ramos*, 623 F.3d at 681–82 (concluding that explaining due process rights in writing is not sufficient for purposes of waiver where an individual cannot comprehend the written language); *United States v. Laney*, 881 F.3d 1100, 1106 (9th Cir. 2018) (reasoning that a defendant must know and explicitly waive right to a criminal jury trial in writing).

In addition to assuring that the individual knew of her rights, a court must also examine whether she *intended* to forfeit them.  "[O]nly where stated by the most express language or by such overwhelming implications from the text as [to] leave no room for any other reasonable construction" should a court find waiver, because "[c]onstructive consent is not a doctrine commonly associated with the surrender of constitutional rights." *Edelman v. Jordan*, 415 U.S. 651, 673 (1974) (internal quotation marks omitted); *Barker,* 407 U.S. at 526 ("[P]resuming waiver of a fundamental right from inaction, is inconsistent with this Court's pronouncements on waiver of constitutional rights.").  Accordingly, the terms and conditions of the waiver must be explicitly clear in order for a court to find valid waiver.  *See United States v. Goodall*, 21 F.4th 555, 561 (9th Cir. 2021) (explaining that a

court must look to whether the language is "clear and unambiguous on its face" to determine whether a waiver is valid); *Davies v. Grossmont Union High School Dist.*, 930 F.2d 1390, 1394–95 (9th Cir. 1991) (looking to the clarity of the language in the settlement agreement to determine whether the waiver was knowing and intelligent).

Adherence to these principles is crucial when examining whether an individual has signed away her fundamental rights.  In *Walls v. Central Contra Costa Transit Authority*, 653 F.3d 963 (9th Cir. 2011), the Ninth Circuit assessed whether a public employee's signing of an employment agreement effectively waived his right to a pretermination hearing.  Recognizing that Walls had a "protected property interest" in his continued employment, the court held that he was entitled to certain due process procedural protections including a pretermination hearing.  *Id.* at 968.  The court concluded that the employment agreement did not validly waive his due process rights because (1) the agreement did not explicitly waive Walls's right to a pretermination hearing and (2) its language and structure misleadingly conveyed that he would maintain this right.  *Id.* at 969–70.  First, the Ninth Circuit noted that the employment agreement did not expressly waive, let alone explain, Walls's "right to a pre-termination hearing" nor "the right to due process pursuant to a termination hearing."  *Id.* at 969.  Thus, the court reasoned that the form did not clearly indicate that Walls "knew and understood" that he was surrendering this right.  *Id.*; *see also United States v. Valdivia-Flores*, 876 F.3d 1201, 1205–06 (9th Cir. 2017), *overruled on other grounds by Alfred v. Garland*, 64 F.4th 1025 (9th Cir. 2023) (finding that a form waiving a right to judicial review was invalid because it neither provided notice of the right nor a vehicle to raise that right).  The Ninth Circuit also found the waiver invalid because the employment agreement's language and organization actually suggested that Walls maintained his pretermination hearing rights.  *Walls*, 653 F.3d at 969–70.  The court pointed out that while the employment agreement explicitly "require[d] [Walls] to waive the post-termination grievance process," it did not clearly request such a waiver of his pretermination rights.  *Id.*  The Ninth Circuit reasoned that in

the absence of an analogous pretermination waiver, "it [was] logical for Walls to have assumed that he would be afforded pretermination safeguards." *Id.* at 970.

Here, the Court concludes that the County failed to provide clear and convincing evidence that in signing the County's Consent Form alone, Mrs. Pope knowingly and intelligently waived her parental rights to notice and attendance at her children's non-emergency medical events while they were in temporary protective custody. Foremost, the Consent Form made no mention of, let alone explicitly and unequivocally explained, that she had the rights to notice of any prospective non-emergency medical care offered to her children and to be present during such care. Dkt. 95-3, Ex. A. Accordingly, Mrs. Pope would not, based on the contents of the Consent Form alone, have been able to make a "knowing" waiver of these two rights. *See Crespin*, 46 F.4th at 809. Nor did the Consent Form explicitly ask parents to waive these rights or counsel parents that by signing the form, they would be surrendering these rights. *Walls*, 653 F.3d at 969. Rather, the Consent Form was entirely silent on the parental rights to notice and attendance at children's medical events, neither informing parents of their privileges nor advising them that signing the Consent Form would forfeit such rights.

In fact, the Consent Form's overall structure and language actually conveyed the opposite. The Consent Form stated that in an emergency, "a reasonable effort to contact parents will be made, if the time and conditions permit." Dkt. 95-3, Ex. A. This statement logically suggests that parents *will be* contacted for non-emergency care because, where there is no urgent crisis, "time and conditions" generally allow for such contact. *Id.* Similarly, the Consent Form's inclusion of an express waiver of the right to attend children's investigatory examinations implies that without such an express waiver, parents retain the right to attend their children's other medical services. *Walls*, 653 F.3d at 969–70. With respect to investigatory examinations, the Consent Form presented parents with two clear options: (1) "Yes, I choose to be present at my child's intake exam" or (2) "No, I choose not to be present at my child's intake exam [and hereby] waive my right to be present." Dkt. 95-3, Ex. A. Thus, the absence of similar language regarding a parent's

right to attend their children's non-emergency medical events misleadingly suggests that this right is not at stake.  *Walls*, 653 F.3d at 969–70.  In sum, the Court finds that the Consent Form not only failed to communicate waiver of the right to notice and attendance at children's medical events, but also affirmatively implied that parents retain these rights. *See id.* (finding invalid waiver because the agreement did not expressly waive Walls's pretermination hearing and the agreement's structure and substance suggested that he was entitled to such a hearing).

The Court also concludes that Mrs. Pope did not knowingly waive her parental right to consent by signing the County's Consent Form.  Although the Consent Form included a provision authorizing and giving blanket "consent for medical, developmental, dental, mental health and other remedial care," this language alone did not constitute a knowing and intelligent waiver of the parental right to consent to one's children's medical decisions. Dkt. 95-3, Ex. A.  Importantly, the Consent Form did not inform parents that they have the fundamental right to give or withhold consent for their children's non-emergency medical care while their children are in temporary protective custody.  *See Crespin*, 46 F.4th at 809. Nor did it inform parents that they have the right to give or decline consent based on the specific treatment suggested for their child rather than merely providing wholesale consent for all medical treatment.  *See id.*  A parent may believe that she foregoes these rights simply because her children have been removed from the home—a misimpression that is only reinforced by the Consent Form's failure to inform her otherwise.  Without explicitly advising parents of their constitutional right to consent to any medical treatment offered to their child and that signing the Consent Form would surrender that right, the Consent Form alone did not constitute a valid waiver of this liberty interest.  *See id.*; *Walls*, 653 F.3d at 969.

In conclusion, because the Consent Form neither informed parents of their fundamental rights to notice, consent, and attendance at their children's non-emergency medical events nor expressly waived these specific rights, the Court finds that the Consent Form did not adequately waive these fundamental parental rights.  As the Fourteenth

Amendment protects parents' rights to notice, consent, and attendance at their children's non-emergency medical events while their children are in protective custody, the Court concludes "as a matter of law" that in signing the Consent Form alone, Mrs. Pope did not forfeit these fundamental rights.

## IV. CONCLUSION

For the above reasons, the Court GRANTS Plaintiffs' partial motion for summary judgment and DENIES Defendant's partial motion for summary judgment.

**IT IS SO ORDERED**.

Dated:  March 1, 2024

_____

Honorable Jinsook Ohta
United States District Judge